# No. 25-2549

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT

NEW ENGLAND TEAMSTERS PENSION FUND, individually and on behalf of all others similarly situated,

*Consolidated Plaintiff-Appellant*,

WESTCHESTER PUTNAM COUNTIES HEAVY & HIGHWAY LABORERS LOCAL 60 BENEFITS FUND, UNITED UNION OF ROOFERS, WATERPROOFERS & ALLIED WORKERS LOCAL UNION NO. 8 WBPA FUND,

*Movants-Appellants*,

JOSHUA PENEYCAD, individually and on behalf of all others similarly situated,

*Plaintiff,*

v.

RTX CORPORATION f/k/a RAYTHEON TECHNOLOGIES CORPORATION, GREGORY HAYES, ANTHONY F. O'BRIEN, NEIL MITCHILL, CHRISTOPHER T. CALIO, SHANE EDDY,

*Defendants-Appellees.*

On appeal from the United States District Court for the District of Connecticut

## APPELLANTS' OPENING BRIEF

(Counsel listed on following page)

Michael P. Canty
LABATON KELLER SUCHAROW LLP
140 Broadway
New York, NY 10005
(212) 907-0700

Lester R. Hooker
SAXENA WHITE P.A.
7777 Glades Road, Suite 300
Boca Raton, FL 33434
(561) 394-3399

Steven B. Singer
SAXENA WHITE P.A.
10 Bank Street, 8th Floor
White Plains, NY 10606
(914) 437-8551

David Zimmer
ZIMMER, CITRON & CLARKE LLP
130 Bishop Allen Dr.
Cambridge, MA 02139
(617) 676-9421

Julia Solomon-Strauss
ZIMMER, CITRON & CLARKE LLP
1629 K Street NW, Suite 300
Washington, DC 20006
(202) 796-4540

*Counsel for Appellants*

January 27, 2026

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, I certify that the New England Teamsters Pension Fund, Westchester Putnam Counties Heavy & Highway Laborers Local 60 Benefits Fund, and United Union of Roofers, Waterproofers & Allied Workers Local Union No. 8 WBPA Fund do not have parent corporations, and that no publicly held company owns 10% or more of their stock.

Date: January 27, 2026                         */s/ David Zimmer*
                                               David Zimmer

## TABLE OF CONTENTS

INTRODUCTION ...................................................................................1

JURISDICTIONAL STATEMENT ........................................................4

ISSUES PRESENTED............................................................................4

STATEMENT OF THE CASE.................................................................5

I.      Legal Background ......................................................................5

II.     Factual Background ...................................................................9

        A.      RTX Invests Billions of Dollars in the Geared Turbofan Engine Program. .......................................................9

        B.      The Geared Turbofan Engine Experiences Early Issues, Which RTX Discloses to Investors....................................11

        C.      RTX Discovers the Defect in Its Powdered Metal Manufacturing. ..............................................................12

                1.      RTX Relies Heavily on Powdered Metal Manufacturing. ..12

                2.      Defendants Ramp Up Powdered Metal Manufacturing for the Geared Turbofan Engine..................................13

                3.      An RTX Engine Rips Apart During Takeoff on a Vietnam Airlines Plane......................................................15

                4.      Defendants Learn About the Powdered Metal Defect That Impacts the Geared Turbofan Engine. ..................16

        D.      Defendants Conceal the Powdered Metal Defect's Impact on Geared Turbofan Engines. ...........................................18

        E.      The Same Powdered Metal Defect Causes a Geared Turbofan Engine To Catch Fire During Takeoff. ..........................22

        F.      RTX's Disclosure of the Powdered Metal Defect Shocks Investors.................................................................23

        G.      Defendants, Investors, and Customers Deal with the Fallout........27

III.    The District Court's Decision.................................................28

SUMMARY OF THE ARGUMENT ....................................................29

STANDARD OF REVIEW .............................................................31

ARGUMENT ...............................................................................31

I.    Defendants' February 2021 Statements Fraudulently Suggested that Known Issues with the Geared Turbofan Engine Had Been Resolved....31

    A.    The 2021 Statements Were Materially False or Misleading..........33

    B.    The Complaint's Allegations, Taken as True, Establish a Strong Inference of Conscious Misbehavior or Recklessness. ......37

    C.    The District Court Erred in Dismissing Plaintiffs' Claims Based on the February 2021 Statements. .......................................................41

        1.    Hayes's 2021 Statement Was Not an Opinion, Puffery, or a Forward-Looking Statement. .........................................42

        2.    The Omissions from RTX's 10-K Were Material in Light of the Total Mix of Information Available to Investors. ......45

        3.    The District Court's Scienter Analysis Was Legally Flawed and Ignored Key Factual Allegations. .................................47

II.    Defendants' 2023 Statements Fraudulently Suggested that RTX's Financial Projections Fully Accounted for the Problems with the Geared Turbofan Engine. ......................................................................52

    A.    The 2023 Statements Were Materially False. ................................54

    B.    The Complaint's Allegations, Taken as True, Establish a Strong Inference of Conscious Misbehavior or Recklessness. ......57

    C.    The District Court Failed To Identify Any Valid Reason Why These Statements Were Not Actionable. .......................................58

III.    The Court Should Reinstate the Derivative Section 20(a) Claims...........61

CONCLUSION ...........................................................................61

CERTIFICATE OF COMPLIANCE...................................................63

CERTIFICATE OF SERVICE .........................................................63

# TABLE OF AUTHORITIES

## Cases

*Abramson v. Newlink Genetics Corp.*,
965 F.3d 165 (2d Cir. 2020) ..........................................................43

*Altimeo Asset Management v. Qihoo 360 Technology Co.*,
19 F.4th 145 (2d Cir. 2021) ...........................................................55

*Basic Inc. v. Levinson*,
485 U.S. 224 (1988).................................................... 6, 7, 34, 46

*City of Warren Police & Fire Ret. Sys. v. Prudential Fin., Inc.*,
70 F.4th 668 (3d Cir. 2023) ..................................................... 55, 59

*Ganino v. Citizens Utilities Co.*,
228 F.3d 154 (2d Cir. 2000) ................................... 8, 31, 35, 46, 61

*Gimpel v. The Hain Celestial Group, Inc.*,
156 F.4th 121 (2d Cir. 2025) ............... 3, 6, 7, 8, 9, 29, 33, 34, 35, 37, 41, 46

*In re Alphabet, Inc. Sec. Litig.*,
1 F.4th 687 (9th Cir. 2021) ...........................................................47

*In re Shanda Games Ltd. Sec. Litig.*,
128 F.4th 26 (2d Cir. 2025) ..................................................... 42, 43, 59

*Lululemon Securities Litigation*,
14 F. Supp. 3d 553 (S.D.N.Y. 2014) ..............................................50

*Matrixx Initiatives, Inc. v. Siracusano*,
563 U.S. 27 (2011)........................................................................56

*Meyer v. Jinkosolar Holdings Co.*,
761 F.3d 245 (2d Cir. 2014) ................................. 34, 35, 46, 48, 58

*Mississippi Public Employees' Retirement System v. Boston Scientific Corp.*,
523 F.3d 75 (1st Cir. 2008)........................................ 36, 37, 40, 41

*Novak v. Kasaks*,
216 F.3d 300 (2d Cir. 2000) ......................................... 8, 44, 45, 48

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*,
575 U.S. 175 (2015)........................................................ 42, 43, 59

*SEC v. Gabelli*,
653 F.3d 49 (2d Cir. 2011) ...........................................................35

*Set Capital LLC v. Credit Suisse Group AG*,
  996 F.3d 64 (2d Cir. 2021) ...........................................................55

*Sherman v. Abengoa, S.A.*,
  156 F.4th 152 (2d Cir. 2025) ......................................................47

*Slayton v. American Exp. Co.*,
  604 F.3d 758 (2d Cir. 2010) .......................................................44

*Tellabs, Inc. v. Makor Issues & Rts., Ltd.*,
  551 U.S. 308 (2007) ................................................................ 9, 51

**Statutes**

15 U.S.C. § 78aa(a) ........................................................................4

15 U.S.C. § 78j(b) ..........................................................................6

15 U.S.C. § 78t(a) .........................................................................61

15 U.S.C. § 78u-4(b)(2) .................................................................8

15 U.S.C. § 78u-5(c) .....................................................................44

15 U.S.C. § 78u-5(c)(1)(A)(i) .......................................................44

15 U.S.C. § 78u-5(i)(1) .................................................................44

28 U.S.C. § 1291 ............................................................................4

28 U.S.C. § 1331 ............................................................................4

**Regulation**

17 C.F.R. § 240.10b-5...................................................................6

# INTRODUCTION

On March 18, 2020, the engine of a Vietnam Airlines plane ripped apart as it was taking off from Ho Chi Minh City, Vietnam. That engine was manufactured by Pratt & Whitney, a subsidiary of defendant RTX Corporation. RTX quickly learned that the engine's failure was caused by a defect in Pratt & Whitney's process for manufacturing turbine disks. It also knew that Pratt & Whitney's flagship Geared Turbofan engine used turbine disks made using the same defective process in the same factory as the defective disk on the Vietnam Airlines plane. Pratt & Whitney spent the next eighteen months frantically making numerous changes to try to fix its manufacturing process. But RTX did not disclose the defect to investors or the flying public. Instead, it kept distributing the Geared Turbofan engine with a part it knew could lead to catastrophic engine failure.

In December 2022, the same turbine-disk defect caused a second RTX engine—this time a Geared Turbofan on a Viva Aerobus flight—to catch fire during takeoff. Still, defendants failed to disclose the manufacturing issues to the investing public. It was only months later, when a recall was imminent, that RTX finally revealed that (1) every single one of the approximately 3,000 in-service engines it had manufactured over six years was potentially defective and needed to be recalled and inspected, and (2) it had known about the defect and its pervasive presence in the Geared Turbofan fleet since the Vietnam Airlines incident in 2020.

1

Hundreds of planes were taken out of service, RTX incurred billions in expenses for emergency repairs and airline compensation, and RTX's stock price plummeted. A89-91. Thereafter, RTX's CEO (defendant Gregory Hayes) expressly acknowledged that the turbine-disk manufacturing defect was "an issue that we first uncovered back in 2020" after the Vietnam Airlines incident; that RTX "knew" in 2020 "that this contamination" in its most-produced engine "had occurred between late 2015 and late 2020, early 2021"; and that RTX management therefore "knew we had a suspect population in the fleet." A104.[1]

RTX shared none of this knowledge with the public. Instead, RTX made a series of statements in 2021 reassuring investors that it had resolved all outstanding "teething problems" with the Geared Turbofan engine, *e.g.*, A183, while concealing both the much bigger problem that had led to the Vietnam Airlines incident and the fact that RTX was urgently making multiple, "extensive" changes to its manufacturing process, A162. Even after the Viva Aerobus fire, RTX told investors in 2023 that its financial projections for the Geared Turbofan engine encompassed "everything that we know about the engine," A196, and that there would be no "surprise here," A199.

A month later, RTX would in fact surprise investors by announcing that it had to foot the bill for pulling hundreds of planes out of service, ultimately costing

---

[1] All emphases in the complaint are omitted unless otherwise noted.

RTX more than $3 billion. A104-105. Investors were predictably shocked and dismayed, asking, for instance, "how could you guys possibly not know about this at Paris when you did this major investor event?" A104.

Because RTX's attempts to conceal its manufacturing defect from investors make out a clear-cut claim for securities fraud, the plaintiffs here sued, seeking redress for the losses they suffered from RTX's huge and predictable stock drop.

The district court nevertheless dismissed plaintiffs' complaint because it misunderstood the legally relevant question. At the heart of the court's decision was its view that the complaint failed to state a claim because it did not allege when RTX learned the precise magnitude of the turbine-disk defect. But the question is not whether RTX knew the precise operational and financial impact of the defect when RTX made its 2021 and 2023 statements. The question is whether RTX knowingly or recklessly omitted material information that would have made RTX's statements "misleading" to a "reasonable investor." *Gimpel v. The Hain Celestial Group, Inc.*, 156 F.4th 121, 139, 146 (2d Cir. 2025) (citation omitted). And that of course includes material risks, known to management, even if the company hopes or believes they might not materialize.

Plaintiffs' allegations easily meet that standard. RTX assured investors in 2021 that its "teething problems" with the engine had been resolved, and in 2023 that its financial projections for the engine (which did not account for the defective

disks) included "everything" RTX knew about the engine and that there would be no "surprise[s]." Any reasonable investor in a company that manufactures airplane engines—and any reasonable airline customer—would have considered themselves misled by these statements when RTX was aware of a known defect that placed thousands of RTX's flagship engines at risk of catastrophic failure. Because a reasonable investor would have viewed the facts that RTX knew as significant, it does not matter whether RTX knew exactly how bad things were going to get.

This Court should reverse.

## JURISDICTIONAL STATEMENT

The district court had jurisdiction under 28 U.S.C. § 1331 and 15 U.S.C. § 78aa(a). It entered final judgment dismissing the complaint under Federal Rule of Civil Procedure 12(b)(6) on September 17, 2025. A53. On October 14, 2025, plaintiffs timely noticed this appeal. A1167. This Court has jurisdiction under 28 U.S.C. § 1291.

## ISSUES PRESENTED

1.      Whether defendants committed securities fraud by knowingly or recklessly concealing the existence of a defect in the Geared Turbofan engine's powdered metal while telling investors that the engine's known issues had been resolved.

4

2.      Whether defendants committed securities fraud by representing that their financial estimates were comprehensive when they were aware of the defect and knew that the estimates failed to reflect the inevitable costs.

3.      Whether the Court should reinstate the derivative claims for control-person liability.

## STATEMENT OF THE CASE

Plaintiffs bring a securities class action against defendant RTX Corporation and certain current and former corporate officers.  The complaint alleges that defendants violated Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 and Rule 10b-5, promulgated thereunder, by knowingly or recklessly making a series of materially false and misleading statements about RTX's flagship product, the Geared Turbofan engine.  The district court (Bolden, J.) dismissed the complaint with prejudice under Federal Rule of Civil Procedure 12(b)(6) for failing to allege falsity and scienter.  *Peneycad v. RTX Corp.*, 2025 WL 2636616 (D. Conn. Sept. 12, 2025).

## I.      Legal Background

Section 10(b) of the Securities Exchange Act makes it unlawful "[t]o use or employ, in connection with the purchase or sale of any security registered on a national securities exchange … any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [Securities and

Exchange] Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors." 15 U.S.C. § 78j(b). The Supreme Court "has described the fundamental purpose of the Act as implementing a philosophy of full disclosure." *Basic Inc. v. Levinson*, 485 U.S. 224, 230 (1988) (quotation marks omitted).

Under its Section 10(b) authority, the Securities and Exchange Commission promulgated Rule 10b-5, which makes it "unlawful for any person, directly or indirectly," "[t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, … in connection with the purchase or sale of any security." 17 C.F.R. § 240.10b-5.

This Court has identified six elements that a plaintiff must satisfy to make out a claim under Section 10(b) and Rule 10b-5: "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Gimpel*, 156 F.4th at 136. Only the first two elements are in dispute here.

1. By requiring that a plaintiff prove either an "untrue statement" or the omission of a fact "necessary in order to make the statements made … not misleading," Rule 10b-5 authorizes "two actionable theories": "(1) a false

6

statement, *i.e.*, an actionable statement that is untrue outright, and (2) a half-truth, *i.e.*, a representation that states the truth only so far as it goes, while omitting critical qualifying information." *Id.* at 138 (quotation marks and alterations omitted). This Court prefers the phrase "half-truth" to "omission" because a "pure omission" is not actionable. *Id.* at 138 & n.11.

While a "half-truth theory involves more nuance" than a straightforward falsehood, *id.* at 138, the gist remains straightforward: "[O]nce a company speaks on an issue or topic, it must tell the whole truth" and "assumes a duty to be both accurate and complete." *Id.* at 139 (quotation marks omitted). In analyzing whether an omission qualifies as an actionable half-truth, the court considers whether a "reasonable investor" would have concluded that the statement "omitted to state a material fact which omission rendered the things said misleading." *Id.* at 136, 139.

A plaintiff must also establish that the false statement or half-truth was "material," meaning "that a reasonable investor would have considered [it] significant in making investment decisions." *Id.* at 139 (quotation marks omitted). As the Supreme Court put it, "there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the total mix of information made available." *Basic*, 485 U.S. at 231-32 (quotation marks omitted). Given the fact-intensive nature of

7

the inquiry, a complaint can only be dismissed based on materiality if "the alleged misstatements or omissions … are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance." *Ganino v. Citizens Utilities Co.*, 228 F.3d 154, 162 (2d Cir. 2000).

2. A plaintiff must also allege that the defendants acted with "scienter," meaning that they made the false or misleading statements through "recklessness or conscious misbehavior." *Novak v. Kasaks*, 216 F.3d 300, 309-10 (2d Cir. 2000); *see also Gimpel*, 156 F.4th at 144. Defendants are reckless when they "knew or, more importantly, should have known that they were misrepresenting material facts related to the corporation[,]" including where they "knew facts or had access to information suggesting that their public statements were not accurate." *Novak*, 216 F.3d at 308, 311; *see also Gimpel*, 156 F.4th at 146.

This Court's longstanding precedent, largely adopted by the Private Securities Litigation Reform Act (PSLRA), requires that a plaintiff allege facts "giving rise to a strong inference that the defendant acted with the required state of mind." *Novak*, 216 F.3d at 306-07 (quoting 15 U.S.C. § 78u-4(b)(2)); *see also id.* at 311 (explaining that the PSLRA was based on this Court's existing standard for pleading scienter). This inference need not be "'irrefutable,' of the 'smoking-gun genre,' or even the 'most plausible of competing inferences.'" *Gimpel*, 156 F.4th at 145 (quoting *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 324

(2007)).  It merely requires that the facts alleged—"taken collectively," not "in isolation"—"render[] an inference of scienter *at least as likely as* any plausible opposing inference."  *Tellabs*, 551 U.S. at 322-23, 328.

A plaintiff can satisfy these requirements "by alleging facts showing that (1) the defendants had the motive and opportunity to commit fraud," "(2) strong circumstantial evidence of conscious misbehavior or recklessness," or (3) "both motive-and-opportunity and circumstantial allegations, considered collectively." *Gimpel*, 156 F.4th at 144.

## II.   Factual Background

### A.   RTX Invests Billions of Dollars in the Geared Turbofan Engine Program.

RTX is an American multinational aerospace and defense corporation. A114.  Pratt & Whitney, one of RTX's three business segments, is an "original equipment manufacturer": it produces commercial jet engines, including the Geared Turbofan engine, and sells them to aircraft manufacturers.  A91, A114-115. Its commercial engine sales are critical to RTX's business.  A91, A115.  Pratt & Whitney brought in $20.5 billion in revenue in 2022, or approximately 30% of RTX's total net sales, over half of which came from its commercial engines business.  A91, A115.  Its biggest customer is Airbus, which accounted for about a third of its sales for the years 2020-2022.  A114 n.10.

9

The Geared Turbofan engine was Pratt & Whitney's flagship product. A87, A91-92, A115. Pratt & Whitney invested $10 billion to develop the engine. A115. RTX described the engine as "the architecture of the future"; planes with Geared Turbofan engines were supposed to consume 16% less fuel, reduce greenhouse gas emissions by 50%, and reduce noise by 75%. A91, A115. Those numbers were revolutionary for the industry. A115-117.

RTX's business model for the Geared Turbofan engine required that RTX get the engines out the door quickly and keep them in the air. A92, A119-120. RTX initially sold the engines at a $1 million loss and expected to recoup that loss, and then profit, through sales and services known as "Aftermarket MRO" (maintenance repair and overhaul). A91-92, A114-115, A119. RTX could charge for those aftermarket sales and services only when its warranty on the Geared Turbofan engines expired—typically up to five years from when the plane went into service. A92. The engines had to spend time "on wing," or in flight, for the warranty time to run. A119-120. This arrangement gave defendants strong incentives to churn out the engines and keep them in service.

The individual defendants—RTX CEO Gregory Hayes, CFO Neil Mitchill and his predecessor Anthony O'Brien, COO Christopher Calio, and Pratt & Whitney President Shane Eddy—were directly involved in the Geared Turbofan program and the events relevant to this litigation. A109-111, A215-216.

10

### B. The Geared Turbofan Engine Experiences Early Issues, Which RTX Discloses to Investors.

The Geared Turbofan engine was an enormous commercial success. But the pressure to fulfill customers' orders—and the fact that RTX's business model created the incentive to get engines in the air quickly so that RTX could begin turning a profit through post-warranty sales and services—led RTX to cut corners in production, resulting in a variety of issues with the engine.

In 2017 and 2018, dozens of Airbus 320neo planes with Geared Turbofan engines had in-flight shutdowns or aborted takeoffs because of engine defects. A124-125 & n.11. These flaws, which RTX described as "teething problems," A125, A183, shook customer confidence and created manufacturing delays. In 2018, Airbus temporarily stopped taking delivery of new Geared Turbofan engines from Pratt & Whitney. A124-125. And customers threatened to cancel their contracts if there were any more manufacturing delays. A124-125.

Investors made clear that they were focused on these early challenges. *See* A125. In response, RTX acknowledged that the Geared Turbofan engine had flaws in its first years on the market and "talked ad nauseam about all of those teething problems" as well as its measures to fix them. A183, A189-190. As a result, by the beginning of the class period, analysts thought that Pratt & Whitney had "overcome most of the technical issues that affected the [Geared Turbofan] engine during its first few years[.]" A125. RTX reinforced that impression, telling

11

investors that, while the Geared Turbofan had been afflicted with "technical issues" since it entered into service in 2016, those issues had been "addressed … through various improvements and modifications."  A176.

Buoyed in part by RTX's assurances that it had addressed the technical problems with the engine, the Geared Turbofan engine was an enormous commercial success.  By February 2021, RTX had a backlog of 10,000 orders for Geared Turbofan engines.  A91.  A few months later, the then-President of Pratt & Whitney and COO of RTX described the Geared Turbofan engine as "the huge driver of growth in this business."  A119.

## C. RTX Discovers the Defect in Its Powdered Metal Manufacturing.

Unbeknownst to investors, however, the Geared Turbofan engine faced a much bigger technical problem than the ones RTX had disclosed.  Defendants learned after a Vietnam Airlines plane experienced engine failure with a Geared Turbofan predecessor engine in March 2020 that RTX was manufacturing defective powdered metal and that the defect pervaded the Geared Turbofan engines.

### 1. RTX Relies Heavily on Powdered Metal Manufacturing.

RTX has used powdered metal to make engine parts since the mid-1900s. A126.  HMI, a Pratt & Whitney subsidiary based in Clayville, New York, has been its powdered metal supplier since 1966.  A127.

12

The powdered metal manufacturing process is prone to contamination, and any contamination presents a serious risk to the integrity of the engine. The process involves liquifying a metal alloy and spraying the molten compound down a tower structure. A126. As the liquid metal particles fall, they disperse and solidify. A126. Those particles are then gathered, compressed, heated, and forged before becoming engine parts. A126. Contamination in the powdered metal can interfere with the metal bonding during forging and create weak spots, or "microcracks," in the part. A127. The temperature and movement of an engine during flight can cause the microcracks to propagate and lead to catastrophic engine failure. A127.

Once the parts are made and installed, metal contamination and microcracks cannot be detected without a time-consuming inspection of the engine parts. A127, A138-139. That inspection must be done "off-wing": The plane must be taken out of service, and Pratt & Whitney must use specialized ultrasounds to determine whether a part is defective, cracked, or needs replacement. A127.

### 2. Defendants Ramp Up Powdered Metal Manufacturing for the Geared Turbofan Engine.

In 2015, Pratt & Whitney began ramping up production of powdered metal parts at HMI to respond to the demand for the Geared Turbofan engine, installing an additional tower for powdered metal manufacturing. A127. As the company accelerated its manufacturing, RTX and its top executives knowingly sacrificed

quality for quantity, and safety for speed.  A92-93, A120-122.  As CEO Hayes admitted in 2023 when he disclosed the powdered metal defect, RTX's efforts to "scale[] up production for" the Geared Turbofan engine "got away from us a little bit."  A162-163.

Defendants knew that the powdered metal was contaminated for years before they disclosed the existence and scope of the problem to investors.  As Hayes said in July 2023, "This is an issue that we first uncovered back in 2020." A104.  He continued, "we knew that this contamination had occurred between late 2015 and late 2020, early 2021."  A104.  This timeline aligns with what former employees have recalled.  A former Pratt & Whitney employee described a teleconference in August 2019 with the company's Chief Engineer to discuss contamination in the powdered metal supplied by HMI.  A96.  Senior leadership at the VP and SVP level were also aware of the problems then.  A96; *see also* A120-122.  A Pratt & Whitney mechanical engineer similarly stated that in about 2020, foreign objects contaminated the powdered metal.  A96-97.  Other former employees, including a manufacturing engineering manager, said that Pratt & Whitney sent customers Geared Turbofan engine parts with known defects because the company was behind on production.  A120-121.

14

### 3. An RTX Engine Rips Apart During Takeoff on a Vietnam Airlines Plane.

Engine failure on a Vietnam Airlines flight brought all this to the fore. On March 18, 2020, Pratt & Whitney's V2500 engine on a Vietnam Airlines plane ripped apart as the plane was taking off from Ho Chi Minh City, Vietnam. A97, A135-136. Pratt & Whitney's V2500 engine is a predecessor to the Geared Turbofan engine and both engines use turbine disks made from the same powdered metal. A135-136. The Federal Aviation Administration (FAA) immediately directed Pratt & Whitney to take all affected high-pressure turbine disks from the V2500 engine family out of service and to determine the "root cause" of the incident. A98.

As defendants discovered, one of the engine's turbine disks had shattered because of a defect in its powdered metal. A88, A97. The turbine propels a plane by converting combustion gases into mechanical energy. A115-116. As part of that process, the turbine's disks are exposed to an incredible amount of heat from the engine's combustor. A116. Defendants learned that the powdered metal they used to manufacture critical engine parts for both the Geared Turbofan engine and the V2500 was contaminated. A97-98. The faulty turbine disk had fractured because of "deficiencies in the manufacturing process," or "a material anomaly." A97.

15

### 4. Defendants Learn About the Powdered Metal Defect that Impacts the Geared Turbofan Engine.

There is no dispute that "RTX knew about the powdered metal issue. That is well pleaded." A1154. As CEO Hayes explained in discussing the defect in the Geared Turbofan engine disks, defendants "first uncovered" the issued with the powdered metal "back in 2020 when we had an incident with the V2500 turbine [disk]"—referring to the Vietnam Airlines flight. A104. RTX investigated the incident, as directed by the FAA. Hayes made clear that, "[a]s a result of that investigation, we determined at that point that we had some contamination in this powdered metal." A104. Although the incident involved the V2500 turbine disk, the defect also affected the high-pressure turbine disks for the Geared Turbofan engines, which were manufactured at the same plant, at the same time, using the same process and the same contaminated powdered metal. A97, A135-137, A162. Once defendants knew about the defective disks for the V2500 series of engines, they necessarily knew the Geared Turbofan engines were vulnerable to the same defect. A162.

Defendants also knew that, for two reasons, a defective turbine disk was more likely to impact a Geared Turbofan engine than a V2500 engine. A147. The first reason was volume. Defendants knew that the contamination began in 2015, when the company had brought on an additional tower to manufacture powdered metal specifically for the Geared Turbofan engines. A139, A162. Defendants

16

were manufacturing more Geared Turbofan engines than V2500 engines, so the defect was more likely to manifest in a Geared Turbofan engine.  A147, A161.

The Geared Turbofan engine was also at greater risk from the defect due to its higher thrust.  The higher the thrust of an engine, the hotter it burns, and the more stress is placed on the turbine disks.  A142.  A Geared Turbofan engine with defective powdered metal parts therefore faces greater odds of cracking or shattering than a lower-thrust V2500 engine with the same defect.

Although defendants avoided disaster for a few years, they were on notice that the powdered metal defect in Geared Turbofan engines was causing flight safety incidents.  For example, in December 2018, a Korean Air Flight made an emergency landing because of engine failure; a March 2022 report by the National Safety Transportation Board (NTSB) about the incident revealed that a turbine blade had cracked because it was contaminated by "crystals" of a material that should not have been there and that Pratt & Whitney had inadequately cleaned its metal working equipment.  A211.  Between 2019 and 2022, the NTSB logged fourteen additional flight incidents involving Geared Turbofan engines.  A212.  Additional details of those incidents are not public, but defendants would have known about them and the dangers that the powdered metal defect posed.  A212.

17

### D. Defendants Conceal the Powdered Metal Defect's Impact on Geared Turbofan Engines.

For a year and a half after the Vietnam Airlines incident, defendants knowingly continued to manufacture and sell contaminated Geared Turbofan engines. A88-89, A169. At the same time, as defendants later admitted, defendants were frantically implementing nine separate, "extensive" changes to RTX's manufacturing processes over the course of eighteen months to try to address the defect. A101, A105-106, A140, A162, A169; *see also* A960-961 (defendant Calio describing the "extensive improvements that were made to our powder processing to remove possible contamination sources"). Defendants were not able to produce engines free from contamination until the fourth quarter of 2021. A101. These ongoing manufacturing changes were part of a pattern in which Pratt & Whitney employees sought to fix the Geared Turbofan engine's issues without pausing sales or production and were told to keep quiet about the situation. A122.

Defendants were motivated to hide the defect because it posed a serious financial and reputational threat to RTX's business. The Geared Turbofan was a flagship product that was supposed to sustain the company's growth. But Airbus, Pratt & Whitney's biggest customer, had already threatened to cancel its contracts if there were further delays in manufacturing the Geared Turbofan engines. A124-125. Revealing the true scope of the defect would require RTX to take thousands

18

of Geared Turbofan engines out of service, costing RTX billions of dollars in emergency inspections, repairs, and compensation. A89, A98-99. Bringing the engines in before the warranty period expired would mean that RTX was responsible for the costs of inspection and repair. A144. A single engine inspection would take almost a year to complete due to its complexity and the location of the high-pressure turbine disk. A138-139. The plane would need to be grounded during the inspection, and RTX was responsible for compensating the airline while the plane was in the shop. A89, A139. And while the engines were "off-wing," the warranty period would not continue to run. A119.

Defendants did not inform investors that the engines were defective—even while disclosing other, less serious problems with the engine. For example, on February 8, 2021, defendants issued a 10-K report stating that Pratt & Whitney had identified "technical issues" that are "usual for new engines" and had "addressed these issues through various improvements and modifications." A176. And on February 17, 2021, CEO Hayes gave remarks at the Barclays Industrial Select Conference and said that, for the Geared Turbofan engine, "all those teething problems that we talked about for the last several years seem to be behind us" and "I think, at least, knock on wood, all the [Geared Turbofan] issues that we've been talking about seem to be behind us and the engine's performing really well." A183-184.

19

In a back-and-forth with the FAA over the next several months, defendants were forced to share information about the engines affected by the manufacturing defect. But they continued to maintain that the engines did not need immediate inspection and that the issue did not require a time-sensitive response. In July 2021, Pratt & Whitney gave the FAA a non-public, expanded "root cause analysis" of the Vietnam Airlines incident. It noted that the powdered metal defect affected the Geared Turbofan engine fleet but only identified certain engines that had "the highest risk of failure," without any basis for limiting its analysis to those engines. A147-148.

Following the root cause analysis, the FAA issued an Airworthiness Directive on September 10, 2021. A101. The FAA issues Airworthiness Directives when there is an unsafe condition in a product, or an unsafe condition likely exists or will develop in "other products of the same type design." A98 n.6. But the September 2021 directive, based on what Pratt & Whitney had told the FAA, was limited to three Geared Turbofan engines. A101-102, A149. As to those engines, the FAA mandated urgent removal of the affected disks. A149.

On September 13, 2021, Pratt & Whitney issued a confidential service bulletin to customers (but not investors) that acknowledged the defect and listed thousands of Geared Turbofan engines that could be affected. A149. But the bulletin did not acknowledge that the defect potentially affected the entire Geared

20

Turbofan fleet. A149-150. And even though the FAA's directive had required immediate repair of affected disks, Pratt & Whitney did not suggest that these other affected engines should be inspected immediately, and it withheld from customers the full scope of the issue. A149-150. Customers questioned the scope of the bulletin; Delta recommended to the FAA that the bulletin's partial inspection instruction apply to "ALL" serial numbers. A151-152.

On March 24, 2022, the FAA issued another Airworthiness Directive stating that Pratt & Whitney should not have limited the September 2021 service bulletin to certain Geared Turbofan models when others were "of the same type design and are subject to the same unsafe condition." A151. And on July 8, 2022, RTX revised the September 2021 service bulletin to clarify that 2,070 affected Geared Turbofan engines needed inspection. A152. None of this was disclosed to investors or the public.

Defendants continued to insist that the inspections were not time-sensitive and could wait for regular maintenance, which would in some cases be years away. A152. But the information available to defendants from the V2500 engine showed that the Geared Turbofan engines were also vulnerable to failure. A153-154. On October 3, 2022, the FAA issued another Airworthiness Directive mirroring RTX's view that inspections need not be conducted before regularly scheduled maintenance. A152-153.

21

E.     **The Same Powdered Metal Defect Causes a Geared Turbofan Engine To Catch Fire During Takeoff.**

On December 24, 2022, the Geared Turbofan engine of a Viva Aerobus flight caught fire.  A103, A154-155.  The plane had accelerated for takeoff when the flight crew "felt a strong thump on their controls" and received a fire warning for the airplane's right engine.  A154.  The crew aborted takeoff.  A103.

When defendants investigated the incident, they determined that the same defect that caused the March 2020 Vietnam Airlines incident caused the Viva Aerobus engine failure.  A155.  The powdered metal of the high-pressure turbine disk had been contaminated, and the disk fell apart.  A155.

Although the accident shed some public light on this issue, defendants still did not fully inform investors about the Geared Turbofan engine's problems.  On April 25, 2023, defendants held an earnings call in which RTX CFO Neil Mitchill state that, "in terms of thinking about the [Geared Turbofan engine] and time on wing, basically, what I can say is our estimates today contemplate everything that we know about the engine."  A196.  He continued:  "And any challenges in terms of cost or additional resources we need to put into that area are already contemplated in the outlook that we have for Pratt and for RTX as a whole."  A196.  Despite RTX's knowledge of the issue, Mitchill did not disclose that the powdered metal defect pervaded the Geared Turbofan engine fleet.  A196-197.  And contrary to his statement that the estimates "contemplate everything that

[RTX] kn[ew] about the engine," the estimates did not account for the enormous costs of addressing the powdered metal defect.  A196-197.

On June 19, 2023, Pratt & Whitney President Shane Eddy spoke at the Paris Air Show about the Geared Turbofan engine's profitability and whether Pratt & Whitney was exposed to costs for grounded airplanes.  A103, A198-199.  Eddy said:  "[A]s we have designed the improvements that go into the fleet, we've rolled those costs into the cost basis for the portfolio.  So this is expected costs for us going forward to upgrade the fleet over time, so I think there's not a surprise here coming."  A198-199.  Eddy emphasized that "all of those costs would be programmed into the portfolio and into our calculation as well."  A198-199.  Like Mitchill's statements, Eddy's comments did not inform investors about the effect that the powdered metal defect would have on the Geared Turbofan engine portfolio.  And despite Eddy's assurance to investors that "there's not a surprise here coming," RTX revealed the powdered metal defect in the Geared Turbofan engines just over a month later.

**F.     RTX's Disclosure of the Powdered Metal Defect Shocks Investors.**

On July 25, 2023, RTX issued a press release stating that there was a "rare condition" in its powdered metal that would require Pratt & Whitney "to remove some engines from service for inspection earlier than expected."  A202.  On an earnings call the same day, RTX CEO Hayes informed investors and the public of

23

contaminants in the powdered metal that makes up the Geared Turbofan engines. A104.

Crucially, Hayes conceded that the company had known about the engine defects since shortly after the Vietnam Airlines incident in 2020. As Hayes put it, "This is an issue that we first uncovered back in 2020[.]" A104. The company "knew that this contamination had occurred between late 2015 and late 2020, early 2021" and thus "knew [it] had a suspect population in the fleet." A104. Hayes admitted that, after the 2020 incident, the company began examining and making extensive changes to the powdered metal manufacturing process in a desperate effort to rectify the issue—facts RTX only disclosed to investors or the public in 2023. A140, A162-163; *see* A961 (Calio describing "extensive improvements" to manufacturing process). But now, Hayes admitted that RTX would need to inspect "the whole [Geared Turbofan] fleet" manufactured between 2015 and 2021. A162, A203.

RTX's disclosure that it knew for years that it had a problem with its Geared Turbofan engines, made extensive changes to its manufacturing process in response, and would now need to inspect the engines for defects caused RTX's share price to fall by $9.91 per share, or 10.2%. A104. Analysts were livid at RTX's concealment of the defect, asking how defendants could "possibly not know about this at Paris when you did this major investor event?" A104. Another

24

analyst observed that "the company sounded incrementally bullish" on the Geared Turbofan engine at the Paris Air Show a month earlier despite knowing of the Geared Turbofan engine's issues that were "not fully disclosed" at that time. A163-164.  Barclays similarly criticized RTX for "making no mention nor contingency for this issue" in Paris despite it being "at that point a known potential issue, per company commentary."  A213-214.

On August 2, 2023, the FAA issued a new Airworthiness Directive that warned that the Geared Turbofan engine's high-pressure turbine disks were "susceptible to failure much earlier than previously determined" and said that the parts needed to be inspected as soon as possible:  "[T]he longer these parts remain in service, without the inspections required by this [Directive], the higher the probability of failure."  A166.  The Directive mandated the removal of the high-pressure turbine disks from Geared Turbofan engines by September 15, 2023. A166.

A few days before that deadline, on September 11, 2023, defendants revealed that the powdered metal defect was much bigger than they had acknowledged.  RTX issued a press release revealing the full scope of the problem: All 3,000 Geared Turbofan engines manufactured between 2015 and 2021 were affected.  A105-106.  Several hundred planes—with 600 to 700 engines—would need to be removed from service and grounded for the better part of a year.  A105-

106, A166-167.  And RTX would be responsible for compensating the airlines while the engines were being inspected.  A105-106.  The inspection, repair, and airline compensation would cost RTX $3 to $3.5 billion.  A105-106, A166-167.

On a call that day, Hayes again stated that the powdered metal contamination had been introduced "back in late 2015," when RTX boosted its manufacturing capacity to ramp up production for the Geared Turbofan engine.  A106, A169.  Hayes also elaborated on the "extensive improvements" RTX had made to the manufacturing process:  Between March 2020 and late 2021, RTX had made "nine changes to the process to ensure the purity" of the metal for the engines.  A106, A169.  The powdered metal was not free of contaminants until the fourth quarter of 2021.  A169.  Hayes thus admitted that RTX knew about the problem and was trying to fix it with a cascade of manufacturing changes, but that, in the meantime, RTX had continued delivering Geared Turbofan engines to its customers, knowing that their disks were manufactured with the defective process. A169.

Hayes's statements on the September 2023 call departed from defendants' assurances in April, June, and July of that year.  In April, Mitchill had said that "our estimates today contemplate everything that we know about the engine." A196.  In June, Eddy said that, in terms of costs for grounded airplanes, "there's not a surprise here coming" and stated that "all of those costs" were already

"programmed into the portfolio." A198-199. And in July, defendants said that less than 1% of its Geared Turbofan engines needed to have the high-pressure turbine disks replaced. A167-168. But by September, Calio said that the firm "plan[ned] to replace as many [high-pressure turbine] disks as possible." A167-168 (first alteration in original).

Several analysts commented on the "magnitude" of the issue and the "financial and operational impact" that it would have. A106, A168, A170. One firm also noted investors' "questions about management, given the time it took Pratt [& Whitney] to fully raise the issue." A106, A171. By closing on September 11, 2023, RTX's share price fell an additional $6.58 per share, or 7.9%. A170. All told, the stock had dropped 27% from the Class Period high. A106.

### G. Defendants, Investors, and Customers Deal with the Fallout.

In the aftermath of the September 2023 disclosure, regulators took action. The FAA issued Airworthiness Directives that required every single Geared Turbofan engine's high-pressure turbine disk produced between 2015 and 2021 to undergo a specialized ultrasound inspection for flaws, explaining that the engine's components "are susceptible to failure significantly earlier than previously determined." A106-107, A172. The SEC also launched an investigation and issued subpoenas for documents about Pratt & Whitney's use of powdered metal in

27

manufacturing, the risks associated with its manufacturing processes, and how the company sought to address those risks. A107, A173.

There were immediate consequences for the company, too. Hayes stepped down as CEO, and RTX laid off employees to offset the cost of the Geared Turbofan engine inspections. A173. RTX's airline customers had to adapt to having planes grounded by making service cuts, leading to major disruptions in global air travel. A107, A174-175.

## III.   The District Court's Decision

Plaintiffs filed the operative complaint on July 23, 2024, alleging violations of Section 10(b) and Section 20(a) of the Securities Exchange Act of 1934 and SEC Rule 10b-5. Defendants moved to dismiss the complaint under Rule 12(b)(6), arguing that the complaint did not adequately plead "a material misrepresentation or omission" or "scienter." Defendants did not dispute that the complaint adequately pleaded all the other elements.

On September 12, 2025, the district court granted defendants' motion to dismiss with prejudice. A2. The court held that the complaint did not adequately plead that any of RTX's statements were false and misleading. A15-47. The court also held that plaintiffs failed to adequately allege scienter. A47. While the court identified multiple reasons that various individual statements were non-actionable in its view, the court's core reasoning as relevant to this appeal was that plaintiffs

did not allege that defendants knew the "magnitude of the defect" at the time they made the relevant statements. *E.g.*, A46. Relatedly, the court concluded that the information that RTX did know, had it been disclosed, would not have changed the "total mix" of information available to investors. *E.g.*, A23, A34. Based on its dismissal of the claims for a primary violation of Section 10(b) of the statute, the court also dismissed plaintiffs' derivative claims under Section 20(a). A52.

## SUMMARY OF THE ARGUMENT

The pleadings amply establish that defendants' statements were false and misleading and that they were made either intentionally or recklessly.

I. Defendants' February 2021 statements assuring investors that the engine's "technical issues" had been "addressed," A176, while concealing that the company was distributing the engine with turbine disks made using a manufacturing process that RTX knew to be defective, were materially false or misleading. By choosing to speak regarding problems with the engine, RTX "assume[d] a duty to be both accurate and complete." *Gimpel*, 156 F.4th at 139 (quotation marks omitted). Yet RTX failed to disclose a known manufacturing defect that had already led one engine to rip apart during takeoff—a defect that RTX was, at the time, frantically trying to fix through "extensive" changes to its manufacturing process. A140.

RTX either knew those statements were false and misleading or acted recklessly with regard to that possibility. As RTX later conceded, it learned about

the defect "back in 2020" when the Vietnam Airlines jet engine exploded.  A104.

RTX knew it had been producing contaminated disks "between late 2015 and late

2020, early 2021."  A104.  As it repeatedly tried to resolve the problem, it didn't

tell investors about the "suspect population in the fleet."  A104.

The district court's decision dismissing these claims rested on legal errors

and did not account for many of the key facts in the complaint—including, most

importantly, RTX's admission that it knew about the defect as early as 2020, yet

failed to disclose that information until 2023.

II.  Defendants' statements in July and September 2023 were also material

misstatements because they represented that RTX's financial estimates included

"everything that we know about the engine" and that "there's not a surprise here

coming."  A196, A199.  That was false; they knew that the engines were

contaminated with defective metal and that recalling and repairing them would cost

the company billions of dollars.

Defendants had scienter by February 2021, so they necessarily had scienter

by 2023.  And evidence continued to accumulate showing that defendants knew the

falsity of the 2023 statements: They knew that another engine had exploded

because of the same defect in December 2022; that they had not been able to

manufacture engines without the defect until the end of 2021; and that they had

delivered defective engines to their customers.  Defendants knowingly concealed

30

these facts by falsely telling investors that their financial estimates reflected "everything that we know." A196.

The district court again dismissed plaintiffs' claims based on the 2023 statements only by making legal errors and by ignoring crucial allegations that undermine the court's decision.

## STANDARD OF REVIEW

The Court reviews the district court's dismissal of the complaint pursuant to Rule 12(b)(6) *de novo*. *Ganino*, 228 F.3d at 161. The Court accepts "all factual allegations in the complaint as true and draw[s] all reasonable inferences in the plaintiffs' favor," and upholds a dismissal "only if it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Id.* (quotation marks omitted).

## ARGUMENT

I. **Defendants' February 2021 Statements Fraudulently Suggested that Known Issues with the Geared Turbofan Engine Had Been Resolved.**

The Geared Turbofan engine was plagued with technical issues from its commercial launch in 2016, and defendants were aware of the issues early on. While RTX was able to resolve certain problems, the powdered metal contamination issue plagued the company for years. In February 2021, despite knowing that they had not resolved the powdered metal contamination issue, defendants repeatedly reassured investors that the issues with the engine had been

31

resolved. On February 8, 2021, RTX stated in its 2020 Form 10-K that, "[s]ince the PW1000G Geared TurboFan engine entered into service in 2016, technical issues have been identified and experienced with the engine, which is usual for new engines," but it reassured investors that "Pratt & Whitney has addressed these issues through various improvements and modifications" and did not acknowledge any ongoing issues. A176. Similarly, on February 17, 2021, RTX CEO Hayes told investors that "all those teething problems that we talked about for the last several years seem to be behind us" and "I think, at least, knock on wood, all the [Geared Turbofan] issues that we've been talking about seem to be behind us and the engine's performing really well." A183-184.

Plaintiffs' allegations, taken as true, establish that these statements were materially false or misleading. RTX told investors and the public that problems with the Geared Turbofan engine had been "addressed" despite knowing that the engines included turbine disks made using a defective manufacturing process that had already led one engine to fail during takeoff. A104. A reasonable investor in 2021 would have considered this defect information significant. And plaintiffs' particularized allegations establish that RTX made these misleading statements either intentionally or recklessly.

## A.  The 2021 Statements Were Materially False or Misleading.

RTX's February 2021 assurances that it had "addressed" all the "technical issues" with the Geared Turbofan engine were false or, at best, actionable half-truths.  If RTX intended to include the powdered metal defect as one of the "technical issues … typical for … new aerospace technologies" referred to in the 10-K, or as one of the "teething problems" or "issues that we've been talking about," the statements were false in asserting that the issues were "behind us." The defect had not been addressed in February 2021 when the statements were made. Instead, defendants were in the midst of making nine different manufacturing changes—changes defendants described as "extensive"—to try to solve the problem before word got out.  A162, A169.  RTX did not start producing engines without the defect until several months later, in the fourth quarter of 2021.  A101.

If defendants did *not* mean to include the powdered metal defect among the "technical issues" or "teething problems" that it claimed were resolved, the statements are actionable half-truths.  "[O]nce a company speaks on an issue or topic, there is a duty to tell the whole truth."  *Gimpel*, 156 F.4th at 141.  Here, defendants elected to speak to investors about the "technical issues" and "teething problems" that had impacted the Geared Turbofan engine.  Defendants therefore were required to "tell the whole truth" in a way that was not only "accurate" but also "complete."  *Id.* at 139.  Yet defendants did not "tell the whole truth," *id.*,

because they left out the powdered metal defect, which presented a much bigger issue for the engine and for RTX's outlook than the issues that RTX chose to disclose.

Whether viewed as misstatements or half-truths, defendants' misleading failure to disclose the powdered metal defect was material because "a reasonable investor would have considered [the defect] significant in making investment decisions." *Id.* While the precise, long-term implications of the powdered metal defect may not have been known in 2021, the materiality analysis "measur[es] the importance of the event discounted by the probability of its occurrence." *Meyer v. Jinkosolar Holdings Co.*, 761 F.3d 245, 252 (2d Cir. 2014) (citing *Basic*, 485 U.S. at 238). By 2021, the powdered metal defect had already led the engine on the Vietnam Airlines plane to rip apart during takeoff. And the same manufacturing defect affected the disks on the Geared Turbofan engine—RTX's flagship product. RTX itself viewed the defect as sufficiently serious that it was frantically trying to fix the problem with multiple, "extensive" changes to its manufacturing process. A162. But the issue remained ongoing as of February 2021, meaning that it potentially affected not only the hundreds if not thousands of engines RTX had already distributed but also those in continued production. Taken together, these facts establish a risk to the business that was sufficiently extreme, and sufficiently likely, that a reasonable investor would have considered them significant in

34

deciding whether to invest in the company. They are certainly not so "obviously unimportant" to warrant dismissal at the pleading stage. *Ganino*, 228 F.3d at 162.

This Court has repeatedly found statements actionable where, as here, defendants sought to reassure investors about a particular concern while withholding information that undermined that reassurance. In *Meyer*, for instance, this Court held that defendant's "comforting statements" about its efforts to comply with "applicable environmental regulations" were materially misleading where the defendant failed to disclose then-ongoing violations of those regulations. 761 F.3d at 251-52. In *Gimpel*, this Court held that the defendant had misled investors by reassuring them that cuts in inventory guidance were "one-offs" while withholding data suggesting that product demand had "waned." 156 F.4th at 141-42. And in *SEC v. Gabelli*, this Court held that plaintiffs had alleged an actionable half-truth where the defendant suggested that it had sought to eliminate a certain practice while, in reality, it had expressly allowed it in one instance. 653 F.3d 49, 57 (2d Cir. 2011), *rev'd on other grounds*, 568 U.S. 442 (2013). Similarly here, RTX issued "comforting statements" that it had "addressed" all "technical issues" while failing to disclose a serious, ongoing technical issue that posed an even more substantial risk to the company. *Meyer*, 761 F.3d at 251-52; A176.

This case is also analogous to the First Circuit's decision in *Mississippi Public Employees' Retirement System v. Boston Scientific Corp.*, 523 F.3d 75 (1st

Cir. 2008), which reversed a district court decision granting a motion to dismiss akin to the court's decision in this case. Boston Scientific manufactured stents that it knew had a defect that led to a risk that the stent would not work. *Id.* at 81. Boston Scientific was working on manufacturing changes to fix that defect, but it kept its product on the market in the meantime. *Id.* And it told investors that the stent's issues were attributable to doctor unfamiliarity. *Id.* at 79. That naturally led "investors to conclude the problems would disappear over time as doctors became more familiar with the product, and there would be no recalls." *Id.* at 83. The court determined that a jury could find that the defendants' assertions were misleading unless the company also disclosed the manufacturing changes it was undertaking. *Id.* at 87.

Likewise, here, RTX, under pressure to keep its engines on-wing, concealed known defects in its engines. A104, A119. Concealing the existence of the manufacturing defect was materially misleading. Defendants' statements that any technical issues with the engine had been addressed would have led investors to conclude that the engine was free from pervasive, ongoing issues. Defendants did not disclose, in the course of discussing the engine's issues, that defendants were undertaking a series of manufacturing changes to address a continuing problem with their powdered metal manufacturing that had already led one engine to fail during takeoff. As in *Boston Scientific*, "the existence" of the problem and the

36

changes defendants were making to address that problem "was pertinent to the issue of potential recalls," and the company's ability to "maintain market share." 523 F.3d at 87. In both cases, the fact that the defendants viewed the problem as sufficiently serious to warrant urgent action would have suggested to investors that the problem created a meaningful potential that the problem would lead to recalls or other remedial action that would have a negative financial impact on the company. Thus, in both cases, disclosing the defect and the changes would have significantly altered the total mix of information for a reasonable investor.

### B. The Complaint's Allegations, Taken as True, Establish a Strong Inference of Conscious Misbehavior or Recklessness.

Plaintiffs' allegations, taken as true, also establish a strong inference that, in implying that all known issues with the Geared Turbofan engine were resolved, defendants acted either knowingly or recklessly.

As an initial matter, defendants had a clear motive to hide the defect and its impact on the Geared Turbofan engine from investors: Defendants were actively working to resolve the problem and wanted to avoid disclosing the issues with the turbine disks until they had figured out how to make disks without the defect. *See Boston Scientific*, 523 F.3d at 86 (recognizing, as a motive, the desire to "build up inventory [of non-defective product] before announcing product recalls" of the defective product); *see also Gimpel*, 156 F.4th at 144 (explaining that a plaintiff can establish scienter through allegations of motive and circumstantial evidence of

37

knowledge or recklessness). If defendants could fix their manufacturing process, and if defendants got lucky and a defective disk did not rip apart another engine, then defendants might have been able to avoid any disclosure of the problem—and, in the process, save their jobs. *See* A173 (CEO Hayes stepping down after the manufacturing issues came to light).

RTX's business model for the Geared Turbofan engine provided further motive to mislead investors (and customers) for as long as possible. As discussed, the Geared Turbofan engine would only turn a profit after the planes had been in the air for a certain period of time—after which the costs of repairs would shift from RTX to its customers. P. 10, *supra*. The longer defendants could avoid disclosing the defect, the more likely it became that RTX could push any future inspection and repair costs off on customers, rather than footing the bill itself.

Powerful evidence supports the inference that defendants knew their statements were misleading—or at least acted recklessly. First, and most importantly, defendants *conceded* that they knew about the powdered metal defect, and its impact on the Geared Turbofan engine, when defendants Hayes and O'Brien reassured investors in 2021 that known technical issues had been addressed. Specifically, in July 2023, months after the Viva Aerobus fire, Hayes admitted that the company "first uncovered" the defect "back in 2020 when we had an incident with the V2500 turbine" disk—*i.e.*, when the V2500 engine on the

Vietnam Airlines flight ripped apart. A104. RTX "knew" at that time "that this contamination had occurred between late 2015 and late 2020, early 2021." A104. As Hayes bluntly put it: "[W]e knew we had a suspect population in the fleet." A104.

It is hard to imagine more powerful evidence of scienter than this statement from RTX's CEO, admitting that, as early as 2020, RTX knew that it was churning out Geared Turbofan engines using disks manufactured through a process that created a risk of catastrophic defects. While RTX uncovered the potential for defects in the context of the V2500 engine, RTX knew both that the Geared Turbofan engine used the same disks as the V2500 engine and that the ongoing risks were *greater* for the Geared Turbofan engine than for the V2500 engine because the Geared Turbofan engine's higher thrust put more strain on the disks. *E.g.*, A142, A168. Yet, despite this knowledge, Hayes and O'Brien were assuring investors that "technical issues" with that engine had been "addressed" and were "behind [them]." A176, A183-184.

Second, and relatedly, by the time of RTX's 2021 statements, RTX was in the midst of making "extensive improvements" to its manufacturing process in response to the Vietnam Airlines incident, ultimately making "nine changes to the process" over the course of eighteen months before finally being able to produce contaminant-free engines at the end of 2021. A162-163, A169. As the First

39

Circuit recognized in *Boston Scientific*, a defendant's efforts to correct a problem with its product creates a strong inference that the defendant was aware of the problem. *See* 523 F.3d at 89-91. Similarly here, RTX's extensive, years-long efforts to dramatically change its manufacturing process belies any suggestion that the problem was not significant, or that RTX was not aware that the problem existed.

Third, the nature of the problem and the industry also strongly support an inference of scienter. In *Boston Scientific*, which involved the defendants' failure to disclose problems with their stents, the First Circuit found scienter in part because "[d]efendants are in a highly regulated industry and the company, it can be inferred, constantly monitors reports of patient injury and death and looks for prompt solutions to such problems." *Id.* at 91. Such an inference is at least as warranted here. Like stents and other medical devices, aircraft engines are highly regulated and involve obvious safety concerns. In February 2021, RTX knew that one of its engines had ripped apart during takeoff less than a year before, due to a fault that it knew also existed in its Geared Turbofan engines. As in *Boston Scientific*, the regulated and safety-oriented nature of the aviation industry supports a strong inference that RTX's leaders were aware of the details of a product defect that had already led to such a dramatic engine failure.

40

Fourth, the Geared Turbofan engine was important to RTX's business, and executives "are likely to know more about things central to their business." *Gimpel*, 156 F.4th at 148 (citation omitted). Commercial engine sales are critical to RTX. A91. The Geared Turbofan in particular was "the architecture of the future" and "going to be the huge driver of growth in this business," according to RTX. A118-119. That the fraud concerned "areas of critical import" to RTX "[b]olster[s] the scienter inference." *Gimpel*, 156 F.4th at 148.

In sum, this is not "a case where there is no contemporaneous evidence at all that defendants knew earlier what they chose not to disclose until later." *Boston Scientific*, 523 F.3d at 91. As Hayes conceded, and as RTX's frantic manufacturing changes and the nature of the problem indicate, RTX and its leaders were well aware in 2021 of the defect in the turbine disks for the Geared Turbofan engine. Yet defendants never disclosed that issue to investors, even while assuring investors that "technical issues" with the Geared Turbofan engine had been "addressed" and were "behind [them]." A176, A183-184. Those facts make out a classic case of securities fraud.

### C. The District Court Erred in Dismissing Plaintiffs' Claims Based on the February 2021 Statements.

The district court dismissed plaintiffs' claims based on the February 2021 statements because (1) Hayes's statement at the Barclays Industrial Select Conference (but not RTX's 10-K statements) was opinion, puffery, and a forward-

41

looking statement; (2) RTX's statements in its 10-K (but not Hayes's Barclays statement) were not material because they did not impact the "total mix" of information available to investors; and (3) plaintiffs did not adequately allege scienter as to either statement. The court reached those conclusions by misapplying the relevant legal standards and ignoring key allegations in the complaint.

### 1. Hayes's 2021 Statement Was Not an Opinion, Puffery, or a Forward-Looking Statement.

Contrary to the district court's decision, Hayes's statement that "I think, at least, knock on wood, all the [Geared Turbofan] issues that we've been talking about seem to be behind us," A184, was not shielded from liability. A26.

First, the statement was not a non-actionable "opinion" simply because it began with the phrase "I think." A26. A pure statement of opinion is not false or misleading solely because the opinion "turned out to be wrong." *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 186 (2015). But a statement of opinion is false or misleading where "the speaker did not hold the belief she professed" or "the speaker omit[ted] information whose omission makes the statement misleading to a reasonable investor." *In re Shanda Games Ltd. Sec. Litig.*, 128 F.4th 26, 43 (2d Cir. 2025) (alteration in original). So if a speaker omits "material facts" about the speaker's "knowledge concerning a statement of opinion," and those facts "conflict with what a reasonable investor

would take from the statement itself," the statement is actionable. *Omnicare*, 575 U.S. at 189; *see also Abramson v. Newlink Genetics Corp.*, 965 F.3d 165, 178 (2d Cir. 2020) (statement of opinion actionable where it implied "there were no competing facts"). Put more simply, a defendant cannot shield from liability a statement the defendant knows or should know to be false or misleading simply by appending the words "I think" to the beginning. *See Omnicare*, 575 U.S. at 184-85.

For all the reasons explained above, Hayes's statement that he "think[s] … all the [Geared Turbofan] issues that we've been talking about seem to be behind us" was false and misleading because Hayes knew full well that (1) RTX was distributing engines with defectively manufactured turbine disks that had already led one engine to rip apart during takeoff; and (2) RTX was frantically making extensive changes to its manufacturing process to address that known defect. Contrary to his statement, Hayes therefore did not actually think the engine's problems had been resolved. And, by omitting information that Hayes knew about the powdered metal defect, Hayes "ma[de] the statement misleading to a reasonable investor." *Shanda Games*, 128 F.4th at 43.

Second, Hayes's statement was not protected by the safe harbor for forward-looking statements. A26. The PSLRA defines certain projections of "future economic performance" or "future operations" as "forward-looking statement[s]."

43

15 U.S.C. § 78u-5(i)(1).  Where the allegedly misleading statement meets the definition of a forward-looking statement, is "identified as a forward-looking statement, and is accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement," a plaintiff must prove that the defendant knew the statement was false or misleading.  *Id.* § 78u-5(c).

Here, Hayes's statement is a present-tense description of the state of the engine that does not even meet the threshold definition of a forward-looking statement.  A184.  Moreover, the statement was neither identified as forward-looking nor accompanied by any disclaimers whatsoever about contingent future events—let alone "meaningful" ones—and so is not protected.  *See* 15 U.S.C. § 78u-5(c)(1)(A)(i).  Finally, Hayes made the statement "with actual knowledge that it was false or misleading."  *Slayton v. American Exp. Co.*, 604 F.3d 758, 766 (2d Cir. 2010).  For all of these reasons, the statement is not shielded by the PSLRA's safe harbor.

Third, Hayes's statement did not "amount[] to puffery."  A26.  "[S]tatements containing simple economic projections, expressions of optimism, and other puffery are insufficient" to state a fraud claim.  *Novak*, 216 F.3d at 315.  But Hayes's statement misrepresented that the engine's problems were behind RTX, and "defendants may be liable for misrepresentations of existing facts."  *Id.*  In

44

*Novak*, for example, this Court rejected the defendants' argument that their statements were non-actionable puffery where the complaint alleged that the defendants "stated that the inventory situation was 'in good shape' or 'under control'" even though they knew facts to the contrary. *Id.* So too here: Hayes's statement that the engine's issues "seem to be behind us," A184, "did more than just offer rosy predictions" about the state of the company, *Novak*, 216 F.3d at 315. It was actionable as "plainly false and misleading," not puffery. *Id.*

### 2. The Omissions from RTX's 10-K Were Material in Light of the Total Mix of Information Available to Investors.

The district court also erred in holding that RTX's February 2021 10-K statements were not misleading because the form included generic warnings, such that the "total mix of information available to an RTX investor included the financial risks of manufacturing issues." A23 (quotation marks and citation omitted). These warnings did nothing to apprise investors of the specific manufacturing defect at issue in this case, which the 10-K affirmatively concealed, but merely warned about, for instance, the generic potential that "[a] significant product issue" could "have a material adverse impact on our business." A179-180.

The court's decision flies directly in the face of this Court's precedent. Materiality requires "a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *Basic*, 485 U.S. at 231-32. Thus,

45

where the allegedly omitted information "is already known to the market," the failure to disclose that information in a given statement may not be material. *Ganino*, 228 F.3d at 167. As discussed, however, evaluating materiality— including an analysis of whether the "total mix" of information already disclosed the allegedly omitted facts—is a highly fact-specific inquiry that can almost never be resolved at the pleading stage. *See id.* at 162.

The district court identified no basis for concluding, at the pleading stage, that the "total mix" of information available to investors would have made them aware of the powdered metal defect. All the district court cited were generic warnings in the 10-K about the potential for problems with RTX's products that were not yet known. But that does nothing to alert investors to the fact that there *already was* a known problem with the Geared Turbofan engine. This Court held in *Meyer* that a generic warning of the risk of noncompliance with environmental regulations does not undermine the materiality of the defendant's failure to disclose an ongoing violation of those regulations, and that "[a] generic warning of a risk will not suffice when undisclosed facts on the ground would substantially affect a reasonable investor's calculations of probability." 761 F.3d at 251-52. This Court has reached similar conclusions in other cases, too. *See, e.g.*, *Gimpel*, 156 F.4th at 142 (holding that whether "generic language" describing "incentives and promotions" used to promote sales "sufficiently counterbalanced the

statements that attributed sales growth to growing demand" was not resolvable on the pleadings); *Sherman v. Abengoa, S.A.*, 156 F.4th 152, 168 (2d Cir. 2025) ("[I]t strains credulity to suggest that such a tepid warning … was enough to put investors on notice[.]").  The same analysis precludes judgment on the pleadings here.

Numerous factual allegations in the complaint also refute any suggestion that the powdered metal defect was publicly known to investors.  In 2023, RTX issued multiple press releases and two Form 8-Ks about the defect, followed by same-day conference calls.  *See* A160, A166-167.  That would all be unnecessary if the defect were already known.  The resulting plunge in RTX's stock price, analysts' shocked reactions to the disclosures, and the responses of the FAA and SEC when RTX made these announcements further refute the district court's suggestion that the investing public knew about the defect all along.  A104-107, A162-164, A170-173; *see In re Alphabet, Inc. Sec. Litig.*, 1 F.4th 687, 703 (9th Cir. 2021) ("market reaction, increased regulatory and governmental scrutiny," and media coverage "all support the materiality of the misleading omission").

### 3. The District Court's Scienter Analysis Was Legally Flawed and Ignored Key Factual Allegations.

The district court's opinion addressed scienter only briefly and without considering RTX's statements individually.  *See* A49-50.  The court held that the complaint did not allege scienter because (1) it lacked "facts that demonstrate with

particularity that it should have been obvious to Defendants that the powdered metal defect affected the entire [Geared Turbofan] fleet to the point that a mass recall was required," and (2) "Defendants were cooperating with the FAA." A50. Those conclusions are legally and factually flawed. And the court further erred by ignoring crucial scienter allegations, including RTX's concession that it knew it had a "suspect population in the fleet" as early as 2020. A104.

a. The district court concluded that plaintiffs did not plead scienter because the allegations did not establish that "it should have been obvious" to defendants that "a mass recall was required." A50. But plaintiffs' claim does not depend on it being "obvious" that "a mass recall was required." Scienter requires only that "defendants knew or, more importantly, should have known that they were misrepresenting material facts related to the corporation." *Novak*, 216 F.3d at 308. And materiality requires "measuring the importance of the event discounted by the probability of its occurrence." *Meyer*, 761 F.3d at 252. Thus, plaintiffs need to allege that defendants knew or should have known that the defect presented a sufficient risk of a sufficiently adverse impact on the company that reasonable investors would have considered the defect important in their investment decisions. *See Novak*, 216 F.3d at 311 (question is whether defendants "knew facts or had access to information suggesting that their public statements were not accurate").

48

Nothing required plaintiffs to more specifically allege that defendants knew in 2021 that the defect would lead to a mass recall.

Defendants' knowledge that their flagship airplane engine had a defect that could lead them to rip apart on takeoff—and had already led one engine to do so—is enough to establish scienter regardless of whether defendants knew, to a certainty, that the defect would lead to a mass recall. Even the *potential* that the known defect would lead to engine failure and have significant financial and reputational costs for the company would obviously be important to investors. Had RTX disclosed to investors that the manufacturing defect that led to the Vietnam Airlines incident applied to the Geared Turbofan engine, disclosed that they were working to understand the magnitude of the problem and correct it, and acknowledged that there was some uncertainty, investors could have made their own decisions about the financial risks to the company. Instead, RTX sought to hide the defect from investors altogether—at the same time it assured investors that less-significant problems with the engine had all been resolved.

Moreover, even if the complaint were required to allege that defendants knew a large-scale recall was effectively inevitable, the complaint contains those allegations even dating back to 2021. While Hayes claimed that the defect "occurred very, very rarely," Hayes acknowledged that "it actually resulted in the turbine [disk] failure on an airline." A104. Defendants knew that their plant was

49

manufacturing defective powdered metal for six manufacturing years; that those potentially defective parts were being used in the Geared Turbofan engine; that RTX had surged production of the Geared Turbofan engine while that defective metal was being churned out, so that more of those engines were being manufactured than any other type; and that RTX had to make nine "extensive" changes to its manufacturing process over eighteen months before it could eliminate the contamination from its powdered metal. A139, A162, A169.

In the context of airline engines, even this type of risk would almost inevitably lead to the type of recall that FAA ultimately ordered. A defect that "very, very rarely" leads to product failure in a pair of yoga pants might not lead to a recall and might not matter much to investors. *See Lululemon Securities Litigation*, 14 F. Supp. 3d 553 (S.D.N.Y. 2014). But even an exceedingly rare defect will almost certainly lead to a recall if the result of the defect, when it occurs, is that an airplane engine will rip apart or burst into flames. There was no basis for defendants to believe that anything other than a large-scale recall would be required as soon as they knew that they had a "suspect population in the fleet" of Geared Turbofan engines. A104.

The district court also erred in finding lack of scienter based on defendants' interactions with the FAA. The court concluded that "the extent to which Plaintiffs allege Defendants were cooperating with the FAA and complying with FAA

directives suggests that Defendants were acting within the ordinary standards of care for their industry." A50. But even assuming defendants were fully cooperating with the FAA, there is nothing inconsistent about RTX providing information to its regulating agency (in non-public filings) about the problems with the Geared Turbofan engine while concealing those problems from investors. The two are entirely unrelated. Regardless, the complaint alleges that RTX did *not* cooperate with the FAA but instead repeatedly and deliberately concealed information from its regulators and customers to minimize the issue. *See, e.g.*, A89, A99, A137, A141-143. The district court ignored those allegations.

b. The district court's scienter analysis also ignored several key allegations. *See Tellabs*, 551 U.S. at 323 (directing courts to consider "whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard").

Most importantly, the district court nowhere acknowledged that RTX's CEO admitted that RTX had discovered the defect and its relevance to the Geared Turbofan engine in 2020 following the Vietnam Airlines engine failure. As discussed above, RTX's CEO acknowledged that "we determined at that point that we had some contamination in this powdered metal that we make"; "we knew that this contamination had occurred between late 2015 and late 2020, early 2021"; and "we knew we had a suspect population in the fleet." A104. Those statements go

51

directly to what defendants knew and when, and they strongly support scienter. But the district court inexplicably ignored them.

The district court's scienter analysis also failed to recognize that RTX had built a new tower specifically for the Geared Turbofan engine in 2015 and that, between 2015 and 2021, RTX was producing the Geared Turbofan at a higher volume than any other engine.  A104, A139.  Moreover, while the district court briefly noted that "RTX made changes and updates to its manufacturing process," it did not address the import of those changes in its scienter analysis.  A30.  The changes were not ordinary "updates."  To the contrary, they were numerous "extensive" manufacturing changes made over a period of eighteen months, and they demonstrate that defendants knew there was a serious problem with the engine and that they were desperately trying to fix it.

## II. Defendants' 2023 Statements Fraudulently Suggested that RTX's Financial Projections Fully Accounted for the Problems with the Geared Turbofan Engine.

In December 2022, the Geared Turbofan engine of a Viva Aerobus plane exploded during takeoff—severely undermining defendants' attempts to conceal the manufacturing defects in the Geared Turbofan engine.  But even though defendants knew that the Viva Aerobus fire was caused by the same defect that had led the Vietnam Airlines engine to rip apart, defendants still tried to keep investors in the dark.  In April and June of 2023, defendants claimed that their financial

estimates fully incorporated all the information they knew about the Geared Turbofan engine. However, those estimates did not account for any potential financial impact from the known manufacturing defect that had now led two of RTX's airplane engines to fail during takeoff.

First, on April 25, 2023, defendants held an earnings call. Defendant Mitchill, RTX's CFO, informed investors that "[O]ur estimates today contemplate everything that we know about the engine. … And any challenges in terms of cost or additional resources we need to put into that area are already contemplated in the outlook that we have for Pratt and for RTX as a whole." A196. Second, on June 19, 2023, Shane Eddy, the President of Pratt & Whitney, spoke at the Paris Air Show. A198-199. An analyst asked him about "any financial exposure" based on the issues that "a number of customers" were experiencing with the engine. A198. Defendant Eddy replied: "[A]s we have designed the improvements that go into the fleet, we've rolled those costs into the cost basis for the portfolio … I think there's not a surprise here coming … [A]ll of those costs would be programmed into the portfolio and into our calculation as well." A198-199.

The complaint's allegations, taken as true, establish that these statements were materially false and made with scienter. Mere months after RTX assured investors that its financial statements accounted for everything RTX knew about the engine, RTX shocked investors by announcing the need for a $3 billion recall.

53

### A.     The 2023 Statements Were Materially False.

Defendants' statements in April and June of 2023 that RTX's financial projections encompassed everything RTX knew about the Geared Turbofan engine—even though they made no account of any potential financial impact of the manufacturing defect that had just led one of its engines to explode—were materially false.  By mid-2023, senior executives like RTX's CFO and Pratt & Whitney's President would have known that RTX had distributed six years' worth of engines with potentially defective turbine disks.  *E.g.*, A104.  They would have known that those disks had twice led engines to catastrophically fail during takeoff. And they would have known that assessing whether a given engine had defective turbine disks would require taking planes off-wing, performing specialized testing, and compensating airlines.  *See* A89, A98-99, A127, A138-139.  Assuring investors that financial projections for the engine were comprehensive, while omitting these massive risks to the engine's financial performance, was at best misleading.

This Court has found statements to be false or misleading in analogous cases where a defendant either misstated or misled investors as to the defendant's own understanding of material facts.  In *Set Capital LLC v. Credit Suisse Group AG*, for instance, the defendant had assured investors that it had "no reason to believe" that the defendant's hedging activity would impact the price of a certain financial

54

instrument even though the defendant "knew with virtual certainty" that its activity would, in fact, impact that price. 996 F.3d 64, 85 (2d Cir. 2021). This Court held that the defendant's statement was actionable because it "misrepresented [the defendant's] knowledge and intent." *Id.* at 86. Similarly, in *Altimeo Asset Management v. Qihoo 360 Technology Co.*, the defendant stated that "the Buyer Group does not have any current plans" to relist the company. 19 F.4th 145, 150 (2d Cir. 2021). This Court held that it could "infer" from plaintiffs' "allegations, taken together," that "a concrete plan was in place" to relist the company at the time that statement was made, making the defendant's statement an actionable misstatement or omission. *Id.* at 150-51.

Multiple courts have also recognized that "an inference of falsity is easier to justify for statements that are followed shortly by corrective disclosures of significant dimension." *City of Warren Police & Fire Ret. Sys. v. Prudential Fin., Inc.*, 70 F.4th 668, 693 (3d Cir. 2023) (collecting cases).

As in these cases, plaintiffs' allegations create a plausible inference that RTX's assurances about the comprehensive nature of its financial projections for the Geared Turbofan engine did not reflect RTX's knowledge of the serious financial risks facing that engine—a risk that was borne out mere months after RTX's false and misleading statements.

These misstatements and omissions were material. Any reasonable investor would have considered it significant that RTX was facing a virtually inevitable recall after the turbine-disk defect caused a second explosion. This case is analogous to *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27 (2011). There, the defendant "told the market that revenues were going to rise," but failed to disclose "information indicating a significant risk to its leading revenue-generating product." *Id.* at 47. Similarly here, RTX disclosed rosy financial projections without accounting for the risks from the powdered metal defect.

Investors' reaction to RTX's eventual disclosure confirms materiality. Just a month after Eddy told investors "there's not a surprise here coming," RTX revealed it would be pulling hundreds of engines from flight. A199. Analysts were incredulous. One asked, "how could you guys possibly not know about this at Paris[?]" A163. Another, noting the whiplash between the company's outlook from June to July, commented that "the company sounded incrementally bullish on the [engine] just a month ago" at the Paris Air Show. A163. A third similarly criticized defendants for "making no mention nor contingency for this issue a month ago at its Paris Airshow briefing" even though it was already "a known potential issue, per company commentary." A213-214.

### B. The Complaint's Allegations, Taken as True, Establish a Strong Inference of Conscious Misbehavior or Recklessness.

All of the reasons that plaintiffs' allegations establish scienter as to RTX's 2021 statements apply equally to RTX's 2023 statements. Pp. 37-41, *supra*. The complaint also contains additional allegations that further support scienter as to the 2023 statements. By 2023, a second engine—this time a Geared Turbofan engine—had failed because of a defective turbine disk. RTX was more fully aware of the magnitude of the changes that had been needed to fix that problem, and it knew that it had not been able to fix its manufacturing process until the fourth quarter of 2021. A104. In addition, RTX's interactions with the FAA in the aftermath of both the 2021 and 2023 incidents strongly suggested, by the time of the 2023 statements, that RTX would have to take corrective action that would have a significant financial impact on the company. *E.g.*, A98, A101-102, A155.

As investors themselves recognized, it is inconceivable that RTX's CFO and Pratt & Whitney's President thought the powdered metal defect would have *no* financial impact on RTX mere months before announcing corrective measures that would cost the company more than $3 billion. At the very least, the inference that defendants knew or should have known that these statements were misleading is sufficiently plausible to survive a motion to dismiss.

**C.     The District Court Failed To Identify Any Valid Reason Why These Statements Were Not Actionable.**

The district court erred in holding that these statements were not actionable because (1) plaintiffs did not allege that defendants knew about the "magnitude" of the problem; (2) Eddy's statement that "I think there's not a surprise here coming" was "opinion"; and (3) plaintiffs did not adequately allege scienter.

1.  The district court dismissed plaintiffs' claims as to the 2023 statements because plaintiffs did not allege that defendants "were aware of the magnitude … of the defect" or "were aware that the [Geared Turbofan] fleet would need to be grounded." *E.g.*, A43, A46.  This reasoning is legally flawed, largely for the reasons discussed above.  Pp. 48-49, *supra*.  Plaintiffs did not need to allege that defendants were aware of the precise magnitude of the problem or needed to know, to a certainty, the number of engines that would need to be grounded.  Plaintiffs simply needed to allege that defendants were aware of a risk that was sufficiently likely, and of a sufficient magnitude, that investors would have considered it material in deciding whether to invest in the company.  *Meyer*, 761 F.3d at 252.  The complaint amply makes that showing.  Defendants' statements are false and misleading not because they failed to accurately foresee the precise implications of the powdered metal defect but because they entirely failed to disclose the risks from that defect *at all*—even though, for the reasons discussed above, defendants

plainly knew about those risks, and how serious they were, when they made these statements in 2023.

Moreover, as discussed above, even if plaintiffs somehow needed to allege that defendants effectively knew the fleet would be grounded, plaintiffs' allegations meet that standard. Pp. 49-50, *supra*. That is especially true as to the 2023 statements, which were made after the second explosion and mere months before the fleet was, in fact, grounded. *See City of Warren Police & Fire Ret. Sys.*, 70 F.4th at 693-94 (conclusion that statements were untrue "is not impermissible fraud by hindsight, but instead a reasonable inference" when "Prudential's corrective disclosures were momentous … and close in time (eight weeks later) to [the defendant's] statements").

2. The district court also erred in holding that Eddy's statement at the Paris Air Show was nonactionable opinion. A43. ("That Mr. Eddy was incorrect in his opinion that there was not a 'surprise' coming is also insufficient to allege fraud."). As discussed above, pp. 42-43, *supra*, opinions are actionable where the speaker did not hold the belief he professed or he omitted information that made the statement misleading to a reasonable investor. *Shanda Games*, 128 F.4th at 43. Eddy's "I think" statement conveyed that he "actually h[eld] the stated belief" that there was no surprise coming in connection with the Geared Turbofan engine, *Omnicare*, 575 U.S. at 184, when he in fact knew about the defect that had caused

two engines to fail during takeoff—a massive "surprise" to investors.  *See, e.g.*, A163 (analyst asking "how could you guys possibly not know about this at Paris[?]"), A214 (RTX "sounded incrementally bullish on the [engine]" at Paris). The complaint alleges that Eddy did not hold the belief he professed and omitted material information, making his statement false and misleading, and actionable.

3.  As discussed above, the district court's conclusion that the complaint did not allege scienter as to any of RTX's statements was legally and factually flawed and ignored key pieces of evidence.  A49-50; pp. 47-52, *supra*.  The flaws in the court's reasoning are further evident when considering the 2023 statements, which RTX made a mere month before disclosing the recall.  For the reasons discussed above, it is practically inconceivable that, by June of 2023, RTX did not have a strong sense that there would be significant financial repercussions from the defect and know that a significant recall was extremely likely—if not certain.  Yet RTX neither disclosed that likelihood nor stayed silent, but instead repeatedly reassured investors that its financial projections for the engine, which did not account for the possibility of a recall or any other financial repercussions from the defect, remained accurate.  The district court did not attempt to explain how the complaint fell short of alleging scienter as to the 2023 statements.

### III. The Court Should Reinstate the Derivative Section 20(a) Claims.

Plaintiffs also brought claims under Section 20(a). 15 U.S.C. § 78t(a). These claims are derivative of the Section 10(b) claims. To state a prima facie Section 20(a) claim against the individual defendants, plaintiffs must, among other things, "show a primary violation" of Section 10(b) and Rule 10b-5 by RTX. *Ganino*, 228 F.3d at 170. Because the district court found that the complaint did not state such a primary violation, the court dismissed the derivative Section 20(a) claims. A52. If the Court vacates the district court's dismissal of the Section 10(a) and Rule 10b-5 claims, it should remand for the district court to address the Section 20(a) claims in the first instance. *See, e.g.*, *Ganino*, 228 F.3d at 170-71.

### CONCLUSION

This Court should reverse the judgment of the district court.

Dated: January 27, 2026

Respectfully submitted,

*/s/ David Zimmer*

Michael P. Canty
LABATON KELLER SUCHAROW LLP
140 Broadway
New York, NY 10005
(212) 907-0700

David Zimmer
ZIMMER, CITRON & CLARKE LLP
130 Bishop Allen Dr.
Cambridge, MA 02139
(617) 676-9421

Lester R. Hooker
SAXENA WHITE P.A.
7777 Glades Road, Suite 300
Boca Raton, FL 33434
(561) 394-3399

Julia Solomon-Strauss
ZIMMER, CITRON & CLARKE LLP
1629 K St. NW
Suite 300
Washington, DC 20006
(202) 796-4540

Steven B. Singer
SAXENA WHITE P.A.
10 Bank Street, 8th Floor
White Plains, NY 10606
914-437-8551

*Counsel for Appellants*

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(b)(i) and Second Circuit Rule 32.1(4) because it contains 13,980 words, excluding those parts of the brief exempted by Federal Rule of Appellate Procedure 32(f). This brief complies with the typeface and type style requirements of Federal Rule of Appellate Procedure 32(a)(5) and 32(a)(6) because it has been prepared in a proportionately spaced typeface using Microsoft Word in Times New Roman, 14-point font for text and footnotes.

Dated: January 27, 2026         */s/ David Zimmer*
                                       David Zimmer

## CERTIFICATE OF SERVICE

I, David Zimmer, certify that, on this date, I electronically filed the foregoing document with the United States Court of Appeals for the Second Circuit by using the ACMS system. I certify that the counsel of record for Appellees will be served by the ACMS system.

Dated: January 27, 2026         */s/ David Zimmer*
                                       David Zimmer