# 25-2549

## United States Court of Appeals

*for the*

## Second Circuit

NEW ENGLAND TEAMSTERS PENSION FUND,
Individually and on behalf of all others similarly situated,

*Consolidated Plaintiff-Appellant,*

WESTCHESTER PUTNAM COUNTIES HEAVY & HIGHWAY LABORERS LOCAL 60 BENEFITS FUND, UNITED UNION OF ROOFERS, WATERPROOFERS & ALLIED WORKERS LOCAL UNION NO. 8 WBPA FUND,

*Movants-Appellants,*

JOSHUA PENEYCAD, Individually and on behalf of all others similarly situated,

*Plaintiff,*

– v. –

RTX CORPORATION, f/k/a Raytheon Technologies Corporation, GREGORY HAYES, ANTHONY F. O'BRIEN, NEIL MITCHILL, CHRISTOPHER T. CALIO, SHANE EDDY,

*Defendants-Appellees.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

## BRIEF FOR DEFENDANTS-APPELLEES

JOHN W. CERRETA
DAY PITNEY LLP
Goodwin Square
225 Asylum Street
Hartford, Connecticut 06103
(860) 275-0665

WILLIAM SAVITT
GRAHAM W. MELI
ADAM L. GOODMAN
KATHERINE DUBBS
WACHTELL, LIPTON, ROSEN & KATZ
51 West 52nd Street
New York, New York 10019
(212) 403-1000

*Attorneys for Defendants-Appellees*

COUNSEL PRESS (800) 4-APPEAL • (392128)

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, Defendant-Appellee RTX Corporation, f/k/a Raytheon Technologies Corporation, states that it has no parent corporation and that no publicly held corporation owns 10% or more of its stock.

# TABLE OF CONTENTS

**Page**


PRELIMINARY STATEMENT ........ 1

COUNTERSTATEMENT OF ISSUES ........ 4

COUNTERSTATEMENT OF THE CASE ........ 4

A. RTX and its officers ........ 4

B. The GTF engine enters service and experiences early problems ........ 5

C. In March 2020, an aircraft with a non-GTF engine aborts takeoff due to failure of a part made with powdered metal ........ 7

D. Pratt analyzes additional actions for V2500 and GTF engines ........ 8

E. In December 2022, a GTF-powered aircraft aborts takeoff, causing Pratt to reassess the methodology employed in its investigation ........ 10

F. RTX continues to update investors about issues affecting the GTF engine's financial performance ........ 11

G. In July 2023, RTX announces that "recent learnings" require accelerated inspections ........ 13

H. Plaintiffs sue, and the district court dismisses the complaint ........ 16

STANDARD OF REVIEW ........ 17

SUMMARY OF ARGUMENT ........ 18

ARGUMENT ........ 21

I. THE DISTRICT COURT CORRECTLY DISMISSED THE § 10(B) CLAIM FOR FAILURE TO PLEAD FALSITY ........ 21

A. The complaint fails to adequately plead falsity with respect to the February 2021 statements ........ 22

1. The complaint pleads no facts showing that the February 2021 statements were materially false or misleading when made ........ 23

2. The February 2021 statements include inactionable opinion, forward-looking statements, and puffery. 33

B. The complaint fails to adequately plead falsity with respect to the April and June 2023 statements. 36

1. The complaint pleads no facts showing that the April and June 2023 statements were materially false or misleading when made. 37

2. The April and June 2023 statements also include inactionable opinion and forward-looking statements. 42

C. Plaintiffs have waived their challenges to other alleged statements. 43

II. THE DISTRICT COURT CORRECTLY DISMISSED THE § 10(B) CLAIM FOR FAILURE TO PLEAD SCIENTER. 44

A. Plaintiffs fail to adequately allege motive to commit fraud. 46

B. Plaintiffs fail to adequately plead strong circumstantial evidence of conscious misbehavior or recklessness. 48

1. Defendants did not "concede" scienter. 49

2. Pratt's manufacturing changes do not support an inference of scienter. 51

3. The "nature of the problem and the industry" do not support an inference of scienter. 52

4. The importance of the GTF engine to RTX's business does not support an inference of scienter. 54

C. The more compelling inference is of nonfraudulent intent. 56

III. THE DISTRICT COURT CORRECTLY DISMISSED THE § 20(A) CLAIM. 58

CONCLUSION 58

# TABLE OF AUTHORITIES

**Cases** **Page(s)**

*Abramson* v. *Newlink Genetics Corp.*,
965 F.3d 165 (2d Cir. 2020) ....................24

*Acito* v. *IMCERA Grp.*,
47 F.3d 47 (2d Cir. 1995) ....................30

*Altimeo Asset Mgmt.* v. *Qihoo 360 Tech. Co.*,
19 F.4th 145 (2d Cir. 2021) ....................39

*Ark. Pub. Emps. Ret. Sys.* v. *Bristol-Myers Squibb Co.*,
28 F.4th 343 (2d Cir. 2022) ....................58

*ATSI Commc'ns, Inc.* v. *Shaar Fund, Ltd.*,
493 F.3d 87 (2d Cir. 2007) ....................22, 38, 44, 53

*Basic Inc.* v. *Levinson*,
485 U.S. 224 (1988)....................30

*City of Hialeah Emps. Ret. Sys.* v. *Peloton Interactive, Inc.*,
153 F.4th 288 (2d Cir. 2025) ....................*passim*

*Denny* v. *Barber*,
576 F.2d 465 (2d Cir. 1978) ....................41

*Doherty* v. *Bice*,
101 F.4th 169 (2d Cir. 2024),
*cert. denied*, 145 S. Ct. 381 (2024)....................29–30

*ECA, Loc. 134 IBEW Joint Pension Tr. of Chi.* v.
*JP Morgan Chase Co.*,
553 F.3d 187 (2d Cir. 2009) ....................45

*Ernst & Ernst* v. *Hochfelder*,
425 U.S. 185 (1976)....................44

*Frankfurt-Tr. Inv. Luxemburg AG* v. *United Techs. Corp.*,
336 F. Supp. 3d 196 (S.D.N.Y. 2018), *aff'd sub nom.*,
*Kapitalforeningen Lægernes Inv.* v. *United Techs. Corp.*,
779 F. App'x 69 (2d Cir. 2019) ....................55

*Ganino* v. *Citizens Utils. Co.*,
228 F.3d 154 (2d Cir. 2000) ....................29, 32 n.4

*Gimpel* v. *Hain Celestial Grp.*,
156 F.4th 121 (2d Cir. 2025) .................... *passim*

*Harris* v. *Ivax Corp.*,
182 F.3d 799 (11th Cir. 1999) ....................35

*Higginbotham* v. *Baxter Int'l, Inc.*,
495 F.3d 753 (7th Cir. 2007) ....................30

*I. Meyer Pincus & Assocs., P.C.* v. *Oppenheimer & Co.*,
936 F.2d 759 (2d Cir. 1991) ....................28, 41, 49

*In re Checkpoint Therapeutics Sec. Litig.*,
2025 WL 1434400 (S.D.N.Y. May 19, 2025) ....................53

*In re Express Scripts Holdings Co. Sec. Litig.*,
773 F. App'x 9 (2d Cir. 2019) ....................35

*In re Gen. Elec. Sec. Litig.*,
844 F. App'x 385 (2d Cir. 2021) ....................29, 52, 58

*In re Lululemon Sec. Litig.*,
14 F. Supp. 3d 553 (S.D.N.Y. 2014),
*aff'd*, 604 F. App'x 62 (2d Cir. 2015)....................31–32

*In re Mobileye Glob. Sec. Litig.*,
2025 WL 1126967 (S.D.N.Y. Apr. 16, 2025),
*aff'd*, 2025 WL 3640904 (2d Cir. Dec. 16, 2025) ....................42

*In re Philip Morris Int'l Inc. Sec. Litig.*,
89 F.4th 408 (2d Cir. 2023) ....................17, 21

*In re Target Corp. Sec. Litig.*,
955 F.3d 738 (8th Cir. 2020) ....................55–56

*Jackson* v. *Abernathy*,
960 F.3d 94 (2d Cir. 2020) ....................45

*Kalnit* v. *Eichler*,
264 F.3d 131 (2d Cir. 2001) ....................46, 48

*Khoja* v. *Orexigen Therapeutics, Inc.*,
899 F.3d 988 (9th Cir. 2018) ....................28, 41, 49

*Laurent* v. *PricewaterhouseCoopers LLP*,
794 F.3d 272 (2d Cir. 2015) ....................17

*Matrixx Initiatives, Inc.* v. *Siracusano*,
563 U.S. 27 (2011)....................40

*Meyer* v. *Jinkosolar Holdings Co.*,
761 F.3d 245 (2d Cir. 2014) ....................32

*Miss. Pub. Emps. Ret. Sys*. v. *Bos. Sci. Corp.*,
523 F.3d 75 (1st Cir. 2008)....................33, 51, 52

*Novak* v. *Kasaks*,
216 F.3d 300 (2d Cir. 2000) ....................*passim*

*Omnicare, Inc.* v. *Laborers Dist. Council Const. Indus. Pension Fund*,
575 U.S. 175 (2015)....................34, 42

*Rombach* v. *Chang*,
355 F.3d 164 (2d Cir. 2004) ....................2, 22, 35, 38

*Ronconi* v. *Larkin*,
253 F.3d 423 (9th Cir. 2001) ....................44

*San Leandro Emergency Med. Grp. Profit Sharing Plan* v. *Philip Morris Co., Inc.*,
75 F.3d 801 (2d Cir. 1996) ....................24, 56

*S. Cherry St., LLC* v. *Hennessee Grp.*,
573 F.3d 98 (2d Cir. 2009) ....................*passim*

*S.E.C.* v. *Gabelli*,
653 F.3d 49 (2d Cir. 2011),
*rev'd on other grounds*, 568 U.S. 442 (2013) ....................32–33

*Set Cap. LLC* v. *Credit Suisse Grp. AG*,
996 F.3d 64 (2d Cir. 2021) ....................39, 40

*Shields* v. *Citytrust Bancorp, Inc.*,
25 F.3d 1124 (2d Cir. 1994) ....................46

*Sneed* v. *Talphera, Inc.*,
147 F.4th 1123 (9th Cir. 2025) ....................................................................26

*Stratte-McClure* v. *Morgan Stanley*,
776 F.3d 94 (2d Cir. 2015), *abrogated on other grounds by Macquarie Infrastructure Corp.* v. *Moab Partners*,
601 U.S. 257 (2024)...........................................................................................56

*Teamsters Loc. 445 Freight Div. Pension Fund* v. *Dynex Cap. Inc.*,
531 F.3d 190 (2d Cir. 2008) ..............................................................................47

*Tellabs, Inc.* v. *Makor Issues & Rts., Ltd.*,
551 U.S. 308 (2007)...................................................................................*passim*

*Tongue* v. *Sanofi*,
816 F.3d 199 (2d Cir. 2016) ..............................................................................30

**Statutes and Rules**

15 U.S.C. § 78j(b) .........................................................................................*passim*

15 U.S.C. § 78t(a) ........................................................................................17, 58

15 U.S.C. § 78u-4.....................................................................................2, 21, 44

15 U.S.C. § 78u-5..................................................................34, 35, 35 n.5, 43

17 C.F.R. § 240.10b-5...................................................................................16, 21

Fed. R. Civ. P. 9(b) .......................................................................................*passim*

## PRELIMINARY STATEMENT

In July 2023, RTX Corporation announced that its Pratt & Whitney business unit was recalling jet engines it manufactured due to a rare but significant defect. Certain parts in the affected engines were made of a material called "powdered metal," which could be contaminated during production and reduce the parts' useful life. The recall led to declines in RTX's stock price.

Plaintiffs try to turn this corporate bad news into securities fraud by claiming that RTX knew for years that the powdered metal defect would require a massive recall but concealed that information from investors. This theory rests almost entirely on what RTX's executives said when they announced the recall in 2023. In plaintiffs' telling, the executives confessed to their own fraud, revealing that they knew the extent of the problem since 2020 while "frantically" trying to fix it through secret manufacturing changes. Pls.' Br. 1–2. But plaintiffs gloss over the executives' actual statements, which eliminate any inference of fraud. Plaintiffs omit that the executives in fact explained how Pratt's previous engineering assessment showed that a large-scale recall was *not* needed. Only work done shortly before the July 2023 announcement, including analysis of "very recent learnings" and "recent inspection findings," changed Pratt's understanding of this complex issue. And that work was still ongoing at the time: RTX would "know a lot more in the next 6 weeks."

Plaintiffs offer no well-pleaded facts that, contrary to these statements, the individual defendants understood before July 2023 that a fleet-wide recall was coming. This pleading failure is fatal. The Private Securities Litigation Reform Act of 1995 ("PSLRA") requires securities-fraud plaintiffs to support their claims with particularized allegations of fact. They must not only specify which statements were false or misleading, "they must demonstrate with specificity why and how that is so." *Rombach* v. *Chang*, 355 F.3d 164, 174 (2d Cir. 2004). And they must "state with particularity facts giving rise to a *strong inference* that the defendant acted with the required state of mind," *i.e.*, scienter. 15 U.S.C. § 78u-4(b)(2) (emphasis added). That strong inference must be "at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs, Inc.* v. *Makor Issues & Rts., Ltd.*, 551 U.S. 308, 324 (2007). As the district court held, plaintiffs fail to satisfy these pleading standards on multiple independent grounds.

*First*, the complaint pleads no material misstatement or omission with particularity. This Court has long warned against pleading "fraud by hindsight." *E.g.*, *Novak* v. *Kasaks*, 216 F.3d 300, 309 (2d Cir. 2000). Plaintiffs try to do just that. They point to adverse developments—the engine recall and fall in RTX's stock price—and claim that defendants should have disclosed the problem earlier. But plaintiffs must plead that defendants' statements to the market were materially false or misleading *when made*. *Rombach*, 355 F.3d at 172. This requires pleading

contemporaneous facts that contradict those statements. Plaintiffs have no such facts. The district court rejected plaintiffs' attempt to rely on allegations by "confidential witnesses," and plaintiffs do not challenge that holding on appeal. So they are left trying to cobble together "admissions" from when defendants disclosed the recall. But read in full, rather than in the snippets plaintiffs offer the Court, those disclosures destroy the claim that defendants' statements were materially false or misleading.

*Second*, the complaint fails to plead any inference of scienter, let alone the strong inference required. Again, plaintiffs lack particularized facts supporting any inference that the individual defendants knew information that contradicted their public statements. And plaintiffs make no effort to explain why it would make any sense for defendants to fraudulently conceal a financially material defect requiring a recall—supposedly to reap profits in later years and avoid compensating affected customers—only to then voluntarily disclose the defect and compensate those very customers. The far more compelling inference is the nonculpable one: that the information available to defendants evolved as Pratt's engineers gathered and analyzed data and that defendants announced the recall when they learned one was warranted, not that defendants defrauded investors.

The district court's judgment should be affirmed on each of these independent grounds.

## COUNTERSTATEMENT OF ISSUES

1. Did the district court correctly dismiss plaintiffs' securities fraud claim for failure to plead with particularity that defendants' statements in February 2021, April 2023, and June 2023 were materially false or misleading when made?

2. Did the district court correctly dismiss plaintiffs' securities fraud claim for failure to plead facts giving rise to a strong inference that the individual defendants acted with scienter at the time of their statements?

3. Did the district court correctly dismiss plaintiffs' control-person liability claim for failure to plead an underlying securities fraud claim?

## COUNTERSTATEMENT OF THE CASE

### A. RTX and its officers

RTX Corporation is an aerospace and defense company. A109, 114 (¶¶ 57, 74). It manufactures and services thousands of products, including multiple airplane engine models. *See* A264, 539, 694, 907. In 2022, the company had about 182,000 employees, including 55,000 engineers, across 52 countries. A697. RTX operates in three business segments: Collins Aerospace, Raytheon, and Pratt & Whitney. A114 (¶ 74). Pratt designs, manufactures, and services engines for commercial and military aircraft. A114 (¶ 75). It earns profits through engine sales and aftermarket maintenance, repair, and overhaul services. A114 (¶ 76).

The complaint names five individual defendants. Each was an officer of RTX or Pratt during the alleged Class Period in 2021 through 2023. A230 (¶ 396). Gregory Hayes was RTX's Chief Executive Officer and Chairman. A109 (¶ 58). Anthony O'Brien was RTX's Chief Financial Officer until April 2021. A110 (¶ 60). Neil Mitchill succeeded Mr. O'Brien as CFO. A109 (¶ 59). Christopher Calio was President of Pratt and then became Chief Operating Officer of RTX. A110 (¶ 61). After the Class Period, Mr. Calio became CEO of RTX. *Id.* Shane Eddy has been President of Pratt since March 2022. A110 (¶ 62).

### B. The GTF engine enters service and experiences early problems.

Over the years, Pratt has produced several generations of "turbofan" engines, which ingest air, feed it through a compressor and a combustor, and then expel heated air through a turbine to propel the aircraft. A115–16 (¶ 80). In 2008, Pratt began developing a new family of "geared turbofan" ("GTF") engines for commercial aircraft. A115 (¶ 78). These engines were heralded for fuel efficiency, performance, and noise reduction. A115, 116–17 (¶¶ 79, 82–83).

Pratt has long made certain engine parts, including for GTF engines, from "powdered metal." A95, 126 (¶¶ 20, 107). The manufacturing process involves creating a powdered metal alloy from raw materials, forging it into a solid through compression and heat, and shaping that metal into finished parts. *Id.*

GTF engines entered service in 2016 with the PW1100G model, and later the PW1500G and PW1900G models. A115 (¶ 78). The engines experienced some early reliability and durability issues, dubbed "teething problems" because they arose in the engines' infancy. *E.g.*, A124–25 (¶¶ 102–04). These problems were unrelated to powdered metal. A124, 177 (¶¶ 102, 237).

RTX disclosed these early issues to investors. For example, in February 2021, RTX disclosed in its Form 10-K that, since the GTF "engine entered into service in 2016, technical issues have been identified and experienced with the engine, which is usual for new engines and new aerospace technologies." A176 (¶ 235) (quoting A382).[1] RTX added that Pratt had "addressed these issues through various improvements and modifications," which "resulted in financial impacts." *Id.* At a conference later that month, RTX's CEO, Mr. Hayes, explained that about 85% of the GTF engine-powered fleet was "flying on a regular basis" and that "[d]ispatch reliability"—flight departures without mechanical delays—was then 99.97%. A183–84 (¶ 250) (quoting A1049). Mr. Hayes then said, "all those teething problems that we talked about for the last several years seem to be behind us" and "the engine's performing really well." *Id.*

As it discussed the financial impacts caused by GTF engines' teething problems, RTX disclosed that "[a]dditional technical issues, either related to this

[1] Emphasis that appears in the complaint is omitted.

[GTF] program or other programs, may also arise in the normal course, which may result in financial impacts that could be material." A176 (¶ 235) (quoting A382) (RTX Feb. 8, 2021 Form 10-K); A320. In Forms 10-K filed from 2021 through 2023, RTX also disclosed risks for its products more broadly, including that they "incorporate advanced technologies," which "involves risks" that could cause "material additional costs." A181–82 (¶ 247) (quoting A277), 552, 705–06. RTX noted that potential "product recalls" could result in significant costs. A179–80 (¶ 243) (quoting A279), 192–93 (¶ 278) (quoting A553–54), 282, 556–57, 707–08, 711. Other risks included "a catastrophic product failure or similar event, particularly in [Pratt's] commercial aerospace business." A179–80 (¶ 243) (quoting A279); *see* A192–93 (¶ 278) (quoting A553–54), 707–08.

### C. In March 2020, an aircraft with a non-GTF engine aborts takeoff due to failure of a part made with powdered metal.

On March 18, 2020, an aircraft operated by Vietnam Airlines aborted takeoff, without injuries, after the failure of its engine—an older-model, non-GTF engine called the V2500. A97, 135–36 (¶¶ 26, 134); A1157. Examination of the plane's V2500 engine showed that a high-pressure turbine ("HPT") disc, part of the engine's propulsion system, cracked and failed during takeoff. A136 (¶ 135).

After this event, Pratt and the Federal Aviation Administration ("FAA") apprised aircraft owners and operators of necessary actions. Engine manufacturers like Pratt issue "service bulletins" with safety and maintenance recommendations.

A137 (¶ 138 n.12). The FAA issues "airworthiness directives"—legal mandates, published in the Federal Register—requiring aircraft owners or operators to remedy an "unsafe condition." A98 (¶ 28 n.6). Such directives often incorporate the manufacturer's recommendations from prior service bulletins. A137 (¶ 138 n.12). In March and April 2020, the FAA issued airworthiness directives in coordination with Pratt related to 11 specific V2500 engines, requiring their removal within 30 days. A98, 137 (¶¶ 28, 136); A860.

Pratt also began an investigation to determine the "root cause" of the failure of the V2500 engine in the Vietnam Airlines event. A98, 137 (¶¶ 28, 137). Pratt later determined that the engine's HPT disc was affected by contamination of the powdered metal from which it was made. A98 (¶ 28). Such contamination can lead to weak spots or "microcracks" in a part, which can grow as the engine operates, shortening the part's life. A127 (¶¶ 108–09).

### D. Pratt analyzes additional actions for V2500 and GTF engines.

In the months after the Vietnam Airlines event, Pratt continued to investigate. A137 (¶ 137). A service bulletin and an airworthiness directive in January 2021 said that Pratt had identified additional V2500 HPT discs affected by "an anomaly in the material that can affect the part certified life." A137 (¶¶ 137–38). Pratt advised that the discs be scanned for defects with an imaging technique called "angled ultrasonic inspection" ("AUSI"). A127, 141 (¶¶ 109, 148).

By June 2021, Pratt had expanded its analysis to include certain GTF engines. A147 (¶ 164). Pratt's recommendations at this time involved a small number of engines and did not require broad recalls before scheduled maintenance. In July 2021, Pratt informed the FAA of 59 specific GTF engines (in a fleet of about 3,000 engines) that it identified as having the highest risk due to potential defects in powdered metal. A147–48, 150 (¶¶ 165, 170). In September 2021, the FAA publicly issued an airworthiness directive requiring removal of three specific GTF engines; Pratt then issued a service bulletin listing a larger, separate set of GTF engines that required AUSI scans to be conducted on their HPT discs due to an "anomaly" introduced "during part manufacture." A148–49 (¶¶ 167–68). In the service bulletin, Pratt advised that the scans of the larger group of GTF engines could await the "next shop visit"—*i.e.*, when the engine would next be in a repair shop for regular maintenance—meaning that an unscheduled grounding of these engines was not then contemplated. A149, 152 (¶¶ 170, 175).

Throughout late 2021 and 2022, Pratt continued to analyze the powdered metal issue and to refine its recommended remedial actions. In October 2021, the FAA issued a proposed directive shortening compliance thresholds for certain "high-thrust" V2500 engines (*i.e.*, engines that produce more force). A150 (¶ 171) (quoting A865); A116 (¶ 82). In January 2022, the FAA required removal of HPT discs in 21 more GTF engines—specifically, PW1500G and PW1900G models,

which produced less thrust than the PW1100G at issue in prior directives. A150 (¶ 172); A871. Subsequent bulletins and directives in 2022 required AUSI scans of additional GTF engines, while continuing to advise that these inspections could be completed during scheduled maintenance—again, not requiring an accelerated recall or grounding of fleets. A152–53 (¶¶ 175–76).[2]

### E. In December 2022, a GTF-powered aircraft aborts takeoff, causing Pratt to reassess the methodology employed in its investigation.

On December 24, 2022, almost three years after the Vietnam Airlines incident, an aircraft operated by Mexican airline Viva Aerobus aborted takeoff, without injuries. A103, 154–55 (¶¶ 39, 181); A1161. This plane had a GTF engine, unlike the V2500 engine in the March 2020 Vietnam Airlines incident. A103, 154–55 (¶¶ 39, 181). A series of airworthiness directives followed. A154–55 (¶ 181). As one noted, the event caused Pratt to conduct "a records review of production and field-returned parts, and re-evaluate[] their engineering analysis methodology." *Id.* (quoting A874). The "new analysis" found that the failure was

---

[2] Plaintiffs assert that the FAA determined that Pratt "should not have limited" a September 2021 bulletin to certain GTF models. Pls.' Br. 21. But the incorporated documents show that changes to the affected engine population over time were based on Pratt's ongoing assessment. *See, e.g.*, A1036 (October 2022 directive stating that, "[s]ince the FAA issued" its September 2021 directive, Pratt "identified another subpopulation" of HPT discs for inspection).

"caused by a nickel powdered metal anomaly" that was "similar in nature" to the March 2020 V2500 engine failure. A874, 141 (¶ 146 n.13) (quoting A874).

### F. RTX continues to update investors about issues affecting the GTF engine's financial performance.

As the powdered-metal investigation continued, so did RTX's work on unrelated GTF engine issues that had caused operational and financial impacts. For example, on a January 2023 earnings call, Mr. Calio described past and future "durability and reliability" upgrades to improve GTF engines' "time on wing"—the time an engine operates before needed service. A155–56 (¶ 184) (quoting A898). This was unrelated to powdered metal. *See* A898, 926–27, 964. On the next earnings call in April 2023, in response to a question about performance of the GTF engine's aftermarket (*i.e.*, maintenance and repair), Mr. Mitchill said, "in terms of thinking about the GTF and time on wing," RTX's "estimates today contemplate everything that we know about the engine," and "any challenges in terms of cost or additional resources we need to put into that area are already contemplated" in the company's outlook. A196 (¶ 289).

On June 19, 2023, RTX held an investor meeting at the Paris Air Show. A198 (¶ 295). Mr. Calio and Mr. Eddy explained that RTX faced delays in repairing GTF engines that were "not a technical issue" but instead "an industrial issue." A909, 926. Mr. Eddy noted that, due to these delays, 10% of the GTF-powered fleet was out of service, affecting RTX's "aircraft on ground" ("AOG")

metrics. A926. An analyst asked about "profitability on the GTF aftermarket" and whether RTX had "financial exposure to the kinds of issues that [customers are] seeing." A931, 198 (¶ 295) (quoting A931). Mr. Eddy responded by describing the company's cost estimates and how it was working with customers on the problems that were taking engines out of service. A931. Regarding aftermarket profits, he noted that upgrades introduced in late 2020 had improved time on wing. *Id.*; *see* A925–27. Mr. Eddy further stated, with respect to "expected costs for us going forward to upgrade the fleet over time, . . . I think there's not a surprise here coming." A198–99 (¶ 296) (quoting A931). And as to the industrial delays, Mr. Eddy said, "[w]hen it comes to how we support our customers in terms of the AOG situation," which included "10% of our fleet out of service," "again all of those costs would be programmed into the portfolio and into our calculation as well." *Id.*

The investor presentations through June 2023 did not discuss the powdered metal issue, *see* A176–201 (¶¶ 234–305), which was consistent with the FAA's and Pratt's belief that inspections to check for the "microcracks" in certain parts would be conducted at regularly scheduled shop visits (*i.e.*, in a manner that would not affect "time on wing" or RTX's financial performance). *See* A149, 152–53 (¶¶ 170, 175–76); A203 (¶ 310) (quoting A965).

### G. In July 2023, RTX announces that "recent learnings" require accelerated inspections.

On July 25, 2023, RTX announced recent findings that changed the timeframe on which the company believed it would need to address the powdered metal issue, particularly for the GTF fleet. On its quarterly earnings call that day, RTX said that a "rare condition" in powdered metal would require removing engines for inspection *before* scheduled shop visits. A960; A202 (¶ 306) (quoting A958, 960, 980). RTX executives explained that, in March 2020, Pratt found microscopic contaminants in the powdered metal used in V2500 engines that could "reduce the life" of "certain engine parts." A221 (¶ 363) (quoting A960); A964, 966. As Mr. Hayes stated, this was a "manufacturing quality issue" different from the "durability issues" that GTF engines had previously faced and which RTX had discussed. A964; *see* A925–27.

Mr. Hayes also explained that, after March 2020, Pratt made manufacturing improvements to ensure that its powdered metal was "contaminant-free to the best of [Pratt's] ability" by the end of 2021. A965. As to engines made before that time, Mr. Calio noted Pratt's earlier efforts to inspect the engines at scheduled shop visits. A960, 963. Over 3,000 inspections yielded a "fallout rate" below 1%, meaning that under 1% of inspected HPT discs had to be replaced. A203 (¶ 310) (quoting A965), 969, 971. Mr. Hayes explained that, when this rate was put into Pratt's "lifing model"—which determines a part's lifespan—Pratt concluded that

the discs could continue to be safely operated so long as they were inspected at scheduled shop visits. A965. Mr. Calio described how Pratt used an iterative process to analyze data and test parts, with "learnings from this proactive monitoring" used "to inform [Pratt's] predictive models." A961.

During the call, RTX executives explained that they had "been working [the issue] for the last . . . 10 days or so," A972, and that the company's very "recent findings" had changed Pratt's understanding of the powdered metal issue and the steps needed to address it, A965:

- "[B]ased upon everything that we knew *until very recently*, we believe[d] that the life of the turbine disc was such that we would see these discs in the shop and be able to inspect them before we ever had an issue." A203 (¶ 310) (quoting A965) (emphasis added).
- "Pratt instituted enhanced inspections to be performed at scheduled shop visits. However, based on *very recent learnings* . . . , Pratt has now determined that the timing of these shop visits needs to be accelerated." A960 (emphasis added).
- "[A]s Pratt analyzed *some recent inspection findings*, it determined the need for an accelerated inspection plan, even though the fallout rate from these inspections is expected to be very low." A961 (emphasis added).

Mr. Hayes explained that, based on these recent findings, Pratt concluded it was "not absolutely positive that the lifing model"—and thus how long discs could safely be deployed—was accurate, causing Pratt "to take a look at these discs at a much accelerated basis." A965. Pratt would continue to update its models, the executives explained, but had a preliminary plan to (1) recall approximately 200 PW1100 GTF engines for accelerated inspection by mid-September 2023; and (2) recall approximately 1,000 more engines for accelerated inspection "within the next 9 to 12 months." A104, 161 (¶¶ 41, 199) (quoting A961).

Mr. Mitchill, the CFO, explained that the financial impact was still under analysis due to "evolving assumptions" and the pending inspection results. A961. Mr. Hayes added that RTX would "know a lot more in the next 6 weeks," and that, "as the information becomes available, [RTX would,] of course, be sharing it with investors." A972. After the call, RTX's share price fell by 10.2%. A222 (¶ 370).

In September 2023, RTX provided a further update on the GTF fleet. A1005, 1025. On a specially scheduled GTF update call with investors, Mr. Calio discussed updates to Pratt's inspection plan based on additional work after the July earnings call. A1005–07. He explained that Pratt now realized that "almost all of the PW1100 engines" needed accelerated inspection, requiring 600 to 700 more shop visits. A1009. Mr. Calio noted Pratt's goal "to replace as many HPT disks as

possible" to avoid "repetitive inspections" (*i.e.*, not because of an increase in the fallout rate of inspected parts found to be defective). *Id.*

Mr. Calio again reviewed Pratt's actions since March 2020: adding "improvements to the powder metal production process," deploying "a new angle ultrasonic inspection," and establishing a new inspection plan. A1006. He noted that, "after [Pratt] put these actions into place," two "significant developments" led Pratt to determine that further remedial action was needed: (1) the December 2022 Viva Aerobus event, which caused Pratt to update its lifing model "to increase [its] assumptions on the likelihood" of a "GTF powder metal part having a crack at the time of manufacturing"; and (2) the results of "inspections and destructive testing" under the ongoing proactive inspection plan, which required increasing the assumed "rate at which a crack would grow," thereby shortening the time before parts would need to be inspected and requiring an accelerated recall. *Id.*

**H. Plaintiffs sue, and the district court dismisses the complaint.**

This case was filed in the District of Connecticut in August 2023. A58, 67. After the district court appointed lead plaintiffs, they filed an amended complaint in July 2024. A73, 75. That complaint asserted two claims. First, plaintiffs alleged that defendants committed securities fraud under § 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and SEC Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5. A232–34 (¶¶ 402–13). Second, plaintiffs alleged that the

individual defendants are secondarily liable as "controlling persons" under Exchange Act § 20(a), 15 U.S.C. § 78t(a). A234–36 (¶¶ 414–18).

Defendants filed a motion to dismiss, which the district court granted on September 12, 2025, following oral argument. A79. The district court dismissed plaintiffs' § 10(b) claim on two independent grounds: (1) failure to plead that any of the alleged statements were false or misleading when made, and (2) failure to plead facts giving rise to a strong inference of scienter. A47, 51. The district court further dismissed plaintiffs' claim for control-person liability under § 20(a) due to the failure to plead an underlying securities fraud claim. A52. The district court entered judgment on September 17, 2025, and lead plaintiffs appealed. A79, 80.

## STANDARD OF REVIEW

This Court reviews the dismissal of a complaint *de novo*. *In re Philip Morris Int'l Inc. Sec. Litig.*, 89 F.4th 408, 416 (2d Cir. 2023). The Court "may affirm on any ground the record supports, and [is] not limited to the reasons expressed by the district court." *Laurent* v. *PricewaterhouseCoopers LLP*, 794 F.3d 272, 273 n.1 (2d Cir. 2015).

## SUMMARY OF ARGUMENT

1. The district court correctly held that the complaint fails to plead that any statement was materially false or misleading when made.

*First*, plaintiffs plead no specific facts that contradict defendants' statements in February 2021 about technical issues with GTF engines and the status of efforts to remedy those issues. The theory of plaintiffs' complaint is that these statements about the GTF engines' performance were false or misleading because they failed to disclose the powdered metal defect, despite RTX's supposed knowledge that it would require a large-scale, costly recall. But this theory is unsupported by allegations of fact, as required by the PSLRA and Federal Rule of Civil Procedure 9(b). Plaintiffs make no attempt on appeal to challenge the district court's rejection of their confidential-witness allegations, and their other factual allegations—including about defendants' supposed admissions—do not support the complaint's theory that RTX long anticipated (but concealed) the need for a costly recall. In addition, the district court correctly held that the February 2021 statements include inactionable opinion, forward-looking statements, and puffery. *See infra* Argument § I.A.

*Second*, plaintiffs similarly fail to plead that defendants' statements in April and June 2023 were false or misleading when made. These statements relate to RTX's financial estimates for GTF engines, and plaintiffs plead no

contemporaneous facts contradicting those estimates. The statements also include inactionable opinion and forward-looking statements. *See infra* Argument § I.B.

*Third*, this Court should affirm dismissal of claims based on other statements and portions of challenged statements as to which plaintiffs make no argument on appeal. *See infra* Argument § I.C.

2. The district court correctly held that the complaint fails to plead the required strong inference of scienter. This failure provides an independent basis to affirm the dismissal.

*First*, the complaint does not plead a motive to defraud. This Court's precedent requires pleading that the individual defendants were motivated by a concrete personal benefit. But the complaint pleads only general business-related motives that are insufficient as a matter of law. *See infra* Argument § II.A.

*Second*, because they do not plead motive, plaintiffs face a heightened burden to plead strong circumstantial evidence of conscious misbehavior or recklessness. Plaintiffs fail to do so. The complaint pleads no contemporaneous facts about what any of the individual defendants knew or what information was available to them at the time of their challenged statements. Plaintiffs' primary argument, that defendants conceded their scienter, is contrary to the disclosures on which plaintiffs rely—disclosures showing that RTX came to understand the magnitude of the issue shortly before announcing it. Plaintiffs' other arguments

about manufacturing changes, interactions with the FAA, and the importance of GTF engines are unavailing. None of these allegations involve specific facts showing that, at the time of any challenged statement, defendants knew that RTX would need to recall (or even was likely to recall) a large number of engines or suffer material financial consequences due to the powdered metal issue. *See infra* Argument § II.B.

*Third*, as the district court correctly held, the competing inference of nonfraudulent intent is more compelling than plaintiffs' claimed inference of scienter. Plaintiffs' theory does not fit the facts. Plaintiffs claim that RTX concealed the powdered metal issue to avoid having to compensate customers. But RTX *did* compensate customers after voluntarily announcing the recall in 2023. Plaintiffs' fraud theory also provides no explanation for why RTX announced the recall when it did. The more compelling explanation is the one that RTX's executives offered in the very statements that plaintiffs implausibly label as "concessions": that new technical information and data emerged in connection with a complex engineering issue, leading RTX to revise its determination of what safety measures were required and issue a prompt recall announcement. *See infra* Argument § II.C.

3. Without a primary violation of the securities laws, plaintiffs' claim for control-person liability also fails. *See infra* Argument § III.

## ARGUMENT

"To state a claim for relief under § 10(b) and Rule 10b-5, a plaintiff must allege that the defendant (1) made misstatements or omissions of material fact, (2) with scienter, (3) in connection with the purchase or sale of securities, (4) upon which the plaintiff relied, and (5) that the plaintiff's reliance was the proximate cause of its injury." *City of Hialeah Emps. Ret. Sys.* v. *Peloton Interactive, Inc.*, 153 F.4th 288, 295 (2d Cir. 2025) (citation modified). These elements must be pleaded under the "heightened pleading standards" of the PSLRA and Rule 9(b). *In re Philip Morris Int'l*, 89 F.4th at 416.

The district court correctly held that the complaint fails to adequately plead either a material misstatement or omission (*i.e.*, "falsity") or scienter. Each element provides an independent ground to affirm the dismissal of the complaint.

### I. THE DISTRICT COURT CORRECTLY DISMISSED THE § 10(B) CLAIM FOR FAILURE TO PLEAD FALSITY.

The PSLRA imposes "stringent procedural requirements on plaintiffs pursuing private securities fraud actions." *Novak*, 216 F.3d at 306. To plead falsity, plaintiffs must specify "each statement alleged to have been misleading" and "the reason or reasons why the statement is misleading." 15 U.S.C. § 78u-4(b)(1). These statutory requirements, paired with Rule 9(b)'s mandate of "particularity," mean that "plaintiffs must do more than say that the statements . . . were false and misleading; they must demonstrate with specificity why and how

that is so." *Rombach*, 355 F.3d at 174; Fed. R. Civ. P. 9(b). "Allegations that are conclusory or unsupported by factual assertions are insufficient." *ATSI Commc'ns, Inc.* v. *Shaar Fund, Ltd.*, 493 F.3d 87, 99 (2d Cir. 2007).

A complaint must also "state with particularity the specific facts" showing that "statements were false *when made*." *Rombach*, 355 F.3d at 172 (emphasis added); *see also Gimpel* v. *Hain Celestial Grp.*, 156 F.4th 121, 138 (2d Cir. 2025) (a false statement "must, of course, be false at the time it was made, and the plaintiff must demonstrate with specificity why the statement is false"). This Court has "refused to allow plaintiffs to proceed with allegations of 'fraud by hindsight.'" *Novak*, 216 F.3d at 309 (citation omitted). Assertions that "defendants should have anticipated future events and made certain disclosures earlier than they actually did do not suffice to make out a claim of securities fraud." *Id.*

The district court held that the complaint fails to plead falsity as to eleven of defendants' statements challenged in the complaint. A15–47. On appeal, plaintiffs contest this conclusion with respect to portions of just four statements: two in February 2021, and two in the spring of 2023. *See* Pls.' Br. 31–32, 52–53. The complaint does not adequately plead the falsity of these statements.

**A. The complaint fails to adequately plead falsity with respect to the February 2021 statements.**

Plaintiffs assert that, in February 2021, defendants "reassured" investors that issues with the GTF engine had been resolved, "despite knowing that they had not

resolved the powdered metal contamination issue." Pls.' Br. 31–32. This argument focuses on two statements. *First*, in its February 8, 2021 Form 10-K, RTX stated that, since the GTF engine "entered into service in 2016, technical issues have been identified and experienced with the engine, which is usual for new engines and new aerospace technologies." A176 (¶ 235) (quoting A382). The Form 10-K added that "Pratt & Whitney has addressed these issues through various improvements and modifications," which "resulted in financial impacts." *Id.* *Second*, at an investor conference on February 17, 2021, RTX's CEO, Mr. Hayes, stated that "all those teething problems that we talked about for the last several years seem to be behind us," and "I think, at least, knock on wood, all the GTF issues that we've been talking about seem to be behind us and the engine's performing really well." A183–84 (¶ 250) (quoting A1049).

Plaintiffs fail to plead facts showing the falsity of these statements when made. And while that pleading failure is sufficient to affirm, the statements also contain inactionable opinion, forward-looking statements, and puffery.

### 1. The complaint pleads no facts showing that the February 2021 statements were materially false or misleading when made.

In addressing the February 2021 statements, the district court began by finding that "Plaintiffs offer no specific allegations that the makers of these allegedly false statements knew the statements were false at the time they were

made—that is, Plaintiffs offer no specific allegations that Defendants knew of the magnitude of the powdered metal defect at the time." A19–20 (agreeing with defendants' argument).

The court's framing correctly applied the law to the allegations of the complaint. The February 2021 statements speak to GTF engines' performance and efforts to remedy previously discussed issues that had caused financial impacts—topics relevant to investors' understanding of RTX's prospects. Those statements could only be false *when made* if the facts in existence *at the time* showed that the powdered metal defect would materially impair RTX's financial performance. A later "surprise" does not render earlier statements fraudulent: "Corporate officials need not be clairvoyant; they are only responsible for revealing those material facts reasonably available to them." *Novak*, 216 F.3d at 309. Nor is it enough to allege that RTX knew of the "powdered metal defect," without a contemporaneous factual basis to conclude it would materially affect financial performance—the subject matter of the statements. *E.g.*, *Abramson* v. *Newlink Genetics Corp.*, 965 F.3d 165, 178 (2d Cir. 2020) (finding falsity not alleged where the pleaded facts "do[] not rebut" challenged statement); *San Leandro Emergency Med. Grp. Profit Sharing Plan* v. *Philip Morris Co., Inc.*, 75 F.3d 801, 812 (2d Cir. 1996) (concluding that plaintiffs' "unsupported general claim of the existence of" contrary facts was insufficient to plead contemporaneous falsity). Put differently,

what defendants must have been aware of, for plaintiffs to establish falsity of these statements implicating financial performance, is not the defect itself but that it would have a financial impact of sufficient magnitude to RTX—a company with $56.5 billion in annual revenues in 2020—to be material to investors. A295.

In the complaint, plaintiffs tried to bridge this gap by asserting that defendants concealed a problem that they knew at the time would have a massive impact on GTF engines' financial performance: that the engines "could only be fixed by grounding the GTF fleet for a lengthy, costly inspection and removal process that would gut the engine program's profitability." A88 (¶ 2); *e.g.*, A90, 98–99 (¶¶ 8, 30). As to the February 2021 statements, the complaint alleges that defendants "knowingly omitted the pervasive problem that stood in the way of the GTF engine fleet's profitability" and "made these statements knowing that . . . RTX would have to ground its GTF engine fleet and perform costly inspections on them out of the Company's own pocket." A177 (¶ 238); *see also* A184 (¶ 251) (alleging that defendants knew defect was "pervasive" and "severe"). But these claims about the magnitude of the powdered metal defect are just conclusory assertions. They can only satisfy the PSLRA and Rule 9(b) if supported by well-pleaded allegations of specific facts. The complaint pleads no such facts.

As in many securities cases, plaintiffs built much of their complaint on allegations attributed to so-called confidential witnesses, or "former employees."

*E.g.*, A92, 96–97, 178–79 (¶¶ 15, 22–24, 239–42); *see Sneed* v. *Talphera, Inc.*, 147 F.4th 1123, 1134 (9th Cir. 2025) (reliance on confidential witnesses is a "common practice in securities lawsuits"). The district court examined the confidential-witness allegations relevant to the February 2021 statements and held that none provided specific facts showing that the defendants were then aware of the magnitude of the powdered metal defect or that they would one day need to ground the fleet. A20–21 & n.4. Plaintiffs do not challenge that holding on appeal. *See* Pls.' Br. 31–61. Beyond passing references to former employees in their Statement of the Case, Pls.' Br. 14 (citing A96–97, 120–22), plaintiffs make no argument that the district court erred in concluding the allegations attributed to these former employees were insufficient, nor that the allegations "provide an adequate basis for believing that the defendants' statements were false," *Novak*, 216 F.3d at 314.

No other well-pleaded facts render defendants' February 2021 statements about the performance of GTF engines false or misleading when made. *First*, plaintiffs claim that "[b]y 2021, the powdered metal defect had already led the engine on the Vietnam Airlines plane to rip apart during takeoff." Pls.' Br. 34. Plaintiffs assert that RTX was then "aware of a known defect that placed thousands of RTX's flagship engines at risk of catastrophic failure." *Id.* at 4; *see id.* at 34–35. But they plead no facts to suggest that, by February 2021, defendants knew that the failure of one plane's V2500 engine—an older-model, non-GTF engine, A97,

135–36 (¶¶ 26, 134)—meant that a large GTF recall was coming or that the issue would have a material financial impact on RTX. To the contrary, plaintiffs allege that Pratt was still investigating the cause and scope of the powdered metal issue in February 2021, identifying discs in certain V2500 engines to be inspected. A137 (¶¶ 137–38). Later in 2021, based on its expanded "root cause" analysis, Pratt identified GTF engines that should be inspected at the "next shop visit," without an expedited recall. A148–49 (¶¶ 167–68, 170); *see supra* Counterstatement of the Case § D. Nothing about Pratt's ongoing analysis suggested a fleet-wide recall was inevitable, and plaintiffs plead nothing to the contrary.

*Second*, plaintiffs allege that Pratt made changes to its manufacturing process after the March 2020 Vietnam Airlines event, which indicate that defendants understood that the powdered metal issue was "sufficiently serious." Pls.' Br. 34; *e.g.*, A101, 205 (¶¶ 35, 315). Plaintiffs try to bolster that conclusion through rhetoric, asserting repeatedly that RTX "frantically" implemented the changes. Pls.' Br. 29, 34, 43; A89, 184 (¶¶ 6, 252). But that colorful adverb is unsupported by any allegation of fact that passes muster under the PSLRA. Nothing in the complaint specifies when or how quickly the changes were made, beyond that they occurred sometime in the eighteen months after March 2020. *E.g.*, A169 (¶ 217) (quoting A1015). Plaintiffs do not even say if the changes

preceded the February 2021 statements that they challenge, such that the changes would have any bearing on the veracity of those statements when made.

The facts that plaintiffs do incorporate into the complaint about the manufacturing changes contradict their claim of falsity. Plaintiffs rely only on defendants' own disclosures, on investor calls in July and September 2023, for the point that RTX made "nine changes to the [manufacturing] process to ensure the purity of the powder." A140 (¶ 144) (quoting A1015); A162 (¶ 202) (quoting A961, 966). But those very disclosures demonstrate that RTX did not know back in February 2021 that the powdered metal issue would have a material impact on the performance of the GTF fleet. RTX's executives were clear that the potential for a material financial impact on RTX—a significant accelerated recall of GTF engines—was not known until shortly before the July 2023 recall announcement. As detailed above, the RTX executives discussed how "very recent learnings" and "recent inspection findings" led Pratt to identify the need for the accelerated recall. A960–61; *see supra* Counterstatement of the Case § G. Plaintiffs cannot cherrypick the part of defendants' discussion they find helpful, "while omitting portions of those very documents that weaken—or doom—their claims." *Khoja* v. *Orexigen Therapeutics, Inc.*, 899 F.3d 988, 1002 (9th Cir. 2018); *accord I. Meyer Pincus & Assocs., P.C.* v. *Oppenheimer & Co.*, 936 F.2d 759, 762 (2d Cir. 1991).

This Court's decision in *In re General Electric Securities Litigation* is analogous. In that case, GE allegedly touted the performance of a new turbine, "while omitting material information about a blade defect, including the impact the defect would have on GE's revenue and profit." 844 F. App'x 385, 387 (2d Cir. 2021) (summary order). In affirming dismissal, this Court noted that "GE had developed what it believed was a workable solution . . . that would not adversely affect the turbines' performance or GE's finances in a material way, and that GE revised its assessment of the issue and its solution when confronted with" a more recent adverse event. *Id.* at 389. So too here, no well-pleaded facts show that defendants knew Pratt's ongoing attempts to address the issue were insufficient to prevent material financial consequences until receiving new data shortly before the July 25, 2023 disclosure. *See supra* Counterstatement of the Case § G.

Plaintiffs suggest that, even if the "precise, long-term implications of the powdered metal defect may not have been known in 2021," their claim should have survived unless the issue was "obviously unimportant." Pls.' Br. 34–35 (quoting *Ganino* v. *Citizens Utils. Co.*, 228 F.3d 154, 162 (2d Cir. 2000)); *see id.* at 49. In so doing, plaintiffs run away from the theory of their own complaint, which repeatedly claims that defendants' statements were false because they knew the *magnitude* of the powdered metal defect: that Pratt would have to "ground" the fleet for "costly inspections." *E.g.*, A177 (¶ 238) *see supra* p. 25; *Doherty* v. *Bice*,

101 F.4th 169, 175 (2d Cir. 2024) ("[Plaintiff] cannot will his way into a complaint that he did not file, and he certainly cannot amend his complaint on appeal."), *cert. denied*, 145 S. Ct. 381 (2024). Moreover, the purpose of the securities laws is to protect the integrity of the markets by policing fraudulent statements and omissions, not to "bury the shareholders in an avalanche of trivial information." *Basic Inc*. v. *Levinson*, 485 U.S. 224, 231 (1988) (citation omitted); *see Tongue* v. *Sanofi*, 816 F.3d 199, 214 (2d Cir. 2016) ("[S]ecurities law does not impose on [issuers] an obligation to disclose every piece of information in their possession."). That purpose would be subverted if multibillion-dollar public companies like RTX—which has thousands of products—had to disclose every issue under investigation or every manufacturing change, regardless of anticipated financial impact. *See, e.g.*, *Higginbotham* v. *Baxter Int'l, Inc.*, 495 F.3d 753, 761 (7th Cir. 2007) ("Taking the time necessary to get things right is both proper and lawful. Managers cannot tell lies but are entitled to investigate for a reasonable time, until they have a full story to reveal."); *Acito* v. *IMCERA Grp.*, 47 F.3d 47, 53 (2d Cir. 1995) (no duty to disclose failed factory inspection where it was not a "foregone conclusion" that "adverse consequences would ensue").

The pleaded facts also do not put this case within plaintiffs' cited precedents about "half-truths," which hold that "once a company speaks on an issue or topic, there is a duty to tell the whole truth." Pls.' Br. 33 (quoting *Gimpel*, 156 F.4th at

141). Plaintiffs' theory appears to be that, having spoken about a *different* issue (the "teething problems" that the statements concerned), defendants had to also disclose "defect information" about powdered metal. Pls.' Br. 32; *see* A177 (¶ 237) (pleading that powdered metal defect was not one of the early "teething problems," as it had "nothing to do with the novelty of the GTF engine itself"). But, again, no pleaded facts show that the powdered metal issue had risen to a magnitude by February 2021 that defendants had any reason to disclose it to investors. In other words, the problem with plaintiffs' pleading is not that it fails to allege defendants' awareness of the "precise operational and financial impact" of the defect, as plaintiffs would have it, Pls.' Br. 3, but that it fails to allege defendants believed there would be any material financial impact at all.[3]

Plaintiffs' assertion that the powdered metal contamination "presented a much bigger issue for the engine and for RTX's outlook" than the teething problems—and presented a "risk to the business that was sufficiently extreme[] and sufficiently likely" so as to warrant disclosure—is based on hindsight alone. Pls.' Br. 34; *see In re Lululemon Sec. Litig.*, 14 F. Supp. 3d 553, 579 (S.D.N.Y. 2014) (rejecting theory that "every time defendants spoke publicly about the high quality of the company's products . . . such statements were false and misleading

[3] Plaintiffs' argument that materiality presents a fact-specific inquiry about the "total mix" of information, Pls.' Br. 45–47, thus elides that their complaint fails on its face to plead facts showing the *falsity* of the challenged statements when made.

because they failed to also disclose other quality control issues"), *aff'd*, 604 F. App'x 62 (2d Cir. 2015) (summary order). And this Court's cases about "half-truths" do not excuse plaintiffs from the obligation to plead *contemporaneous* facts showing that a statement was false when made. *See, e.g.*, *Meyer* v. *Jinkosolar Holdings Co.*, 761 F.3d 245, 251 (2d Cir. 2014) (reasoning that omitted facts "were both present and substantial at the time of the" allegedly misleading half-truth).[4]

The precedents plaintiffs invoke present a sharp contrast to the complaint here: allegations of specific, known facts about an issue that contradicted defendants' statements about the same issue. Thus, in *Meyer*, the defendants claimed that their waste-monitoring equipment and environmental teams ensured compliance with Chinese environmental standards, while failing to disclose that "the equipment and 24-hour team were then failing to prevent substantial violations of the Chinese regulations." 761 F.3d at 251; *see id.* at 247, 252. In *Gimpel*, one defendant characterized the company's problems selling inventory as "one-offs," even though the defendants were aware that "inventory saturation would persist" because the company's "distributors had already reached their inventory capacity." 156 F.4th at 141; *see id.* at 140–41. In *Gabelli*, the

[4] Plaintiffs' circular suggestion that whether information must be disclosed to the market depends on whether it "is already known to the market" is wrong. The case plaintiffs cite was addressing a specific doctrine (the "truth on the market" doctrine) not at issue here. Pls.' Br. 46 (quoting *Ganino*, 228 F.3d at 167).

defendants stated that they "attempted in good faith to reduce or eliminate" a particular practice "across the board," while the company's COO "well knew but failed to disclose" that the company "expressly agreed to let one major investor . . . engage in a very large amount" of the practice. *S.E.C.* v. *Gabelli*, 653 F.3d 49, 57 (2d Cir. 2011), *rev'd on other grounds*, 568 U.S. 442 (2013). And in *Boston Scientific*, on which plaintiffs place heavy reliance, the defendants asserted that "problems about [a heart stent] in the United States resulted from doctor unfamiliarity with the product" while failing to disclose that the actual cause was "not doctor unfamiliarity but rather a manufacturing defect." *Miss. Pub. Emps. Ret. Sys*. v. *Bos. Sci. Corp.*, 523 F.3d 75, 87 (1st Cir. 2008). Plaintiffs' cases share a common feature: the defendants lied.

Here, the complaint alleges no facts showing that the statements defendants made about "teething problems" in February 2021 were contradicted by facts that were available to them at the time. The dismissal of plaintiffs' claims relating to these statements can be affirmed for that reason alone.

**2. The February 2021 statements include inactionable opinion, forward-looking statements, and puffery.**

The district court correctly held that the February 2021 statements plaintiffs challenge are inactionable as a matter of law for additional reasons, which provide independent grounds for affirmance.

*First*, as the district court held, Mr. Hayes's statements that "all those teething problems . . . we talked about for the last several years *seem* to be behind us," and "*I think*, at least, knock on wood, all the GTF issues that we've been talking about *seem* to be behind us," are inactionable opinions. A25–26 (emphasis added) (citing A183–84 (¶ 250) (quoting A1049)). Statements of opinion are not actionable unless plaintiffs plead facts supporting that the speaker "did not hold the belief [he] professed" or "omit[ted] material facts" that "conflict with what a reasonable investor would take from the statement[s] [themselves]." *Omnicare, Inc.* v. *Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175, 186, 189 (2015). Plaintiffs fail to plead facts supporting either exception.

*Second*, as the district court concluded, these statements were protected by the PSLRA's safe harbor for forward-looking statements. A25–26. Forward-looking statements include "plans or objectives relating to the products or services of the issuer," "a statement of future economic performance," and "any statement of the assumptions underlying or relating" to these matters. 15 U.S.C. § 78u-5(i)(1)(B), (C), (D). Mr. Hayes's assessment that certain issues "seem to be behind us" conveys future expectations for RTX's products—that specific past issues will not recur in the future—in the context of projecting the GTF program's future performance. *See* A183–84 (¶ 250) (quoting A1049) (stating that the program "should be breakeven by 2025 given the . . . progression of the aftermarket and as

we continue to drive costs down”). Despite plaintiffs’ contention, forward-looking statements can use present-tense verbs, and at least one circuit court has thus held that a nearly identical statement that “the challenges . . . are now behind us” is forward-looking. *Harris* v. *Ivax Corp.*, 182 F.3d 799, 805 (11th Cir. 1999); *see, e.g.*, *Rombach*, 355 F.3d at 172. The application of the PSLRA safe harbor turns on the substance of the statement, not choice of tense. Mr. Hayes’s comments were also accompanied by “meaningful cautionary statements” as required by the PSLRA; for oral statements like these, the statute permits reference to documents containing that disclosure, as was done here. 15 U.S.C. § 78u-5(c)(1)(A), (c)(2); A1045; A176 (¶ 235) (quoting A382), 179–80 (¶ 243) (quoting A279), 270–71.[5]

*Third*, the district court correctly held that Mr. Hayes’s statement that “the engine’s performing really well” is inactionable puffery, a holding plaintiffs do not appear to challenge on appeal. A25–26 (citing *In re Express Scripts Holdings Co. Sec. Litig.*, 773 F. App’x 9, 13 (2d Cir. 2019) (summary order) (holding that statements that a relationship was “great” and “very, very solid” were puffery)); *see* Pls.’ Br. 44–45. “Expressions of puffery and corporate optimism do not give

[5] The district court also concluded that RTX’s February 8, 2021 Form 10-K included forward-looking statements and was “replete with the types of warnings and qualifications . . . that signify ‘actual results [could] differ materially from those in the forward-looking statement.’” A22–23 (quoting 15 U.S.C. § 78u-5(c)(1)). Plaintiffs do not challenge this holding on appeal.

rise to securities violations." *Peloton*, 153 F.4th at 295 (citation modified). Mr. Hayes's statement is a quintessential example.

### B. The complaint fails to adequately plead falsity with respect to the April and June 2023 statements.

Plaintiffs argue that "[d]efendants' statements in April and June of 2023 that RTX's financial projections encompassed everything RTX knew about the Geared Turbofan engine" were "materially false" because they made "no account of any potential financial impact of the manufacturing defect" relating to powdered metal, which ultimately required taking GTF engines "off-wing" and posed "massive risks to the engine's financial performance." Pls.' Br. 54. Plaintiffs base this claim on two statements. *First*, during an earnings call on April 25, 2023, an analyst asked RTX's CFO, Mr. Mitchill, a question about the GTF engine's aftermarket (*i.e.*, maintenance, repair, and overhaul sales and services). A196 (¶ 289). Mr. Mitchill responded that, "in terms of thinking about the GTF and time on wing, basically, what I can say is our estimates today contemplate everything that we know about the engine." *Id.* Mr. Mitchill continued, "any challenges in terms of cost or additional resources we need to put into that area are already contemplated in the outlook that we have for Pratt and for RTX as a whole." *Id.*

*Second*, on June 19, 2023, an analyst asked Pratt's President, Mr. Eddy, at the Paris Air Show about certain problems with GTF engines, including customer concerns and related financial exposure. A931; A198 (¶ 295). Mr. Eddy

responded that, "as we have designed the improvements that go into the fleet, we've rolled those costs into the cost basis for the portfolio." A198 (¶ 296) (quoting A931). He added, "so I think there's not a surprise here coming." A199 (¶ 296) (quoting A931). Mr. Eddy then described work involving customers' grounded airplanes and said, "again all of those costs would be programmed into the portfolio and into our calculation as well." *Id.*

Plaintiffs fail to plead facts establishing the falsity of these statements when they were made. The statements also contain inactionable opinion and forward-looking statements, which provide additional grounds for affirming dismissal.

#### 1. The complaint pleads no facts showing that the April and June 2023 statements were materially false or misleading when made.

As with the February 2021 statements, the district court began by addressing whether the complaint pleads contemporaneous facts showing that the April and June 2023 statements were false when made. The court held that "Plaintiffs fail to allege with particularity that, at the time Mr. Eddy made these statements [in June 2023], Defendants were aware that the GTF fleet would need to be grounded." A43; *see* A41–42 (as to April 2023 statements, noting that defendants "contest[ed] that Plaintiffs . . . adequately plead[] these statements were contemporaneously false" and stating "[t]he Court agrees"). This holding was correct.

Plaintiffs can point to no pleaded facts showing that information was available to defendants in April or June 2023 that contradicted their statements about RTX's projections for GTF engines' financial performance. In their brief, plaintiffs repeatedly assert that defendants "would have known" about the impact of the powdered metal defect by this point and the "massive risks to the engine's financial performance." Pls.' Br. 54. But plaintiffs' hindsight-driven speculation about what "would have" been the case does not suffice. *See ATSI*, 493 F.3d at 99 (conclusory assertions are insufficient). The PSLRA and Rule 9(b) require pleading of specific, particularized facts—when defendants knew and "why and how that is so." *Rombach*, 355 F.3d at 174.

As shown above, the principal facts that plaintiffs invoke—defendants' own disclosures of the powdered metal issue—support just the opposite conclusion: that RTX did not come to understand that an accelerated recall, with material financial impact, would be needed until July 2023, *after* the challenged April and June 2023 statements. A203 (¶ 310), 960, 961, 965, 972. The only development that plaintiffs claim distinguishes these statements from the earlier February 2021 statements was the Viva Aerobus event in December 2022. Pls.' Br. 52. But other than conclusory assertions that this event made a recall "virtually inevitable," Pls.' Br. 56, plaintiffs allege no facts showing that it materially changed defendants' understanding about the need for a recall by June 2023. Rather, the incorporated

facts show that, at that time, Pratt had revisited its lifing model in response to the Viva Aerobus event but still believed that inspections could be done at scheduled shop visits, without a materially expensive recall. *See* A149, 152–53 (¶¶ 170, 175–76), 203 (¶ 310) (quoting A965), 1006; *supra* Counterstatement of the Case §§ E–G. The absence of pleaded facts showing that RTX anticipated a material financial impact eliminates any claim that the statements about projected financial performance were false or misleading when made. *See, e.g.*, *Peloton*, 153 F.4th at 296–97 (concluding that statements were not false or misleading when "consistent" with "then-current expectations of further growth" and most accounts "placed the beginning of any decline in demand . . . after the statements were made").

Plaintiffs' authorities are inapposite. Plaintiffs cite cases where, unlike here, defendants made statements expressly denying certain facts while in possession of contradictory information. For example, in *Altimeo Asset Management* v. *Qihoo 360 Technology Co.*, 19 F.4th 145 (2d Cir. 2021), the defendants said that they "d[id] not have any current plans" to relist the company, but documents incorporated into the complaint reflected that they had distributed "plans to relist the company." *Id.* at 148–50. In *Set Capital LLC* v. *Credit Suisse Group AG*, 996 F.3d 64 (2d Cir. 2021), the defendant stated that it had "no reason to believe" that its hedging activity would affect the price of certain notes, but the pleaded facts showed that three of the defendant's prior hedging trades caused a liquidity

squeeze in certain futures contracts and an accompanying sharp drop in price for the notes. *Id.* at 78–79, 85–86. In light of those pleaded facts, this Court held that the defendant had "misrepresented [its] knowledge and intent." *Id.* at 86. And in *Matrixx Initiatives, Inc.* v. *Siracusano*, the defendant denied a risk that it knew about and failed to investigate. 563 U.S. 27, 43, 47 (2011).

Unlike these cases, plaintiffs here plead no facts showing that defendants possessed information in the spring of 2023 that contradicted their public statements about the GTF engine's financial prospects. Defendants' statements reflected the information available to them when they spoke, including the costs of addressing previously disclosed teething problems and durability issues. That information did not contemplate an accelerated recall due to the powdered metal issue that would require removing engines before scheduled shop visits and materially affect RTX's financial performance. Mr. Mitchill's statement that RTX's "estimates . . . contemplate everything that we know about the engine" was thus true when made. A196 (¶ 289). So was his statement that costs related to the GTF engine's time on wing were "already contemplated in the outlook that we have for Pratt and for RTX as a whole," as well as Mr. Eddy's statements that the costs of design improvements and the costs incurred due to grounded airplanes were incorporated into RTX's calculations. *Id.*; A198–99 (¶ 296) (quoting A931). "[A]s long as the public statements are consistent with reasonably available data,

corporate officials need not present an overly gloomy or cautious picture of current performance and future prospects." *Peloton*, 153 F.4th at 297 (citation omitted).

Without facts showing falsity, plaintiffs ask the Court to draw an "inference" of falsity because "corrective disclosures of significant dimension" followed "shortly" after defendants' statements—*i.e.*, RTX disclosed the need for an accelerated recall on July 25, 2023, about five weeks after Mr. Eddy's statements at the June 19 Paris Air Show. Pls.' Br. 55 (citation omitted). But again, plaintiffs ignore what the disclosure they rely on actually said. *See Khoja*, 899 F.3d at 1002; *Oppenheimer*, 936 F.2d at 762. On July 25, 2023, RTX's executives described a problem with a scope that was only determined based on "very recent learnings" and "recent inspection findings," saying that they had "been working [the issue] for the last . . . 10 days or so." A960–61, 972; *see supra* Counterstatement of the Case § G. It is "fraud by hindsight" to claim that "defendants should have anticipated" those developments and "made certain disclosures earlier." *Novak*, 216 F.3d at 309; *Denny* v. *Barber*, 576 F.2d 465, 470 (2d Cir. 1978).

Finally, plaintiffs argue that analysts' "incredulous" reactions to the July 2023 disclosures "confirms materiality" of the statements. Pls.' Br. 56. Plaintiffs are confusing whether the ultimate disclosure was material to the market with whether defendants' earlier statements were *false* when made. Analysts' post-hoc reaction is no substitute for adequate factual pleading under the PSLRA that

defendants had contemporaneous facts contradicting their statements. *See Gimpel*, 156 F.4th at 138; *see also In re Mobileye Glob. Sec. Litig.*, 2025 WL 1126967, at *11 (S.D.N.Y. Apr. 16, 2025) ("An analyst's disappointment with the Company's prior projections . . . does not make the Company's prior revenue reports misleading."), *aff'd*, 2025 WL 3640904 (2d Cir. Dec. 16, 2025) (summary order).

### 2. The April and June 2023 statements also include inactionable opinion and forward-looking statements.

The challenged 2023 statements are inactionable for additional reasons. The district court correctly held that Mr. Eddy's statement that "I think there's not a surprise here coming" is an inactionable opinion. A43–44. That statement conveys Mr. Eddy's belief about the future. *See Omnicare*, 575 U.S. at 183. And as discussed above, plaintiffs have not shown that Mr. Eddy knew on June 19, 2023 that a material engine recall was needed or likely. Plaintiffs thus have not sufficiently alleged that he "did not hold" the stated belief or "omit[ted] material facts" known when he opined. *Id.* at 186, 189.[6]

Mr. Eddy's June 2023 comments are further protected by the PSLRA safe harbor for forward-looking statements. Beyond whether a "surprise" was "coming"—a prediction of an unexpected future event—the comments discussed

---

[6] The district court also correctly concluded that parts of Mr. Mitchill's April 2023 statement, including that RTX was "very comfortable" with its estimates, were inactionable opinions. A41–42. Plaintiffs do not challenge those portions of the statement on appeal. *See* Pls.' Br. 52–53.

"financial guidance" and "expected costs," prototypical forward-looking statements. A198–99 (¶ 296) (quoting 931), 199 (¶ 299) (quoting A927); *see* 15 U.S.C. § 78u-5(i)(1). The statements also said that they were "subject to risks and uncertainty" that "could cause [RTX's] actual actions or results to differ greatly," referring to RTX's SEC filings for more detail. A905; *see* A270–71, 545–46, 700–01, 1064–65, 1084–86, 1104–06; *supra* Counterstatement of the Case § B. Such statements are protected by the PSLRA. *See* 15 U.S.C. § 78u-5(c)(1)(A), (c)(2).

### C. Plaintiffs have waived their challenges to other alleged statements.

As noted, the district court dismissed plaintiffs' claims predicated on seven additional statements. A15–47. Plaintiffs' failure to contest the district court's dismissals as to those statements, as well as to portions of the February 2021, April 2023, and June 2023 statements that plaintiffs do not address on appeal, waives any challenge to those dismissals. *Peloton*, 153 F.4th at 302 n.5.[7]

* * *

Plaintiffs have not met their burden to plead that defendants' statements were false or misleading when made. The district court's dismissal of the complaint in its entirety can be affirmed on that basis alone.

[7] Plaintiffs assert in one sentence that "statements in July and September 2023 were also material misstatements." Pls.' Br. 30. This reference is erroneous, as plaintiffs quote the April and June 2023 statements. *Id.* (quoting A196, 199). And plaintiffs' argument section contains no discussion of the July and September statements, waiving any challenge to them. *Peloton*, 153 F.4th at 302 n.5.

## II. THE DISTRICT COURT CORRECTLY DISMISSED THE § 10(B) CLAIM FOR FAILURE TO PLEAD SCIENTER.

Plaintiffs' failure to plead scienter provides an independent basis for affirmance of the district court's dismissal of the complaint. Under the PSLRA, a complaint must allege particularized facts giving rise to a "strong inference," 15 U.S.C. § 78u-4(b)(2), that the defendants acted with scienter, a mental state reflecting an "intent to deceive, manipulate, or defraud," *Ernst & Ernst* v. *Hochfelder*, 425 U.S. 185, 193 (1976). A "strong inference" is one that is "more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs*, 551 U.S. at 314. In light of this exacting standard, "[i]n few other areas are motions to dismiss . . . so powerful." *Ronconi* v. *Larkin*, 253 F.3d 423, 437 (9th Cir. 2001).

This Court has held that, to plead scienter under the PSLRA, a complaint must allege specific facts showing that "defendants had both motive and opportunity to commit the fraud" or "strong circumstantial evidence of conscious misbehavior or recklessness." *ATSI*, 493 F.3d at 99. In this context, recklessness is "a state of mind approximating actual intent, and not merely a heightened form of negligence." *S. Cherry St., LLC* v. *Hennessee Grp.*, 573 F.3d 98, 109 (2d Cir. 2009) (emphasis omitted). Recklessness is "highly unreasonable" conduct "represent[ing] an extreme departure from the standards of ordinary care to the extent that the danger was either known to the defendant or so obvious that the

defendant must have been aware of it." *Id.* (emphasis omitted). A corporation may be deemed to have such intent only if an individual "whose intent could be imputed to the corporation acted with the requisite scienter." *Jackson* v. *Abernathy*, 960 F.3d 94, 98 (2d Cir. 2020). Thus, except in "exceedingly rare instances" (not at issue here), scienter must be pleaded as to "an individual defendant who made the challenged misstatement" or an officer "involved in the dissemination of the fraud." *Id.* at 98–99.

The district court held that plaintiffs failed to adequately plead scienter. A47–51. *First*, the district court concluded that plaintiffs point only to motives that are "common to most corporate officers" and not to any "concrete [personal] benefits that could be realized" from any of the alleged misstatements or nondisclosures. A49 (quoting *ECA, Loc. 134 IBEW Joint Pension Tr. of Chi.* v. *JP Morgan Chase Co.*, 553 F.3d 187, 198 (2d Cir. 2009); *S. Cherry St.*, 573 F.3d at 108). *Second*, the district court concluded that plaintiffs fail to plead circumstantial evidence that defendants' conduct represented an "extreme departure" from the standards of ordinary care. A49–50 (quoting *S. Cherry St.*, 573 F.3d at 109). The district court reasoned that "Plaintiffs allege no facts that demonstrate with particularity that it should have been obvious to Defendants that the powdered metal defect affected the entire GTF fleet to the point that a mass recall was required." A50. *Finally*, the district court determined that the inference

of nonfraudulent intent was "more plausible than any inference of scienter." *Id.* To the contrary, the pleaded facts support the inference that, "over time, Defendants grew to realize the magnitude of the problem and, at the appropriate time, disclosed that information to regulators and investors." *Id.* The district court was correct as to each of these points.

### A. Plaintiffs fail to adequately allege motive to commit fraud.

To adequately plead a motive to defraud, "plaintiffs must assert a concrete and personal benefit to the individual defendants resulting from the fraud." *Kalnit* v. *Eichler*, 264 F.3d 131, 139 (2d Cir. 2001). "[I]t is not sufficient to allege goals that are 'possessed by virtually all corporate insiders,'" such as the desire to "sustain the appearance of corporate profitability or the success of an investment." *S. Cherry St.*, 573 F.3d at 109 (citation omitted). But that is all plaintiffs allege.

In their brief, plaintiffs assert that the individual defendants had a motive to avoid disclosure to "save their jobs." Pls.' Br. 38. This vague assertion identifies no concrete benefit unique to these defendants: "a plaintiff must do more than merely charge that executives aim to prolong the benefits of the positions they hold." *Shields* v. *Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1130 (2d Cir. 1994). Plaintiffs' contention is also unsupported by any well-pleaded facts. Their brief purports to cite an allegation that "CEO Hayes stepp[ed] down after the manufacturing issues came to light." Pls.' Br. 38 (citing A173). But the only *fact*

alleged in the complaint is that, in May 2024—some *ten months after* the July 2023 disclosure of the recall—RTX announced that Mr. Hayes would step down as CEO and "then remain as the executive chairman of the Board." A173 (¶ 226). This alleged role change hardly supports an inference that Mr. Hayes lost his job due to the powdered metal issue. In any event, the complaint pleads that he was replaced as CEO by Mr. Calio, refuting any inference that the disclosure hurt that defendant's job prospects. *Id.* Meanwhile, Mr. Eddy, the president of Pratt—the unit responsible for GTF engines—remained in his position after the disclosure, as did RTX's CFO, Mr. Mitchill. A109–10 (¶¶ 59, 62).[8]

Plaintiffs' only other theory of motive is that RTX's "business model" for GTF engines gave the defendants reason to commit fraud. Pls.' Br. 38. Plaintiffs argue that "[t]he longer defendants could avoid disclosing the defect, the more likely it became that RTX could push any future inspection and repair costs off on customers, rather than footing the bill itself." *Id.* But this "proffered motive is the same desire to maintain the appearance of profitability that [this Court has] consistently rejected as insufficient in securities fraud pleading." *Teamsters Loc. 445 Freight Div. Pension Fund* v. *Dynex Cap. Inc.*, 531 F.3d 190, 196 (2d Cir. 2008). Such a profit-driven motive is generalizable to all corporate officers and

[8] RTX's former CFO, Mr. O'Brien, left in April 2021, long before the disclosure in 2023. A110 (¶ 60).

fails to show how any of the individual defendants here personally benefitted from the alleged fraud. *See Kalnit*, 264 F.3d at 139; *S. Cherry St.*, 573 F.3d at 109. Plaintiffs' theory also does not stand up to the actual facts: that RTX voluntarily disclosed the defect, recalled planes ahead of scheduled maintenance, and footed the bill. *See, e.g.*, A104, 105–06 (¶¶ 41, 46); A965, 1007.

### B. Plaintiffs fail to adequately plead strong circumstantial evidence of conscious misbehavior or recklessness.

Plaintiffs' failure to plead motive makes their burden even heavier: they may try to plead scienter through "strong circumstantial evidence of . . . conscious misbehavior or recklessness," but "the strength of the circumstantial allegations must be correspondingly greater" absent motive. *Kalnit*, 264 F.3d at 142 (citations omitted). It is typical for successful scienter claims to "specifically allege[] [the] defendants' knowledge of facts or access to information contradicting their public statements." *Gimpel*, 156 F.4th at 146 (citation omitted). And plaintiffs "must specifically identify the reports or statements containing this information" that were the source of the defendants' alleged knowledge. *Novak*, 216 F.3d at 309.

None of that exists here. The complaint alleges no facts about what information was available to any of the individual defendants at the time of their challenged statements. On appeal, plaintiffs make no argument that their confidential witnesses allege any facts that support an inference of scienter.

Instead, plaintiffs trot out a variety of speculative theories, none of which supports the necessary strong inference of scienter.

**1. Defendants did not "concede" scienter.**

Plaintiffs' principal theory is that defendants "*conceded*" scienter. Pls.' Br. 38; *id.* at 51–52. This theory again rests on out-of-context snippets of Mr. Hayes's July 25, 2023 disclosures, which plaintiffs argue show that defendants "knew about the powdered metal defect, and its impact on the Geared Turbofan engine" at the time of their alleged misstatements. Pls.' Br. 38. But as discussed above, plaintiffs cannot strip Mr. Hayes's statements of the portions that refute their theory and pretend Mr. Hayes didn't make them. *See Khoja*, 899 F.3d at 1002; *Oppenheimer*, 936 F.2d at 762. Although Pratt began its analysis of the powdered metal issue in 2020, Mr. Hayes was clear that it had not determined that an accelerated recall of GTF engines was necessary until shortly before July 25, 2023. Mr. Hayes discussed at length how the accelerated inspections Pratt then determined were needed resulted from "very recent learnings" and "recent inspection findings," disclosing that RTX's senior executives had "been working [the issue] for the last . . . 10 days or so." A960–61, 972; *see supra* Counterstatement of the Case § G. Mr. Hayes added that RTX would "know a lot more in the next 6 weeks" and that, "as the information becomes available, [RTX would,] of course, be sharing it with investors"—which is exactly what RTX did some six weeks later. A972; *see*

A1005–08. Far from a concession that defendants "knew about the . . . impact" of the powdered metal defect going back to 2021, Pls.' Br. 38, these statements destroy plaintiffs' theory.

Plaintiffs accuse the district court of ignoring "crucial scienter allegations" that they cherrypick from the RTX executives' statements. Pls.' Br. 48. For example, plaintiffs assert that the court failed to consider "RTX's concession that it knew it had a 'suspect population in the fleet' as early as 2020." *Id.* (quoting A104). Mr. Hayes did refer to engines manufactured when "contamination had occurred between late 2015 and late 2020, early 2021," as a "suspect population." A203 (¶ 310) (quoting A965). In his very next sentences, however, Mr. Hayes explained that Pratt had conducted inspections in this population and that, "based upon everything that we knew until very recently," Pratt "believe[d] that the life of the turbine disc was such that we would see these discs in the shop and be able to inspect them *before we ever had an issue*." *Id.* (emphasis added).[9]

These detailed disclosures about RTX's process also belie plaintiffs' unsupported claims that the powdered metal defect would "almost certainly lead to

---

[9] Plaintiffs also ignore that Mr. Hayes was not stating what he, or any individual defendant, knew or understood in 2021 or at any other time before July 2023. Mr. Hayes was the CEO of a vast company with 182,000 employees and multiple business segments. A114 (¶ 74), 697. And plaintiffs' confidential witness allegations, which they do not defend on appeal, fail to tie any individual defendant to specific reports, meetings, or assessments about the defect before July 2023.

a recall" and that "[t]here was no basis for defendants to believe that anything other than a large-scale recall would be required as soon as they knew that they had a 'suspect population in the fleet.'" Pls.' Br. 50 (quoting A104). They also belie plaintiffs' newly adopted theory on appeal that defendants understood the defect posed a "sufficient risk of a sufficiently adverse impact" to be material, such that the defendants knew they were "misrepresenting material facts" when they spoke. *Id.* at 48. Mr. Hayes explained why Pratt believed the opposite—that the suspect population could be investigated and addressed through inspections of discs during scheduled maintenance—until July 2023.

#### 2. Pratt's manufacturing changes do not support an inference of scienter.

Plaintiffs next raise Pratt's manufacturing changes as circumstantial evidence that defendants were aware of the magnitude of the powdered metal issue and the grave risk it posed to RTX's financial performance. Pls.' Br. 39–40, 50, 52. As discussed above, plaintiffs fail to show that RTX or any of its officers were aware that the powdered metal issue would result in an accelerated recall of GTF engines or that manufacturing changes would be insufficient. *See supra* pp. 27–29. Plaintiffs' reliance on *Boston Scientific* is misplaced. In that case, the complaint alleged that "defendants received numerous adverse reports" about a product malfunction that rendered misleading their statements attributing the product's problems to doctor unfamiliarity. *Bos. Sci.*, 523 F.3d at 87. Here, plaintiffs plead

no such facts about the specific information made available to the individual defendants in February 2021, April 2023, or June 2023. Moreover, plaintiffs' syllogism that a "defendant's efforts to correct a problem . . . creates a strong inference that the defendant was aware of the problem," Pls.' Br. 40 (citing *Bos. Sci.*, 523 F.3d at 89–91), does nothing to establish that defendants were aware that an accelerated recall was inevitable or even contemplated as a possibility. This case is thus much more like *In re General Electric*, in which this Court found no inference of scienter based on allegations showing that the defendant "developed what it believed was a workable solution" until new information changed its assessment. 844 F. App'x at 389.

### 3. The "nature of the problem and the industry" do not support an inference of scienter.

Plaintiffs contend that the "regulated and safety-oriented nature of the aviation industry supports a strong inference that RTX's leaders were aware of the details" of the powdered metal defect. Pls.' Br. 40. Plaintiffs ignore that the "regulated and safety-oriented nature of the aviation industry" is at odds with their overarching theory that RTX was engaged in a multi-year-long fraud on its primary regulator and its investors, while consciously putting human lives at risk. In any event, this contention is not a "particularized allegation[] of fact" but instead a "generic statement[] about 'industry practice' that conclusorily restate[s]

the [complaint's] allegations." *In re Checkpoint Therapeutics Sec. Litig.*, 2025 WL 1434400, at *26 (S.D.N.Y. May 19, 2025); *see ATSI*, 493 F.3d at 99.

Plaintiffs also take issue with the district court's conclusion that defendants' cooperation with the FAA showed that they were "acting within the ordinary standards of care for their industry." Pls.' Br. 50–51 (quoting A50). Plaintiffs assert that the complaint alleges that RTX did not cooperate with the FAA and, in any event, concealed relevant information from investors. *Id.* at 51. The complaint pleads no facts supporting a charge of regulatory non-compliance. Nor does it plead that the FAA ever made such an adverse regulatory finding. To the contrary, the FAA airworthiness directives and service bulletins issued to customers discussed Pratt's investigation of the powdered metal issue over time and recommended remedial actions for certain engines, with none requiring a significant GTF recall before July 2023. A101–02, 137, 147–50, 152–53 (¶¶ 37, 136, 165, 167, 168, 170, 172, 175, 176); A859–72, 1030–40. The complaint pleads no facts showing that any defendant knew that these actions were insufficient, misled the FAA, or constituted "an extreme departure from the standards of ordinary care." *S. Cherry St.*, 573 F.3d at 109 (citation omitted).

Similarly unavailing are plaintiffs' arguments that, after the failure of a GTF engine in December 2022, Pratt's interactions with the FAA "strongly suggested, by the time of the 2023 statements, that RTX would have to take corrective action

that would have a significant financial impact on the company." Pls.' Br. 57. The only facts that the complaint pleads about these FAA interactions are reflected in the airworthiness directives and service bulletins, none of which called for or referenced the need for large-scale recalls before July 2023—only removals of individual engines or inspections at regular shop visits. *E.g.*, A101–02 (¶ 37) (requiring removal of three GTF engines); A152–53 (¶¶ 175–76) (requiring AUSI scans of certain GTF engines as part of scheduled maintenance).[10]

#### 4. The importance of the GTF engine to RTX's business does not support an inference of scienter.

Plaintiffs argue that the GTF engine was "important to RTX's business," and "executives 'are likely to know more about things central to their business.'" Pls.' Br. 41 (quoting *Gimpel*, 156 F.4th at 148); *see id.* at 50, 52. Though they avoid acknowledging it in their brief, plaintiffs are invoking the dubious "core-operations" doctrine. *Gimpel*, 156 F.4th at 148 n.19; *see* A207 (¶¶ 319) (alleging that "Pratt & Whitney's commercial engine sales were a core operation"). To the extent that doctrine retains any validity after the enactment of the PSLRA, it applies only as "supplemental support for allegations of scienter" and "cannot

[10] Plaintiffs argue that "RTX knew" that turbine discs were at greater risk of failure in a GTF engine than in a V2500 engine due to the GTF engine's higher thrust rating. Pls.' Br. 39. But they point to no facts to support this claim and plead that the powdered metal issue affected both higher- and lower-thrust engine models. *See* A150 (¶ 172) (requiring inspection of 21 PW1500G and PW1900G engines, "which were actually lower-thrust variants of GTF models").

establish scienter independently." *Gimpel*, 156 F.4th at 148 n.19 (citation omitted). It also has no place here, where plaintiffs' allegations show that the GTF engine constitutes only a part of Pratt's business, which is in turn only one of several segments of RTX. A114–15 (¶¶ 74–77); *e.g.*, *Frankfurt-Tr. Inv. Luxemburg AG* v. *United Techs. Corp.*, 336 F. Supp. 3d 196, 225 (S.D.N.Y. 2018) (reasoning that plaintiffs failed to plead that operation was central to entire company's business when it contributed 25% of overall profit), *aff'd sub nom.*, *Kapitalforeningen Lægernes Inv.* v. *United Techs. Corp.*, 779 F. App'x 69 (2d Cir. 2019) (summary order). And even if the doctrine were to support the inference that the individual defendants were personally aware of the defect, it does nothing to support what plaintiffs' case actually hinges on: awareness "that there would be significant financial repercussions from the defect and . . . that a significant recall was extremely likely—if not certain." Pls.' Br. 60.

For similar reasons, plaintiffs cannot plead scienter through the conclusory assertion that it is "inconceivable" that Mr. Mitchill and Mr. Eddy were unaware of the powdered metal defect's significant financial impact "mere months" before RTX's disclosure. Pls.' Br. 57. "Allegations that executives absolutely had to have known the depth of [the company's] problems are conclusory and perfectly consistent with the narrative that [the company] had serious problems that none of its executives understood." *In re Target Corp. Sec. Litig.*, 955 F.3d 738, 745 (8th

Cir. 2020) (quotation marks omitted). Nor does the chronology support scienter, particularly when the disclosures themselves explain the recency of RTX's changed understanding of the issue. *See supra* Counterstatement of the Case § G; *Stratte-McClure* v. *Morgan Stanley*, 776 F.3d 94, 107 (2d Cir. 2015) (failing to allege scienter when disclosure occurred less than a month after alleged misstatement), *abrogated on other grounds by Macquarie Infrastructure Corp.* v. *Moab Partners*, 601 U.S. 257 (2024); *San Leandro*, 75 F.3d at 812–13 (same).

**C. The more compelling inference is of nonfraudulent intent.**

Plaintiffs claim that their inference of scienter is "sufficiently plausible to survive a motion to dismiss." Pls.' Br. 57. Plaintiffs' allegations fall far short of pleading *any* inference of scienter as to any defendant. But even if a plausible inference could be made drawing all inferences in favor of plaintiffs, that is not the test under the PSLRA. Rather, plaintiffs must plead a "*strong* inference"—one that is "*at least as compelling* as any opposing inference of *non*fraudulent intent." *Tellabs*, 551 U.S. at 314 (emphasis added). Plaintiffs cannot meet this test: they do not even attempt to conduct the weighing analysis that *Tellabs* calls for.

The theory of the complaint is that defendants tried to push costs out past the GTF engines' warranty periods so customers, rather than RTX, would have to bear them. *E.g.*, A89, 119 (¶¶ 5, 88); Pls.' Br. 30, 38. This theory does not create a cogent inference of scienter in light of the alleged facts. Pratt investigated the

cause and scope of the powdered metal defect, undertook corrective measures that were communicated to customers and published in official government reports, and, after new information changed its previous assumptions and model, voluntarily announced accelerated inspections to ensure passenger safety. *See supra* Counterstatement of the Case §§ C–G. Critically, RTX committed to "make the airlines whole as a result of the disruption" from these inspections and incurred a $3 billion charge in connection with that effort. A965, 1007; *see* A89, 104, 105–06, 210 (¶¶ 5, 41, 46, 332); Pls.' Br. 2–3, 26. These facts are inconsistent with a theory that defendants were trying to push costs out past the GTF engines' warranty period so customers, rather than RTX, would have to pay. Plaintiffs' theory also provides no explanation for why RTX announced the recall when it did—a voluntary announcement that plaintiffs do not allege was compelled by any regulatory or other external requirement—if its motive for the supposed fraud was to "keep [the engines] in service" until the warranty period expired. Pls.' Br. 10.

Rather than evidencing fraud, the more "cogent and . . . compelling" inference is the "opposing inference of nonfraudulent intent." *Tellabs*, 551 U.S. at 314. As reflected in the very statements on which plaintiffs rely, the straightforward inference of nonfraudulent intent is that RTX developed what it "believed was a workable solution" to a complex engineering issue and, when confronted with new information, "revised its assessment of the issue and its

solution," and then "disclosed the financial consequences with reasonable promptness." *In re Gen. Elec.*, 844 F. App'x at 389.

Plaintiffs thus fail to plead a "strong inference" of scienter that is "more than merely plausible or reasonable." *Tellabs*, 551 U.S. at 314. That failure is a sufficient and independent basis for this Court to affirm the district court's dismissal of the complaint.

## III. THE DISTRICT COURT CORRECTLY DISMISSED THE § 20(A) CLAIM.

Because plaintiffs fail to allege "a primary violation" under § 10(b), the dismissal of their claim for secondary liability under § 20(a) should also be affirmed. *Ark. Pub. Emps. Ret. Sys.* v. *Bristol-Myers Squibb Co.*, 28 F.4th 343, 356–57 (2d Cir. 2022).

## CONCLUSION

For the foregoing reasons, the district court's judgment should be affirmed.

Dated: April 28, 2026

Respectfully submitted,

*/s/ William Savitt*

William Savitt
Graham W. Meli
Adam L. Goodman
Katherine Dubbs
WACHTELL, LIPTON, ROSEN & KATZ
51 West 52nd Street
New York, New York 10019
(212) 403-1000

John W. Cerreta
DAY PITNEY LLP
Goodwin Square
225 Asylum Street
Hartford, Connecticut 06103
(860) 275-0665

*Attorneys for Defendants-Appellees*

## CERTIFICATE OF COMPLIANCE

The undersigned counsel certifies that this brief complies with the type-volume limitations of Federal Rule of Appellate Procedure 32(a)(7)(B), as modified by Second Circuit Rule 32.1(a)(4)(A), because, excluding the parts of the document exempted by Federal Rule of Appellate Procedure 32(f), this document contains 13,978 words.

The undersigned counsel further certifies that this brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and complies with the type style requirements of Federal Rule of Civil Procedure 32(a)(6) because it has been prepared in Microsoft Word in a proportionally spaced typeface using 14-point Times New Roman font.

Dated: April 28, 2026

*/s/ William Savitt*
William Savitt