# No. 25-2549

**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE SECOND CIRCUIT**

NEW ENGLAND TEAMSTERS PENSION FUND, individually and on behalf of all others similarly situated,

*Consolidated Plaintiff-Appellant*,

WESTCHESTER PUTNAM COUNTIES HEAVY & HIGHWAY LABORERS LOCAL 60 BENEFITS FUND, UNITED UNION OF ROOFERS, WATERPROOFERS & ALLIED WORKERS LOCAL UNION NO. 8 WBPA FUND,

*Movants-Appellants*,

JOSHUA PENEYCAD, individually and on behalf of all others similarly situated,

*Plaintiff,*

v.

RTX CORPORATION f/k/a RAYTHEON TECHNOLOGIES CORPORATION, GREGORY HAYES, ANTHONY F. O'BRIEN, NEIL MITCHILL, CHRISTOPHER T. CALIO, SHANE EDDY,

*Defendants-Appellees*.

On appeal from the United States District Court for the District of Connecticut

**APPELLANTS' REPLY BRIEF**

(Counsel listed on following page)

Michael P. Canty
LABATON KELLER SUCHAROW LLP
140 Broadway
New York, NY 10005
(212) 907-0700

Lester R. Hooker
SAXENA WHITE P.A.
7777 Glades Road, Suite 300
Boca Raton, FL 33434
(561) 394-3399

Steven B. Singer
SAXENA WHITE P.A.
10 Bank Street, 8th Floor
White Plains, NY 10606
(914) 437-8551

David Zimmer
ZIMMER, CITRON & CLARKE LLP
711 Atlantic Avenue, 6th Floor
Boston, MA 02111
(617) 676-9421

Julia Solomon-Strauss
ZIMMER, CITRON & CLARKE LLP
14 Ridge Square NW, Suite 328
Washington, DC 20016
(202) 796-4540

*Counsel for Appellants*

May 19, 2026

# TABLE OF CONTENTS


INTRODUCTION ....................................................................................... 1

ARGUMENT ........................................................................................... 4

I. Public Companies May Not Mislead Investors About A Significant Risk To Their Business. ........................................................ 4

II. Defendants' February 2021 Statements Fraudulently Implied that Known Issues with the Geared Turbofan Engine Had Been Resolved ...... 9

A. The 2021 Statements Were False or Misleading Because They Hid RTX's Systemic Defect in Manufacturing Turbine Disks ...... 10

B. The Omitted Information About the Defect Was Material. ........... 14

C. The Complaint's Allegations, Taken as True, Establish a Strong Inference of Conscious Misbehavior or Recklessness. ...... 16

1. Plaintiffs Allege Strong Circumstantial Evidence of Scienter. ............................................................ 16

2. Plaintiffs Do Not Need to Allege Motive, But They Do. ............................................................ 19

3. Scienter Is At Least as Compelling an Explanation for Defendants' Misdirection as Any Other.. ........................... 20

D. Hayes's Statement Was Not An Opinion, Forward-Looking Statement, or Puffery. .................................................. 22

III. Defendants' 2023 Statements Fraudulently Implied that RTX's Financial Projections Fully Accounted for the Problems with the Geared Turbofan Engine. ................................................ 24

A. The 2023 Statements Were False or Misleading. .......................... 25

B. The Omitted Information Was Material. ..................................... 27

C. The Complaint's Allegations, Taken as True, Establish a Strong Inference of Conscious Misbehavior or Recklessness. ...... 27

D. Eddy's Statement Is Not Protected Opinion or a Forward-Looking Statement. ..................................................... 29

IV. The Court Should Reinstate the Derivative Section 20(a) Claims ........... 30

CONCLUSION ......................................................................................... 30

CERTIFICATE OF COMPLIANCE ............................................................. 32

CERTIFICATE OF SERVICE ..................................................................... 32

# TABLE OF AUTHORITIES

**Cases**

*Abramson v. Newlink Genetics Corp.*,
965 F.3d 165 (2d Cir. 2020) ....................14

*Acito v. IMCERA Group*,
47 F.3d 47 (2d Cir. 1995) ....................8

*Basic Inc. v. Levinson*,
485 U.S. 224 (1988).................... 3, 5, 6, 7, 9, 14, 15, 16, 27

*City of Warren Police & Fire Ret. Sys. v. Prudential Fin., Inc.*,
70 F.4th 668 (3d Cir. 2023) ....................26

*Ganino v. Citizens Utilities Co.*,
228 F.3d 154 (2d Cir. 2000) .................... 15, 16

*Gimpel v. The Hain Celestial Group, Inc.*,
156 F.4th 121 (2d Cir. 2025) .................... 1, 12, 13, 14, 16, 19, 20

*Harris v. Ivax Corp.*,
182 F.3d 799 (11th Cir. 1999) ....................23

*Higginbotham v. Baxter Int'l*,
495 F.3d 753 (7th Cir. 2007) ....................8

*In re Gen. Elec. Sec. Litig.*,
2020 WL 2306434 (S.D.N.Y. May 7, 2020) ....................4, 8

*In re Gen. Elec. Sec. Litig.*,
844 F. App’x 385 (2d Cir. 2021) ....................4, 8

*In re Target Corp. Sec. Litig.*,
955 F.3d 738 (8th Cir. 2020) ....................28

*Matrixx Initiatives, Inc. v. Siracusano*,
563 U.S. 27 (2011)....................6, 7

*Meyer v. Jinkosolar Holdings Co.*,
761 F.3d 245 (2d Cir. 2014) .................... 1, 3, 6, 13

*Mississippi Pub. Employees’ Ret. Sys. v. Bos. Sci. Corp.*,
523 F.3d 75 (1st Cir. 2008).................... 13, 16, 18, 19, 20

*Novak v. Kasaks*,
216 F.3d 300 (2d Cir. 2000) .................... 8, 24

*Oklahoma Firefighters Pension & Ret. Sys. v. Six Flags Ent. Corp.*,
58 F.4th 195 (5th Cir. 2023) ....................................................................23

*Rombach v. Chang*,
355 F.3d 164 (2d Cir. 2004) ....................................................................24

*San Leandro Emergency Med. Grp. Profit Sharing Plan v. Philip Morris Co.*,
75 F.3d 801 (2d Cir. 1996) ................................................................ 14, 29

*SEC v. Gabelli*,
653 F.3d 49 (2d Cir. 2011) ................................................................ 13, 14

*Slayton v. American Exp. Co.*,
604 F.3d 758 (2d Cir. 2010) ........................................................ 23, 24, 30

*Stratte-McClure v. Morgan Stanley*,
776 F.3d 94 (2d Cir. 2015) ......................................................................29

*TSC Indus., Inc. v. Northway, Inc.*,
426 U.S. 438 (1976)............................................................................ 7, 15

**Statute**

15 U.S.C. § 78u-5(i)(1) ................................................................................23

## INTRODUCTION

As the opening brief explained, this case presents a classic example of securities fraud. Securities law forbids public companies from knowingly or recklessly making a materially false statement or, while "speak[ing] on an issue or topic," "omitt[ing] to state a material fact which omission render[s] the things said misleading." *Gimpel v. The Hain Celestial Group, Inc.*, 156 F.4th 121, 137, 139 (2d Cir. 2025).

Defendants did just that. Defendants assured investors in 2021 that they had "addressed" "technical issues" they had "identified" with the Geared Turbofan engine. A176. And they reassured investors in 2023 that their financial estimates for the engine "contemplate everything that we know about the engine." A196. But defendants failed to tell investors about a systemic manufacturing defect that had already caused one engine to rip apart before the 2021 statements and two engines to rip apart before the 2023 statements—and that affected every Geared Turbofan engine made over a six-year period. A reasonable investor would have felt that defendants' statements were misleading or even outright lies. And because the defect affected RTX's Geared Turbofan fleet—"the architecture of the future" for RTX, A118—the "reasonable investor would consider [the defect] important," and hence material. *Meyer v. Jinkosolar Holdings Co.*, 761 F.3d 245, 251 (2d Cir. 2014).

Plaintiffs also allege facts that, taken as true, make an inference of scienter at least as plausible as any innocent explanation for defendants' misdirection. Defendants have *admitted* that they knew, shortly after the first engine exploded during takeoff in March 2020, that a systemic defect in RTX's manufacturing process caused that explosion and created a "suspect population in the fleet." A104. Defendants knew that RTX's flagship Geared Turbofan engine was particularly vulnerable to the defect. And defendants knew something had to be done—RTX undertook nine "extensive" manufacturing changes over eighteen months. A140. In the meantime, defendants produced and shipped defective engines while reassuring investors that technical issues had been addressed and financial projections were comprehensive. These allegations create a strong inference that defendants knew about the defect and knew it posed a serious threat to RTX's business, but hid the defect from investors.

Like the district court, defendants insist it is not enough that defendants hid a known, systemic manufacturing defect that impacted a key product and caused an engine to explode. According to defendants, plaintiffs' claims fail because plaintiffs do not allege that "RTX knew for years that the powdered metal defect *would require a massive recall* but concealed that information from investors." RTX Br. 1.[1] Because defendants did not know they *would* recall the engines,

[1] All emphasis added unless otherwise noted.

defendants insist they cannot have fraudulently concealed *the recall*, and plaintiffs' theory is "fraud by hindsight." RTX Br. 2.

Plaintiffs' claims do not turn on when defendants knew there *would* be a recall. The Supreme Court and this Court have squarely held that misleading investors about "contingent or speculative information or events" can be actionable because even a contingent event can have "significance [to] the reasonable investor," depending on the "probability that the event will occur and the anticipated magnitude of the event in light of the totality of the company activity." *Basic Inc. v. Levinson*, 485 U.S. 224, 238, 240 (1988); *see also Meyer*, 761 F.3d at 252 (citing *Basic* and looking to "the importance of the event discounted by the probability of its occurrence"). Thus, knowingly or recklessly misleading investors about a risk to the company that would be significant to a reasonable investor is securities fraud, whether or not that risk ultimately comes to pass.

The question in this case is therefore not whether defendants knew there *would* be a mass recall at the time they made the relevant statements. The question is whether defendants knowingly misled investors by failing to disclose the known, systemic manufacturing defect that had already led its airplane engines to fail, and whether that defect raised serious enough risks to RTX that investors would want to know about it. The answer is yes.

The best defendants can do in response is repeatedly analogize this case to *In re General Electric Securities Litigation*, 844 F. App'x 385 (2d Cir. 2021), where this Court affirmed (by summary order) the dismissal of a securities fraud case involving an oxidation issue with GE's power plant turbines. GE informed customers of the oxidation issue and its proposed solution when GE became aware of it and before any product had malfunctioned; and when a product did malfunction, demonstrating that the problem was potentially more severe than GE previously believed, GE quickly disclosed the issue to investors. *Id.* at 389; *In re Gen. Elec. Sec. Litig.*, 2020 WL 2306434, at *2 (S.D.N.Y. May 7, 2020). The complaint alleges that defendants here did the opposite: Despite knowing that their systemic manufacturing defect had caused airplane engines to rip apart, defendants kept the defect secret while assuring investors that technical problems had been resolved and that their financial disclosures were comprehensive.

This Court should reverse.

## ARGUMENT

### I. Public Companies May Not Mislead Investors About A Significant Risk To Their Business.

Over and over, defendants insist that they cannot be liable because they did not know for certain that the manufacturing defect would "inevitabl[y]" lead to a mass or accelerated recall. RTX Br. 27, 52. As to every element of plaintiffs' claim, defendants contend that, because the complaint does not allege that "RTX

knew for years that the powdered metal defect *would* require a massive recall" or that the defect "*would* have a financial impact of sufficient magnitude to RTX … to be material to investors," RTX cannot be liable. RTX Br. 1, 25; *see also, e.g.*, RTX Br. 28 (lack of knowledge of "a significant accelerated recall of GTF engines"); RTX Br. 38 ("RTX did not come to understand that an accelerated recall, with material financial impact, *would* be needed until July 2023"); RTX Br. 49 ("[RTX] had not determined that an accelerated recall of GTF engines *was necessary* until shortly before July 25, 2023."); RTX Br. 51 ("plaintiffs fail to show that RTX or any of its officers were aware that the powdered metal issue *would* result in an accelerated recall of GTF engines"). In so arguing, defendants double-down on the district court's error in requiring that plaintiffs allege that defendants knew "that a mass recall was required." A50.

That is not the law and it is not plaintiffs' theory. In *Basic*, the Supreme Court rejected a categorical rule that would limit liability to events that were all-but-certain to come about. 485 U.S. at 232-36. After the plaintiffs in *Basic* brought suit based on the company's false or misleading statements about preliminary merger discussions, defendants argued that such discussions were immaterial because the merger was "contingent or speculative." *Id.* at 232. The Supreme Court disagreed. Adopting precedent from this Court, the Supreme Court held that when a company knowingly or recklessly makes a false or misleading

statement about such a contingent event, materiality (and hence liability) turns on "whether the 'reasonable investor' would have considered the omitted information significant" given "the indicated probability that the event will occur and the anticipated magnitude of the event in light of the totality of the company activity." *Id.* at 232, 238. Accordingly, this Court evaluates materiality based on "the importance of the event discounted by the probability of its occurrence." *Meyer*, 761 F.3d at 252. Defendants' insistence that they did not *know* that there *would* be a recall when they made the statements at issue is thus beside the point.

Defendants' position that they cannot be liable for concealing the defect unless the recall was a certainty also conflicts with the Supreme Court's consistent rejection of categorical rules that "designate[] a single fact or occurrence as always determinative of an inherently fact-specific finding." *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 39 (2011) (quoting *Basic*, 485 U.S. at 236).

Defendants argue that requiring companies to disclose issues like the powdered metal defect would "bury the shareholders in an avalanche of trivial information." RTX Br. 30 (quoting *Basic*, 485 U.S. at 231). But *Basic*, on which defendants rely, rejected that precise concern. The defendants in *Basic* argued that companies should not be required to disclose possible mergers before the agreement-in-principle stage because "an investor [should] not be overwhelmed by excessively detailed and trivial information." *Basic*, 485 U.S. at 233. The Court

squarely rejected the argument: "Disclosure, and not paternalistic withholding of accurate information, is the policy chosen and expressed by Congress." *Id.* at 234. "The role of the materiality requirement is … to filter out essentially useless information that a reasonable investor would not consider significant," and uncertain events can have "probabilistic significance." *Id.* As *Basic* recognizes, it is defendants' position—that companies can affirmatively represent that all is well until the moment catastrophe is imminent—that undermines the point of securities law: to let investors make an "informed choice" to take the risk and stick with the company or get out and protect their investment. *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 448 (1976); *see Basic*, 485 U.S. at 234.

In fearing excessive disclosure, defendants also forget there is no "affirmative duty" under the securities laws "to disclose any and all material information." *Matrixx*, 563 U.S. at 44. "[C]ompanies can control what they have to disclose." *Id.* at 45. Here, defendants chose to make affirmative representations about the soundness of the engine and the comprehensive nature of their financial statements—presumably because investors cared about those issues, *see* A124-125, A183, A189-190. Having chosen to speak on those important issues, defendants could not then knowingly or recklessly mislead investors by omitting related and significant information.

Nor would reversal here prevent companies from telling investors they believe there are workable solutions or revising their assessment as new information emerges. *Contra* RTX Br. 57-58. The problem here is not that defendants painted too rosy a picture of their efforts to address the defect. The problem is that defendants hid the systemic defect from investors altogether until defendants decided to ground the fleet—even when that defect had caused two airplane engines to fail. For that reason, the *General Electric* case that defendants repeatedly cite undermines their position. As soon as a customer reported a defect, GE disclosed the issue to investors—together with its plan to solve the problem. *In re Gen. Elec. Sec. Litig.*, 2020 WL 2306434, at *2. Investors could therefore evaluate for themselves the problem, GE's proposed solution, and the risks to the company. By contrast, defendants in this case left investors entirely in the dark while they reassured them everything was alright.[2]

For similar reasons, plaintiffs are not arguing for "fraud by hindsight." RTX Br. 2, 41. Plaintiffs agree that executives need not "be clairvoyant; they are only responsible for revealing those material facts reasonably available to them." RTX Br. 24 (quoting *Novak v. Kasaks*, 216 F.3d 300, 309 (2d Cir. 2000)). Here,

[2] In the other cases RTX cites, the defendants similarly disclosed the problem promptly after discovering it. RTX Br. 30 (citing *Higginbotham v. Baxter Int'l*, 495 F.3d 753 (7th Cir. 2007) (month-and-a-half), and *Acito v. IMCERA Group*, 47 F.3d 47, 53 (2d Cir. 1995) (one month)).

defendants knew all the relevant facts when they spoke: They knew that six years' worth of RTX's flagship Geared Turbofan engines were made with parts that, due to a systemic manufacturing defect, could fail, leading the engine to rip apart. And they knew that this defect had *already* led one engine to rip apart in 2021, and two engines to rip apart by 2023. Those are "contemporaneous facts," not "hindsight." RTX Br. 2-3.

In sum, defendants' primary argument—that they did not *know*, in 2021 and 2023, that there *would* be a mass recall (or some equivalent financial fallout)—does not address the right question. The question before this Court is whether the facts alleged, taken as true, establish that defendants lied to or misled investors by failing to disclose the systemic manufacturing defect; that the omission was material under *Basic*'s "probability/magnitude approach," 485 U.S. at 238; and that defendants acted with scienter. For the reasons explained in the opening brief and below, plaintiffs sufficiently allege those elements. Moreover, while it is not necessary, plaintiffs' allegations also establish that defendants did know, as far back as 2021, that a recall (or some analogous financial impact to RTX) was effectively inevitable. *See* Opening Br. 49-50.

## II. Defendants' February 2021 Statements Fraudulently Implied that Known Issues with the Geared Turbofan Engine Had Been Resolved.

The complaint's allegations, taken as true, establish that, in February 2021, defendants knew that they were manufacturing disks for the Geared Turbofan

engine with contaminated powdered metal and that the defect had led the V2500 engine on the Vietnam Airlines flight to rip apart during takeoff. Opening Br. 12-17. But in its February 2021 10-K, RTX stated that, while "technical issues have been identified and experienced with the engine, which is usual for new engines," "Pratt & Whitney has addressed these issues through various improvements and modifications"—with no mention of the powdered metal defect. A176. Similarly, on February 17, 2021, CEO Hayes told investors that "all those teething problems that we talked about for the last several years seem to be behind us" and "I think, at least, knock on wood, all the [Geared Turbofan] issues that we've been talking about seem to be behind us and the engine's performing really well." A183-184. Again, no mention of the powdered metal defect.

Those statements violated the securities laws. A reasonable investor would have been misled by defendants' omission of the manufacturing defect and considered the omitted information material. And plaintiffs' allegations, taken as true, establish a strong inference of scienter.

### A. The 2021 Statements Were False or Misleading Because They Hid RTX's Systemic Defect in Manufacturing Turbine Disks.

RTX's February 2021 assurances that it had "addressed" all the "technical issues" with the Geared Turbofan engine were false or, at best, misleading half-truths. Opening Br. 33-37. They concealed the existence of the defect, which defendants admitted they knew about and were trying to address through nine

different "extensive" manufacturing changes.[3] A101, A162, A169. And because defendants described how other "technical issues" and "teething problems" had been resolved, A100-101, A177, they were obligated to disclose the powdered metal defect too. *Contra* RTX Br. 31.

Aside from their repeated assertion that they did not know there would be a recall, defendants make essentially two arguments in their defense. Both fail.

First, defendants argue that their statements only concerned "a *different* issue" than the powdered metal defect—specifically, the engine's "teething problems" and other "[a]dditional technical issues." RTX Br. 6, 31. But the 10-K stated generally that, since the engine "entered into service in 2016, technical issues have been identified and experienced with the engine" and that "Pratt & Whitney has addressed these issues." A176. Especially at the motion to dismiss stage, defendants identify no reason that a reasonable investor would have not considered the powdered metal defect to be a "technical issue[] … with the engine" that was encompassed by this statement.

Moreover, the statements are actionable even if defendants are right that their reference to "teething problems" and "technical issues" did not *literally* encompass the powdered metal defect. The point of the half-truth doctrine is that,

[3] Though defendants assert otherwise, RTX Br. 27-28, the complaint alleges that defendants made these statements while they were making manufacturing changes. A101.

"once a company speaks on an issue or topic, there is a duty to tell the whole truth." *Gimpel*, 156 F.4th at 141. Defendants read this duty so narrowly as to do little more than prohibit literal falsehoods. RTX Br. 31. But this Court has made clear that the inquiry is not so narrow: The question in a half-truth case is whether "a reasonable investor, considering not only a statement's literal truth but also its context and manner of presentation," would have considered the statement "misleading." *Gimpel*, 156 F.4th at 139 (quotation marks omitted). Here, a jury could conclude that an investor who heard defendants' reassuring statements that RTX had resolved the "technical issues" and "teething problems" with the Geared Turbofan engine would have considered themselves misled had they learned that there was a known, outstanding, and systemic manufacturing defect with the engine's turbine disks—a defect that had already led another engine to rip apart during takeoff.

Second, defendants observe that the only engine that had ripped apart by 2021 was a V2500, not a Geared Turbofan. RTX Br. 7, 26-27. But the defect had nothing to do with the engine model and everything to do with the manufacturing process for turbine disks—which was the same for both engines. A97, A135-137, A162. As one of the confidential informants put it, if flour is contaminated, it will impact every baked good made from that flour. A129.

Defendants knew this. As defendant Calio told investors, "this is not a [Geared Turbofan] design issue. This is a manufacturing process issue in our powdered metal." A963. The Geared Turbofan and V2500 disks were manufactured in the same facility, using the same process, at the same time. A97, A135-137, A162. That is how the V2500 explosion "frankly instigated this entire thing," as Calio put it. A1014; *see* A964 (Hayes describing the defect as a "manufacturing quality issue … that we first uncovered back in 2020 when we had an incident with the V2500 turbine disc"). Indeed, defendants knew that the Geared Turbofan engine was *more* vulnerable to the defect than the V2500, both because it was higher-thrust and because they were making more of them. A142. As Hayes explained, "the preponderance of the impact is going to be on the [Geared Turbofan] fleet because of the size of the fleet." A1015.

Defendants fail to distinguish the many cases where courts found statements actionable where, as here, defendants made affirmative representations about a particular issue and withheld information that renders those representations misleading. Opening Br. 35-36 (discussing *Meyer*, *Gimpel*, *SEC v. Gabelli*, 653 F.3d 49, 57 (2d Cir. 2011), *rev'd on other grounds*, 568 U.S. 442 (2013), and *Mississippi Pub. Employees' Ret. Sys. v. Bos. Sci. Corp.*, 523 F.3d 75, 87 (1st Cir. 2008)). Defendants claim that, in those cases, "defendants lied." RTX Br. 33. But in each case, the Court was explicit that the statements were both "technically" or

"literal[ly]" true *and* fraudulent in light of the withheld information, *Meyer*, 761 F.3d at 250-51—that is why they are "half-truth" cases, *Gimpel*, 156 F. 4th at 141. *See also, e.g.*, *Gabelli*, 653 F.3d at 57.

The cases defendants cite do not help them. RTX Br. 24. The complaint in *Abramson v. Newlink Genetics Corp.*, 965 F.3d 165, 178 (2d Cir. 2020), pled that a certain figure was 20.1, while the challenged statement described a figure "in the low 20s," so the Court found that the challenged statement was accurate, not misleading. In *San Leandro Emergency Medical Group Profit Sharing Plan v. Philip Morris Co.*, 75 F.3d 801, 812 (2d Cir. 1996), the Court determined that the plaintiffs' "unsupported general claim" about "confidential company sales reports" did not show defendants' knowledge of contrary facts. But there is nothing unsupported or general about defendants' alleged knowledge here: According to their own admissions (among other things), defendants knew about, and were trying to deal with, the fallout from the manufacturing defect for three years before they disclosed it to investors.

### B. The Omitted Information About the Defect Was Material.

Plaintiffs' allegations establish that the omitted information—*i.e.*, the existence of the manufacturing defect—would have been material to a reasonable investor. As discussed above, materiality is a low bar, especially at the pleading stage: The materiality requirement merely "filter[s] out essentially useless

information that a reasonable investor would not consider significant." *Basic*, 485 U.S. at 234; *see Ganino v. Citizens Utilities Co.*, 228 F.3d 154, 162 (2d Cir. 2000) (information is not material only if it is "obviously unimportant to a reasonable investor").

Applying *Basic*'s "probability/magnitude approach," 485 U.S. at 238, plaintiffs' allegations easily clear this low bar. By the time of defendants' 2021 statements, they knew there was a systemic defect in manufacturing turbine disks for RTX's engines, including RTX's flagship Geared Turbofan engine. A87-88, A97-98, A104, A126-135. They knew the defect had already led a V2500 engine to rip apart during takeoff. A97-98, A135-136. They knew that, because of the V2500 incident, there had been recalls of that engine. A98, A146. They knew that the Geared Turbofan engine's higher temperature and pressure made it more susceptible to the manufacturing defect. A142, A161-162. And they knew that investors, customers and analysts were concerned about the engine's reliability, functionality and longevity—concern that was unsurprising, as RTX had touted the engine as the "architecture of the future" for the company. A118, A124-125, A183. These allegations, taken as true, establish a sufficient probability of a financial impact of sufficient magnitude that the disclosure of the defect, and the risks it posed, "would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available" about the

engine's—and the company's—prospects. *TSC Indus.*, 426 U.S. at 449. Information about a manufacturing defect in RTX's flagship engine that had already led one engine to rip apart at takeoff is plainly not "essentially useless," *Basic*, 485 U.S. at 234, or "obviously unimportant," *Ganino*, 228 F.3d at 162.

Defendants offer no serious response. They argue that only news of the recall itself would have been material, which is wrong for the reasons explained above. And they breezily assert that "no pleaded facts show that the powdered metal issue had risen to a magnitude by February 2021 that defendants had any reason to disclose it to investors." RTX Br. 31. That simply ignores the allegations catalogued above, which must be taken as true.

### C. The Complaint's Allegations, Taken as True, Establish a Strong Inference of Conscious Misbehavior or Recklessness.

As the opening brief explains, the complaint amply alleges that defendants acted knowingly or recklessly when they misled investors. Opening Br. 37-41. Defendants' principal response—that scienter requires knowledge that a recall would occur—fails for the reasons detailed in Part I.

#### 1. Plaintiffs Allege Strong Circumstantial Evidence of Scienter.

The opening brief details the allegations that provide (at minimum) strong circumstantial evidence of conscious wrongdoing or recklessness—allegations of the sort that have satisfied this Court and others. *See Boston Scientific*, 523 F.3d at

89-91; *Gimpel*, 156 F.4th at 148. RTX's CEO admitted that defendants knew about the defect, its cause, and that they had a "suspect population" in the fleet dating back to 2020, A162; RTX made numerous "extensive improvements" to its manufacturing process, A162, but was still knowingly producing defective engines; airplane engines are highly regulated, and the defect had already caused engine failure on a flight in progress; and the Geared Turbofan engine was vital to RTX's business. *See* Opening Br. 37-41 (detailing these and other circumstances). Defendants challenge each piece in isolation, but it is the combination of these allegations that supplies the strong inference of scienter.

Defendants' attacks on the individual pieces of plaintiffs' scienter showing fail in any event. Defendants strain to neutralize Hayes's admission that RTX "first uncovered" the defect "back in 2020" when the first engine failed and hence "knew" at that time that "we had a suspect population in the fleet." A104. Defendants point to Hayes's supposed hope that RTX could have resolved the defect without a recall. RTX Br. 49-51. A jury, however, could reasonably view that part of Hayes's statement as a post-hoc effort to excuse his misleading omissions. Regardless, Hayes's concession that RTX knew about the undisclosed defect strongly supports scienter even if Hayes genuinely believed RTX could avoid a recall. After all, defendants reassured investors that "technical issues" with the engine had been "addressed," A176, while knowing (as Hayes conceded) that

the manufacturing defect that had led the Vietnam Airlines engine to rip apart had not been addressed and created a "suspect population" in the Geared Turbofan fleet.

Next, defendants say the highly regulated nature of the industry cuts in their favor because (they say) no one would try to cheat a regulator or put passenger safety at risk. RTX Br. 52-54. But no court has implied such good faith by regulated entities in industries in which safety is important, and for good reason. *E.g.*, *United States v. Boeing*, 4:21-cr-00005, Dkt. No. 4, at 1-2 (N.D. Tex. Jan. 7, 2021) (Boeing admitting to conspiracy to defraud the United States by deceiving the FAA). Rather, as *Boston Scientific* explained, the regulated, safety-oriented nature of the industry supports the inference that defendants would have known about the defect and the risk it posed after the defect had caused an actual engine to fail. 523 F.3d at 91.

Defendants also claim that RTX's series of "extensive" manufacturing changes does not support scienter, arguing they did not know there would be an "accelerated recall" or that the "manufacturing changes would be insufficient." RTX Br. 51. But it does not matter what defendants knew about the recall, as explained already. And the significance of the manufacturing changes does not turn on whether defendants believed they would succeed or not; the changes show

defendants knew they had a serious problem on their hands—but did not disclose it. *See Boston Scientific*, 523 F.3d at 87, 89-91.[4]

Defendants next contest the significance of their Geared Turbofan engine business and its relevance to scienter. RTX Br. 54-55. But the complaint alleges that engine was a flagship product for RTX: It was "the architecture of the future" for the company. A118-119. And this Court recently confirmed that, if "the alleged fraud touches on large swaths of [the company's] U.S. business and areas of critical import," that "[b]olster[s] the scienter inference." *Gimpel*, 156 F.4th at 148. At minimum, as defendants concede, the importance of the Geared Turbofan business supplies "supplemental support for allegations of scienter." RTX Br. 54 (quoting *Gimpel*, 156 F.4th at 148 n.19).

### 2. Plaintiffs Do Not Need to Allege Motive, But They Do.

Defendants contend they had no personal motive to commit fraud. RTX Br. 46-48. But such a showing is not necessary. "[S]trong circumstantial evidence of conscious misbehavior or recklessness" suffices. *Gimpel*, 156 F.4th at 144. And, as discussed, there is ample evidence of that.

[4] Defendants attempt to distinguish *Boston Scientific* on the ground that plaintiffs do not plead "facts about the specific information made available" to the defendants in the months they made their statements. RTX Br. 51-52. But plaintiffs here plead more, including defendants' admission of their knowledge going back *years*, to 2020. A104.

Regardless, plaintiffs do allege that defendants were motivated to hide the defect and its impact on the Geared Turbofan engine from investors for reasons beyond "a 'generalized' desire of individual defendants to see strong corporate performance or higher stock prices." *Id.* Defendants imply, in effect, that nothing can establish motive beyond something akin to suspicious stock sales. But in *Boston Scientific*, the court found motive based on case-specific reasons for hiding the defect from investors: Defendants sought "to build up inventory prior to announcing recalls." 523 F.3d at 89. Likewise, here, defendants hoped that, if they could replace the disks during normal shop visits before more engines ripped apart, they might get away with having hidden the defect. Opening Br. 37-38. And defendants needed to keep engines on-wing and in service for profitability and market share. *See* Opening Br. 18-19, 38; A91-94, A119-120. Those motives strongly support the independently sufficient evidence of scienter.

#### 3. Scienter Is At Least as Compelling an Explanation for Defendants' Misdirection as Any Other.

So long as plaintiffs' theory of fraudulent intent is "at least as compelling as any opposing inference of nonfraudulent intent," they have sufficiently pleaded scienter. *Gimpel*, 156 F.4th at 143. Defendants' proposed nonfraudulent theory is that RTX "voluntarily" decided to recall the engines "to ensure passenger safety," and that, because they ultimately compensated airlines for the recall, they had no incentive to "push costs out" past the engines' warranty period. RTX Br. 56-57.

Plaintiffs' theory of fraudulent intent is at least as compelling as defendants' post-hoc attorney argument, which is at odds with the complaint.

First, RTX never said it decided to recall the engines for passenger safety, and indeed, RTX had already sacrificed that safety by letting defective engines fly and fail. As the complaint alleges, the September 11, 2023, recall announcement was triggered by the FAA's August 22, 2023, Airworthiness Directive, which required the affected disks to be removed by September 15, 2023, due to "an immediate safety of flight problem." A166. It is hardly "voluntary" to institute a recall mere days before the FAA effectively demanded it.

Second, the complaint contradicts RTX's contention that RTX had no reason to push costs out. RTX had to cover maintenance and repairs on the Geared Turbofan engines until its warranty expired, which created an incentive to delay any recall. A92. RTX claims that it "committed to make the airlines whole," RTX Br. 57 (quotation marks omitted), but there is no evidence about the number of engines that were still under warranty such that RTX would actually have had to foot the bill. Even if RTX was forced to fully incur the costs of repairing the defect for all engines by its own warranty policies, that is an indication that defendants' scheme failed, not that they lacked scienter.

### D. Hayes's Statement Was Not An Opinion, Forward-Looking Statement, or Puffery.

The district court and defendants are wrong that Hayes's 2021 statement is protected as an opinion, forward-looking statement, or puffery.[5] RTX Br. 34-36.

First, as to opinion, Hayes' statement that "I think, at least, knock on wood, all the [Geared Turbofan] issues that we've been talking about seem to be behind us," A184, is actionable, twice over. Defendants agree, as they must, that opinion statements are actionable where the speaker (1) does not in fact hold the belief he professes or (2) omits information that renders the statement misleading to a reasonable investor. RTX Br. 34; Opening Br. 42-43. That leaves defendants to simply declare, without elaboration, that "[p]laintiffs fail to plead facts supporting either exception." RTX Br. 32. But the complaint amply alleges that Hayes knew a systemic and unresolved manufacturing defect had caused the Vietnam Airlines incident—and that RTX was actively making nine extensive changes to its manufacturing process to address the defect—and therefore Hayes did not genuinely believe the "issues" were "behind" RTX. Separately, Hayes's failure to

[5] The district court did not hold, and defendants do not argue, that the specific misleading statement in RTX's February 2021 10-K that plaintiffs challenge in this appeal—*i.e.*, the statement that "technical issues" with the engine had been "addressed"—is shielded from liability. *See* A15-23. The district court merely concluded that the 10-K filing, a lengthy document, included some other forward-looking statements. *See* RTX Br. 35 n.3; A21-23 (referring to cost estimates). That is a true, but irrelevant, observation.

mention the defect rendered his statement misleading to investors, for the reasons explained above.

Second, Hayes's statement is not protected by the safe harbor for forward-looking statements. *Contra* RTX Br. 34-35. For one, it was not a forward-looking statement at all; Hayes spoke about the current state of the engine's technical fitness (issues "seem to be behind us," *i.e.*, presently resolved), not any "projection" of "future" "performance" or "plans." 15 U.S.C. § 78u-5(i)(1); *compare Harris v. Ivax Corp.*, 182 F.3d 799, 805 (11th Cir. 1999) (cited at RTX Br. 35) (statement that "challenges … are now behind us" was "prediction of economic performance" based on "anticipated improvements in business conditions").

For another, Hayes's statement lacked the "meaningful cautionary statements" the safe harbor requires. *Contra* RTX Br. 35. The disclaimers Hayes cited—in RTX's 10-K—were "unattached to individual forward-looking statements," *Oklahoma Firefighters Pension & Ret. Sys. v. Six Flags Ent. Corp.*, 58 F.4th 195, 211 (5th Cir. 2023); Hayes made only a vague reference to the 10-K in his introductory remarks, and only to mollify "the lawyers." A1045. And the disclaimers in the 10-K were not, as the statute requires, "a realistic description of the risks applicable to the particular circumstances." *Slayton v. American Exp. Co.*, 604 F.3d 758, 772 (2d Cir. 2010). They were a "boilerplate litany of generally

applicable risk factors" or otherwise entirely irrelevant to Hayes's comments (*e.g.*, COVID-19 risks). *Id.*; *see* A270-71. In any case, RTX's "[c]autionary words about future risk" in the 10-K "cannot insulate from liability the failure to disclose that the risk has transpired." *Rombach v. Chang*, 355 F.3d 164, 173 (2d Cir. 2004); *see Slayton*, 604 F.3d at 771.

Finally, Hayes's statement falls outside the safe harbor, even if it is forward-looking, because the complaint alleges that Hayes made the statement "with actual knowledge that it was false or misleading." *Slayton*, 604 F.3d at 766.

Third, Hayes's statement that the engine's issues "seem to be behind us," A184, was not puffery. *See* Opening Br. 44-45. It was a misrepresentation of the present state of the engine, and "defendants may be liable for misrepresentations of existing facts." *Novak*, 216 F.3d at 315. Defendants do not argue otherwise. *See* RTX Br. 35-36.

## III. Defendants' 2023 Statements Fraudulently Implied that RTX's Financial Projections Fully Accounted for the Problems with the Geared Turbofan Engine.

Statements by Mitchill (RTX's CFO) and Eddy (Pratt & Whitney's President) in April and June 2023 are also actionable misstatements.

In December 2022, another defectively manufactured turbine disk failed, causing the Geared Turbofan engine of a Viva Aerobus plane to explode during takeoff—the second engine to fail during takeoff in less than three years. But

defendants still did not come clean to investors. Instead, Mitchill stated on April 25, 2023, that "our estimates today contemplate everything that we know about the engine. … And any challenges in terms of cost or additional resources we need to put into that area are already contemplated in the outlook that we have for Pratt and for RTX as a whole." A196. And, on June 19, 2023, Eddy confirmed at the Paris Air Show that "as we have designed the improvements that go into the fleet, we've rolled those costs into the cost basis for the portfolio … I think there's not a surprise here coming. … [A]ll of those costs would be programmed into the portfolio and into our calculation as well." A198-199.

### A. The 2023 Statements Were False or Misleading.

The 2023 statements were false or misleading for the same reasons as defendants' 2021 statements—and then some. Not least, another engine—this time a Geared Turbofan—had failed during takeoff. Nevertheless, defendants told investors that RTX's financial projections reflected "everything we know" about the engine and "there's not a surprise here coming," while making no contingency to account for the systemic manufacturing defect that had taken out two of its engines and that infected much of the flagship Geared Turbofan fleet. Like the 2021 statements, these statements were either outright lies (because, for instance, RTX's financial statements did not "contemplate everything that we know") or, at the very least, actionable half-truths.

The false or misleading nature of the 2023 statements is further supported by the fact that defendants were forced to reveal the truth so soon after assuring investors that its projections encompassed everything they knew. Eddy's statement that "there's not a surprise here coming" was squarely contradicted by Hayes's acknowledgment, weeks later, that the revelation of the systemic turbine-disk manufacturing problem was "a bit of a surprise" to investors, A972, though not to defendants. As other courts have explained, where a defendant's statement is followed by a "momentous" and "close in time" corrective disclosure, the conclusion that those "statements were untrue is … a reasonable inference," particularly at the pleading stage. *City of Warren Police & Fire Ret. Sys. v. Prudential Fin., Inc.*, 70 F.4th 668, 693-94 (3d Cir. 2023).

In addition, investors made clear that they *did* feel misled by the 2023 statements after they learned the truth about the defect and defendants' knowledge of it. As one analyst report noted, RTX made "no mention nor contingency for this issue a month ago at its Paris Airshow briefing" even though it was "at that point a known potential issue, per company commentary." A163-164. Another analyst asked: "[H]ow could you guys possibly not know about this at Paris when you did this major investor event?" A163. Defendants seek to minimize this incredulity, emphasizing—again—that they had only determined that they needed a recall based on "recent learnings" and "findings." RTX Br. 41. But, again, when

defendants learned that there *would* be a recall is not the relevant question as long as they knew about a sufficiently material risk.

### B. The Omitted Information Was Material.

Defendants' failure to disclose the fact that both the Vietnam Airlines *and* Viva Aerobus engine failures were caused by a systemic manufacturing defect clears the low bar for materiality for the same reasons discussed above. Defendants nevertheless insist that the systemic manufacturing defect was *still* too trivial to disclose to investors because a "material financial impact" or a "materially expensive recall" was still not *certain*. *See* RTX Br. 38-39. That is not only legally wrong for the reasons explained in Part I, *supra*, but also exposes the absurdity of defendants' position. It is simply inconceivable that a "reasonable investor" would think that knowledge of a systemic manufacturing defect was "essentially useless," *Basic*, 485 U.S. at 231, even after it had caused two different airplane engines to rip apart at takeoff.

### C. The Complaint's Allegations, Taken as True, Establish a Strong Inference of Conscious Misbehavior or Recklessness.

For the reasons explained above and in the opening brief, the inference of scienter for the 2023 statements is at least as plausible as any innocent explanation. Opening Br. 37-41; pp. 16-21, *supra*. In addition to the 2021 scienter evidence, by spring of 2023 another engine, Viva Aerobus's Geared Turbofan engine, had exploded because of the same systemic defect that destroyed the first engine and

RTX had been going back and forth with the FAA, parceling out information about the cause of the engine explosions. A98, A101-102, A155. Moreover, defendants made the 2023 statements only weeks before disclosing the defect. As investors noted, common sense suggests that defendants' awareness of the significant risks to the company could not have materialized so quickly. A163-164.

The district court never explained why plaintiffs' scienter allegations were insufficient for the 2023 statements specifically. Opening Br. 60. And defendants simply ignore the fact that, by 2023, the systemic manufacturing defect they failed to disclose had led two engines to rip apart during takeoff, including a Geared Turbofan engine. Defendants argue that their exchanges with the FAA show that they were "acting within the ordinary standards of care for their industry." RTX Br. 53 (quoting A50). But the complaint alleges that RTX repeatedly misled the FAA and downplayed the defect, and that the FAA expanded the set of Geared Turbofan engines subject to inspection in March 2022 based on its own, and not defendants', determination. A89, A99, A136-137, A141-143, A148-150.

Defendants dispute the relevance of the short time between their 2023 statements and their disclosure of the recall, citing three cases where, according to defendants, courts dismissed securities claims for lack of scienter even when the disclosure occurred shortly after the alleged misstatement, RTX Br. 55-56 (citing *In re Target Corp. Sec. Litig.*, 955 F.3d 738, 745 (8th Cir. 2020), *Stratte-McClure*

*v. Morgan Stanley*, 776 F.3d 94, 107 (2d Cir. 2015), and *San Leandro*, 75 F.3d at 812-13). But none of those cases disputes that timing can be relevant to scienter. Here, timing simply confirms the numerous other allegations that support scienter: Defendants knew about the systemic defect, knew that defect had caused multiple engines to rip apart during takeoff, and knew the defect impacted much of the Geared Turbofan fleet—and yet said nothing about the defect to investors, even while reassuring investors that "our estimates today contemplate everything that we know about the engine," A196.

### D. Eddy's Statement Is Not Protected Opinion or a Forward-Looking Statement.

Defendants seek to defend Eddy's statement (but not Mitchill's) as a protected opinion and a forward-looking statement. RTX Br. 42-43. Both arguments fail.

First, Eddy's statement was not protected opinion because plaintiffs have alleged facts showing that Eddy did not actually believe there was "not a surprise here coming" and because he concealed information that would be material to an investor—the existence of the defect. Like Hayes (pp. 22-23, *supra*), Eddy knew about the defect, that it primed six years' worth of engines for failure, and that investors did not know that the defect even existed. The revelation of the defect—not the "recall," RTX Br. 42—was the costly "surprise" investors did not see

coming, even though Eddy did. His opinion, then, was not genuinely held and was materially misleading even if it was.

Second, Eddy's statement falls outside the safe harbor for forward-looking statements. His assurance that "there's not a surprise here coming" was not accompanied by any meaningful cautionary statements. Another RTX employee—not Eddy—made only boilerplate disclaimers when introducing a slate of speakers long before Eddy first spoke, and even then, only generally referred investors to "our SEC filings." A905, A931. That is insufficient. *See Slayton*, 604 F.3d at 772. And because Eddy made the statement with actual knowledge that it was misleading or false, he cannot avail himself of the safe harbor. Unsurprisingly, then, the district court did not adopt RTX's forward-looking-statement argument below. *See* A43-44.

## IV. The Court Should Reinstate the Derivative Section 20(a) Claims.

Because the Section 10(b) claims should be reinstated, the Court should reinstate plaintiffs' derivative 20(a) claims. Opening Br. 61.

## CONCLUSION

This Court should reverse the judgment of the district court.

Dated: May 19, 2026

Respectfully submitted,

*/s/ David Zimmer*

David Zimmer
ZIMMER, CITRON & CLARKE LLP
711 Atlantic Avenue
Boston, MA 02111
(617) 676-9421

Julia Solomon-Strauss
ZIMMER, CITRON & CLARKE LLP
14 Ridge Square NW, Suite 328
Washington, DC 20016
(202) 796-4540

Michael P. Canty
LABATON KELLER SUCHAROW LLP
140 Broadway
New York, NY 10005
(212) 907-0700

Lester R. Hooker
SAXENA WHITE P.A.
7777 Glades Road, Suite 300
Boca Raton, FL 33434
(561) 394-3399

Steven B. Singer
SAXENA WHITE P.A.
10 Bank Street, 8th Floor
White Plains, NY 10606
914-437-8551

*Counsel for Appellants*

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(b)(i) and Second Circuit Rule 32.1(4) because it contains 6,972 words, excluding those parts of the brief exempted by Federal Rule of Appellate Procedure 32(f). This brief complies with the typeface and type style requirements of Federal Rule of Appellate Procedure 32(a)(5) and 32(a)(6) because it has been prepared in a proportionately spaced typeface using Microsoft Word in Times New Roman, 14-point font for text and footnotes.

Dated: May 19, 2026

*_/s/ David Zimmer_*
David Zimmer

## CERTIFICATE OF SERVICE

I, David Zimmer, certify that, on this date, I electronically filed the foregoing document with the United States Court of Appeals for the Second Circuit by using the ACMS system. I certify that the counsel of record for Appellees will be served by the ACMS system.

Dated: May 19, 2026

*_/s/ David Zimmer_*
David Zimmer